# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARISELI GOMEZ (now known as MARISELI GOMEZ BELL), Individually, and on Behalf of All Others Similarly Situated, | ) ) ) |
| | ) 1:12-cv-1274 |
| Plaintiff, | ) |
| v. | ) Judge Thomas Durkin |
| | ) |
| PNC BANK, NATIONAL ASSOCIATION, a national banking association, | ) ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER AMENDED MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................1

II.   FACTUAL BACKGROUND .................................................................4

    A.   PNC's Organizational Structure ................................................4

    B.   PNC Has Written Policies Requiring Employees To Properly Record All Time Worked And To Pay Time And A Half For Overtime.................................6

        1.   Pursuant To PNC's Overtime Policy, It Has Paid Overtime At Every Branch In The Putative Class Every Year During The Class Period.......................................6

        2.   PNC Takes Regular Steps To Ensure Its Policies Are Understood And Followed .................................7

        3.   PNC's ER Ensures Strict Compliance With Its Policies And The Prompt Investigation Of Any Violations.......................................7

III.  ARGUMENT AGAINST CLASS CERTIFICATION .......................................9

    A.   Separate And Apart From The Requirements of Rule 23, Plaintiff Is Unable To Identify A Class At All.......................................9

    B.   Rule 23 Requirements Are Rigorous And Plaintiff Cannot Meet Them.............12

        1.   Plaintiff Cannot Show Numerosity Under Rule 23(a)(1).........................13

        2.   Plaintiff Cannot Show That She Will Fairly And Adequately Represent The Class's Interests Under Rule 23(a)(4) .............................15

            a.   Plaintiff Is Inadequate As A Class Representative Because She Is Dissimilar And Subject To Individualized Defenses ........15

            b.   Plaintiff's Inconsistent Testimony Makes Her An Inadequate Class Representative .................................18

        3.   Plaintiff Cannot Show Commonality Under Rule 23(a)(2).....................20

        4.   Plaintiff Cannot Show Typicality Under Rule 23(a)(3) .........................27

        5.   Plaintiff Cannot Demonstrate That Common Questions Of Law Or Fact Predominate As Required By Rule 23(b)(3) ...................28

        6.   Plaintiff Cannot Demonstrate That The Class Action Is Superior To Other Means Of Adjudication Under Rule 23(b)(3).......................30

IV.   ARGUMENT AGAINST CONDITIONAL CERTIFICATION ...................................31

    A.   Plaintiff Misconstrues The Applicable Legal Standard To Conditionally Certify A Class In This Case .................................31

    B.   Even Under The Most Lenient Standard, Plaintiff's Motion For Conditional Certification Still Fails.......................................32

# TABLE OF CONTENTS
(continued)

**Page**

C.     Under No Circumstance Is Plaintiff Entitled To Toll Putative Class
Members' Claims ................................................................................................. 35

V.     CONCLUSION ............................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott v. Lockheed,*
    725 F.3d 803 (7th Cir. 2013) ................................................................................. 11

*Allen v. Chi. Transit Auth.,*
    No. 99-7614, 2000 WL 1207408 (N.D. Ill. July 31, 2000) .................................... 27

*Am. Honda Motor Co. v. Allen,*
    600 F.3d 813 (7th Cir. 2010) ................................................................................. 12

*Amchem Prods., Inc. v. Windsor, Inc.,*
    521 U.S. 591 (1997) ......................................................................................... 15, 28

*Barvinchak v. Indiana Reg'l Med. Ctr.,*
    No. 3:2006-69, 2007 WL 2903911 (W.D. Pa. Sept. 28, 2007) ............................. 24

*Basco v. Wal-Mart Stores, Inc.,*
    No. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) ..................................... 23

*Bensman v. U.S. Forest Serv.,*
    408 F.3d 945 (7th Cir. 2005) ................................................................................. 36

*Bjornson v. Daido Metal U.S.A., Inc.,*
    12 F. Supp. 2d 837 (N.D. Ill. 1998) ...................................................................... 17

*Boelk v. AT&T Teleholdings, Inc.,*
    No. 12-cv-40-bbc, 2013 WL 261265 (W.D. Wis. Jan. 10, 2013) ............... 21, 31, 32

*Boelk v. AT&T Teleholdings, Inc.,*
    No. 12-cv-40-bbc, 2013 WL 3777251 (W.D. Wis. July 19, 2013) ........................ 24

*Bolden v. Walsh Constr. Co.,*
    688 F.3d 896 (7th Cir. 2012) ........................................................................... 22, 25

*Bond v. Nat'l City Bank of Pa.,*
    No. 05-0681, 2006 WL 1744474 (W.D. Pa. June 22, 2006) ................................. 34

*Brumbelow v. Quality Mills, Inc.,*
    462 F.2d 1324 (5th Cir. 1972) ............................................................................... 24

*Bunyan v. Spectrum Brands, Inc.,*
    No. 07-cv-0089-MJR, 2008 WL 2959932 (S.D. Ind. July 31, 2008) ............... 31, 34

iii

*Burk v. Contemporary Home Servs., Inc.*,
   No. C-06-1459-RSM, 2007 WL 2220279 (W.D. Wash. Aug. 1, 2007)................................17

*Butler v. Sears Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ..............................................................................................29

*Camilotes v. Resurrection Health Care Corp.*,
   286 F.R.D. 339 (N.D. Ill. 2012) .........................................................................................29

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) ..............................................................................................17

*Clarke ex rel. Pickard v. Ford Motor Co.*,
   228 F.R.D. 631 (E.D. Wis. 2005)........................................................................................27

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ........................................................................................................21

*Condo v. Sysco Corp.*,
   1 F.3d 599 (7th Cir. 1993) ..................................................................................................17

*Doe v. Guardian Life Ins. Co. of Am.*,
   145 F.R.D. 466 (N.D. Ill. 1992) .........................................................................................30

*Dotson v. Portfolio Recovery Assoc., LLC*,
   No. 08-3744, 2009 WL 1559813 (E.D. Pa. June 3, 2009) ..................................................18

*Doyel v. McDonald's Corp.*,
   No. 4:08-cv-1198 CAS, 2010 WL 3199685 (E.D. Mo. Aug. 12, 2010) ..............................30

*Driver v. AppleIllinois, LLC*,
   No. 06-6149, 2012 WL 689169 (N.D. Ill. Mar. 2, 2012) ....................................................26

*Duffin v. Exelon Corp.*,
   No. Civ A 06 C 1382, 2007 WL 845336 (N.D. Ill. Mar. 19, 2007) .......................................9

*Franks v. MKM Oil, Inc.*,
   No. 10-00013, 2012 WL 3903782 (N.D. Ill. Sept. 7, 2012) (Chang, J.) ..........................11, 29

*Gen. Tel. Co. of Nw., Inc. v. EEOC*,
   446 U.S. 318 (1980) ........................................................................................................13, 14

*Gomez v. St. Vincent Health, Inc.*,
   649 F.3d 583 (7th Cir. 2011) ..............................................................................................15

*Gonzales v. Hair Club for Men, Ltd.*,
   No. 6:06-cv-1762-Orl-28JGG, 2007 WL 1079291 (M.D. Fla. Apr. 9, 2007)......................33

*Gromek v. Big Lots, Inc.*,
No. 10-4070, 2010 WL 5313792 (N.D. Ill. Dec. 17, 2010) .................................................. 33

*Guillory v. Am. Tobacco Co.*,
No. 97-8641, 2001 WL 290603 (N.D. Ill. Mar. 20, 2001) ........................................................ 9

*Hadley v. Journal Broad. Grp., Inc.*,
No. 11-147, 2012 WL 523752 (E.D. Wis. Feb. 16, 2012) .................................................... 34

*Hawkins v. Alorica, Inc.*,
287 F.R.D. 431 (S.D. Ind. 2012) .................................................................................... 22, 32

*Haynes v. Tru-Green Corp.*,
154 Ill. App. 3d 967, 507 N.E.2d 945 (Ill. App. 4th Dist. 1987) .......................................... 17

*Healy v. IBEW Local Union No. 134*,
--- F.R.D. ----, 2013 WL 4494685 (N.D. Ill. Aug. 22, 2013) ................................................ 29

*Hinojos v. Home Depot, Inc.*,
No. 06-00108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) .............................................. 23, 33

*Hoffman-LaRoche, Inc. v. Sperling*,
493 U.S. 165 (1989) ........................................................................................................ 35

*Horne v. United Servs. Auto. Ass'n*,
279 F. Supp. 2d 1231 (M.D. Ala. 2003) ............................................................................ 35

*House of Clean, Inc. v. St. Paul Fire &Marine Ins. Co., Inc.*,
775 F. Supp. 2d 302 (D. Mass. 2011) ............................................................................... 19

*Howard v. Ray's LLC*,
No. 1:08-CV-627-RLY-MJD, 2011 WL 4625735 (S.D. Ind. Sept. 30, 2011) ...................... 18

*Humphrey v. Int'l Paper*,
No. 02-4147, 2003 WL 22111093 (N.D. Ill. Sept. 11, 2003) ....................................... 9, 10, 11

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ............................................................................................ 15

*In re AutoZone, Inc., Wage & Hour Emp't Practices Litig.*,
289 F.R.D. 526 (N.D. Cal. 2012) ...................................................................................... 22

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) .............................................................................................. 28

*Jamie S. v. Milwaukee Pub. Schs.*,
668 F.3d 481 (7th Cir. 2012) ............................................................................................ 23

*Jamison v. First Credit Servs., Inc.*,
 290 F.R.D. 92 (N.D. Ill. 2013) ......................................................................... 11

*Johnson v. Pinstripes, Inc.*,
 No. 12-1018, 2013 WL 5408657 (N.D. Ill. Sept. 26, 2013) .................................... 29

*Kaplan v. Pomerantz*,
 132 F.R.D. 504 (N.D. Ill. 1990) ....................................................................... 18

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
 634 F.3d 883 (7th Cir. 2011) ........................................................................... 12

*Kellar v. Summit Seating Inc.*,
 664 F.3d 169 (7th Cir. 2011) ........................................................................... 24

*Lilly v. Ford Motor Co.*,
 No. 00-7372, 2002 WL 507126 (N.D. Ill. Apr. 3, 2002) ........................................ 30

*Marcial v. Coronet Ins. Co.*,
 880 F.2d 954 (7th Cir. 1989) ........................................................................... 13

*McLaughlin v. Richland Shoes Co.*,
 486 U.S. 128 (1988) ...................................................................................... 36

*McManus v. Sturm Foods Inc.*,
 292 F.R.D. 606 (S.D. Ill. 2013) ....................................................................... 11

*Messner v. Northshore Univ., HealthSystem*,
 669 F.3d 802 (7th Cir. 2012) ........................................................................... 12

*Mungia v. Tony Rizza Oldsmobile, Inc.*,
 No. 01-460, 2001 WL 1104635 (N.D. Ill. Sept. 19, 2001) ..................................... 13

*Newton v. City of Henderson*,
 47 F.3d 746 (5th Cir. 1995) ............................................................................ 24

*Northside Chiropractic, Inc. v. Yellowbook, Inc.*,
 No. 09-4468, 2012 WL 3777010 (N.D. Ill. Aug. 29, 2012) .................................... 11

*Oplchenski v. Parfums Givenchy, Inc.*,
 254 F.R.D. 489 (N.D. Ill. 2008) ....................................................................... 31

*Oshana v. The Coca-Cola Co.*,
 225 F.R.D. 575 (N.D. Ill. 2005) ....................................................................... 11

*Panzirer v. Wolf*,
 663 F.2d 365 (2d Cir. 1981) ............................................................................ 18

*Pastor v. State Farm Mut. Auto. Ins. Co.,*
No. 05-1459, 2005 WL 2453900 (N.D. Ill. Sept. 30, 2005), *aff'd*, 487 F.3d 1042 (7th Cir. 2007) ................................................................................................................. 11

*Pfaahler v. Consultants for Architects, Inc.,*
No. 99-6700, 2000 WL 198888 (N.D. Ill. Feb. 8, 2000) ......................................... 34

*Pfeil v. Rogers,*
757 F.2d 850 (7th Cir. 1985) .................................................................................. 19

*Powers v. Centennial Commc'ns Corp.,*
No. 1:08–cv–208–PPS, 2010 WL 746776 (N.D. Ind. Feb. 26, 2010) .................... 37

*Pruitt v. City of Chicago,*
472 F.3d 925 (7th Cir. 2006) .................................................................................. 14

*Radmanovich v. Combined Ins. Co. of Am.,*
216 F.R.D. 424 (N.D. Ill. 2003) ............................................................................. 31

*Randall v. Rolls-Royce Corp.,*
637 F.3d 818 (7th Cir. 2011) .................................................................................. 15

*Roach v. T.L. Cannon Corp.,*
No. 10-0591, 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013) .................................. 28

*Robinson v. Dolgencorp, Inc.,*
No. 06-122, 2006 WL 3360944 (M.D. Fla. Nov. 13, 2006) .................................... 23

*Robinson v. Sheriff of Cook Co.,*
167 F.3d 1155 (7th Cir. 1999) ................................................................................ 15

*Rodriguez-Laboy v. R &R Eng'g Prods.,*
Civ. A. No. 03-1367 (DRD), 2006 WL 852086 (D.P.R. Mar. 30, 2006) ............... 19

*Ross v. RBS Citizens, N.A.,*
667 F.3d 900 (7th Cir. 2012) .................................................................................. 21

*Ross v. RBS Citizens, N.A.,*
No. 09-5695, 2010 WL 3980113 (N.D. Ill. Oct. 8, 2010), *aff'd*, 667 F.3d 900 (7th Cir. 2012) ................................................................................................................... 21

*Ruiz v. Serco, Inc.,*
No. 10-cv-394-bbc, 2011 WL 7138732 (W.D. Wis. Aug. 5, 2011) ....................... 33

*Ruiz v. Stewart Assocs., Inc.,*
167 F.R.D. 402 (N.D. Ill. 1996) ............................................................................. 27

*Saleen v. Waste Mgmt., Inc.*,
No. 08-4959, 2009 WL 1664451 (D. Minn. June 15, 2009) ................................................33

*Salinas v. O'Reilly Auto., Inc.*,
No. 3: 04-CV-1861-B, 2005 WL 3783598 (N.D. Tex. Nov. 17, 2005) ...............................34

*Savino v. Computer Credit, Inc.*,
164 F.3d 81 (2d Cir. 1998) ..............................................................................................18

*Schultz v. Am. Family Ins. Co.*,
No. 04-5512, 2005 WL 5909003 (N.D. Ill. Nov. 1, 2005)...............................................36

*Scott v. NOW Courier, Inc.*,
No. 10-cv-971-SEB-TAB, 2012 WL 1072751 (S.D. Ind. Mar. 29, 2012)............................31

*Slayton v. Iowa Coll. Acquisition Corp.*,
No. 09-6977, 2010 WL 3937455 (N.D. Ill. Oct. 5, 2010)...............................................22

*Smith v. Family Video Movie Club, Inc.*,
No. 11 CV 1773, 2013 WL 1628176 (N.D. Ill. Apr. 15, 2013) ..........................12, 22, 28, 29

*Smith v. Potter*,
445 F.3d 1000 (7th Cir. 2006) ........................................................................................36

*Spano v. The Boeing Co.*,
633 F.3d 574 (7th Cir. 2011) .............................................................................................9

*Stolarczyk v. Senator Int'l Freight Forwarding, LLC*,
376 F. Supp. 2d 834 (N.D. Ill. 2005).............................................................................19

*Strait v. Belcan Eng'g Grp. Inc.*,
911 F. Supp. 2d 709 (N.D. Ill. 2012)..............................................................................31

*Syrja v. Westat*,
No. PJM 09-1956, 1956 WL 95230 (D. Md. Nov. 2, 2010) ...........................................36

*Thola v. City of Liberty Lake*,
No. 12-cv-0452-TOR, 2013 WL 5138943 (E.D. Wash. Sept. 13, 2013) ..............................24

*Thompson v. Speedway SuperAmerica LLC*,
No. 08-cv-1107, 2009 WL 130069 (D. Minn. Jan. 20, 2009) .........................................32

*Thorogood v. Sears, Roebuck & Co.*,
547 F.3d 742 (7th Cir. 2008) ........................................................................................12

*Valentino v. Howlett*,
528 F.2d 975 (7th Cir. 1976) ........................................................................................13

*Vang v. Kohler Co.*,
488 F. App'x 146 (7th Cir. 2012)........................................................................21

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*,
274 F.R.D. 229 (S.D. Ill. 2011).........................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ...............................................................................passim

*Walker v. Bankers Life & Cas. Co.*,
No. 06-6906, 2008 WL 2883614 (N.D. Ill. July 28, 2008)...................................31

*Walsh Chiropractic, Ltd. v. StrataCare, Inc.*,
No. 09-cv- 1061-MJR, 2011 WL 4336727 (S.D. Ill. Sept. 14, 2011)....................31

*West v. Border Foods, Inc.*,
No. 05-2525, 2006 WL 1892527 (D. Minn. July 10, 2006)............................23, 33

*York v. Starbucks Corp.*,
No. 08-7919-GAF, 2011 WL 8199987 (C.D. Cal. Nov. 23, 2011)........................23

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) ...........................................................................30

**STATUTES**

820 Ill. Comp. Stat.........................................................................................24

29 U.S.C. §§ 207, 213 ....................................................................................17

29 U.S.C. § 255(a) .........................................................................................36

Fair Labor Standards Act ("FLSA").................................................................17

FLSA ......................................................................................................passim

**OTHER AUTHORITIES**

29 C.F.R. § 541.100, 200................................................................................17

Ill. Admin. Code tit. 56, pt. 210.120 (2009) ("Illinois Administrative Code")............17

Rule 23..................................................................................................passim

Rule 23(a) ...............................................................................9, 12, 20, 28

Rule 23(a)(1) .................................................................................13, 14

Rule 23(a)(2)..................................................................................20, 22

Rule 23(a)(3).........................................................................................................................27

Rule 23(a)(4).........................................................................................................................15

Rule 23(b).............................................................................................................................9

Rule 23(b)(3) .................................................................................................................passim

I.  **INTRODUCTION**

This case is simple, and involves the actions of one Plaintiff who was misled by her supervisor.  That Plaintiff, Mariseli Gomez Bell, was an overtime-eligible, salaried employee who voluntarily took on managerial responsibilities above and beyond her job title.  Plaintiff's branch manager ("BM"), Ms. Flores-Poole, misled her into believing this would lead to a managerial position.  When that promotion did not materialize, Plaintiff complained to PNC that she was not paid for all hours worked.  PNC promptly investigated Plaintiff's complaint.  When the investigation revealed that Ms. Flores-Poole violated PNC's policies by requiring Plaintiff to work off-the-clock, PNC promptly terminated Ms. Flores-Poole's employment.  PNC also paid Plaintiff 68.15 hours for all unpaid hours worked.

Despite PNC's actions, Plaintiff remained disappointed that she was not promoted and resigned for what she described as a better opportunity.  Prior to resigning, Plaintiff never told PNC that its investigation was deficient, or that she was owed additional pay for overtime.  Rather, Plaintiff agreed that PNC paid her for all hours that she was owed and said she was satisfied.

Months later, however, Plaintiff filed suit.  Plaintiff seeks relief not just for herself, but for an _entire_ class of non-exempt employees in Illinois.  The members of this putative class, however, lack any commonality with each other for purposes of a class action.  The class members work in different branch locations for different BMs under different work conditions.  They also have different job titles with different job duties.  Yet, Plaintiff baldly claims that the entire putative class was subject to an "unofficial policy" that required off-the-clock work and that PNC's investigations into unpaid work were deficient.  Plaintiff, however, has no personal

knowledge to support her broad-based claims, and appears to be merely reacting to her negative relationship with Ms. Flores-Poole.

In search of a theory to substantiate her class-wide allegations, Plaintiff has changed her class definition multiple times during discovery.[1] Left with a putative class that cannot be identified, Plaintiff now attempts to mislead the Court in several ways. First, Plaintiff suggests that there was a directive from "top management" and "PNC Bank" not to pay overtime, but Plaintiff does not describe what that directive was, who made it, or when and how it was uniformly implemented. Second, Plaintiff tries to create the false impression that today there are many PNC employees who performed off-the-clock work for which they have not yet been paid.[2] Discovery, however, has revealed just the opposite.

For example, PNC has written policies that prohibit unpaid overtime and off-the-clock work, and maintains strict compliance with its policies. It provides numerous ways for employees to openly or anonymously report any policy violation, and promptly investigates any

---

[1] Plaintiff originally sought to certify a class (Dkt. No. 4) of all non-exempt Illinois employees (excluding Mortgage Loan Officers and Judicial Officers) who were subject to PNC's allegedly unlawful overtime policies and are owed unpaid overtime. Faced with a record that did not substantiate her class-wide allegations and no additional opt-ins, Plaintiff sought more discovery and to amend her Complaint. Plaintiff then proposed a new class theory based on a "more precise and smaller class definition" of all non-exempt Illinois employees (same exclusion) who were owed unpaid overtime and who were "subject[s] of inquiry by PNC Bank's Employee Relations Department in connection with possible unpaid overtime or off-the-clock hours." (Dkt. No. 27, 27-3.) To avoid any unfavorable decision the Court may have rendered on her motion, Plaintiff's counsel preemptively filed an identical case (Case No. 1:13:cv:0095), this time naming Ernest Ward as a Class Representative, with the same class definition (Dkt. No. 1) that Plaintiff sought leave to file in this case. After both cases were reassigned to this Court and consolidated, this Court ordered that the parties file supplemental briefing (Dkt. No. 48 and No. 49) on Plaintiff's motion. (Dkt. No. 27.) Thereafter, Mr. Ward, who had previously filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois, became precluded from prosecuting his claims because the Bankruptcy Court denied his Motion for Relief from an Automatic Stay (Dkt. No. 52). Thus, Plaintiff was left in the same position that she was in before, a lone class representative with an evolving class theory of liability that remained unsubstantiated.

[2] Plaintiff egregiously misstates the record. To illustrate Plaintiff's blatant mischaracterization of the facts, Exhibit H to the Declaration of Ms. Margaret Alvarez ("Alvarez Decl.") is a chart that compares Plaintiff's allegations, and the corresponding pages of Plaintiff's Appendix that allegedly support them (left column), with the actual facts surrounding PNC's investigation into each allegation (right column). *Id.* Many of Plaintiff's allegations are directly contradicted by the very facts and documents that she cites in support of them. *Id.* To the extent information about each investigation was not contained in Plaintiff's Appendix, it is provided in Ms. Alvarez's Declaration. Alvarez Decl. ¶¶ 44-52. That said, the evidence Plaintiff presents, irrespective of its truth, reiterates that this case is unsuitable for class or collective treatment.

alleged violation to ensure that all employees are paid for all hours worked, including overtime. Finally, PNC appropriately disciplines any employee for failure to comply with its policies.

To that end, PNC produced <u>all</u> of its investigation reports into any direct or indirect complaints of unpaid overtime by PNC's Employee Relations Information Center ("ERIC") in Illinois from February 22, 2009 until August 15, 2013. Only 22 of approximately 216 branches had any complaints. Rather than demonstrating a common unlawful thread, each investigation revealed highly individualized issues stemming from either a rogue employee or BM violating PNC's policies. More importantly, PNC fully paid all employees who were owed money for off-the-clock work. Indeed, the adequacy of PNC's investigations is affirmed by the fact that, in almost two years, only *one* other individual has opted into this lawsuit. Yet, Plaintiff now asserts that PNC spends countless hours and resources investigating alleged policy violations, only then not to enforce those very policies and deliberately underpay its employees.

Now, after discovery has closed, Plaintiff has, yet again, changed her class definition in this motion to include all non-exempt employees in each of the branches in the putative class where PNC has allegedly investigated claims for off-the-clock work.[3] Plaintiff's overly broad class includes employees irrespective of whether they suffered an injury, currently believe that they are owed overtime, and/or were subject to an investigation. The factual record, however, fails to support that this case is suitable for class or collective treatment under this theory or any other class definition.

---

[3] By Plaintiff's own accord, five of these 27 branches (North & Homan, Carpentersville, 35th & State, Madison & Leavitt, and Lincoln Park) did not even involve an allegation of unpaid overtime or any other off-the-clock work. Alvarez Decl., Ex. H.

## II.    FACTUAL BACKGROUND

### A.    PNC's Organizational Structure.

PNC is a national banking association that has employed approximately 4,800 non-exempt employees across 216 branches in Illinois since February 2009.[4]  *See* Declaration of Margaret Alvarez ("Alvarez Decl.") ¶ 4.  PNC has employed around 600 non-exempt employees at the branches in the putative class since January 1, 2009.  *Id*. ¶ 5.  PNC generally employs up to eight different types of non-exempt branch employees who report to the BM, including a Teller, Teller Supervisor, Retail Bank Development Associate, Licensed Branch Financial Sales Consultant ("LBFSC"), Financial Sales Consultant ("FSC"), Financial Specialist, Customer Service Associate (Sales/Service), and Customer Sales Associate (Switcher).[5]  *Id*. ¶ 6.  Further, there are gradations within each position based on experience.  *Id*.  Each type of non-exempt employee has different job duties.  *Id*. ¶ 7.  For example, Tellers and Teller Supervisors are generally referred to as "non-platform" employees whose primary responsibility is to service customers' withdrawals and deposits from the teller line.  *Id*.  Non-platform employees rarely, if ever, work outside the branch.  *Id*.  Conversely, FSCs and LBFSCs are called "platform employees."  *Id*.  Platform employees work away from the teller line in cubicles or at desks and are primarily responsible for opening accounts.  *Id*.  Because only FSCs and LBFSCs open accounts, they are the only non-exempt employees that are permitted, when needed, to work away from the branch at a Workplace Banking ("WB") event with their BM's approval.[6]  *Id*.

---

[4] Throughout this brief, the number of non-exempt employees cited excludes Mortgage Loan Officers.

[5] Some branches also have an Assistant Branch Manager ("ABM") who is an exempt employee.  Alvarez Decl. ¶ 6.

[6] The PNC WB program is managed by Business Development Officers ("BDOs") and divided into different regions.  Alvarez Decl. ¶ 8.  The purpose of WB events is to provide information about PNC banking opportunities to new customers and open new accounts.  *Id*.  The number of WB events that PNC holds varies depending on anticipated opportunities and results.  *Id*.  PNC employs Workplace Banking Financial Sales Consultants ("WBFSCs"), a distinct position from FSCs, solely for the purpose of working at WB events.  *Id*.  Typically, a WB

Although each branch has a BM, a Teller Supervisor, and a Teller, the number employees in these positions varies based on a particular branch's transaction volume and hours. *Id.* ¶ 10. During the class period, PNC's Illinois branches have had as few as two and as many as ten full time, non-exempt employees. *Id.*

Not all non-exempt branch employees report to the BM. *Id.* ¶ 11. For example, Business Banking Officers, Workplace Banking Financial Sales Consultants ("WBFSCs"), Financial Specialists, Financial Advisors (FAs), and members of the Private Client Group may have a work station within a branch but all report to specific team leaders and/or Regional Managers ("RMs"). *Id.*

Above the branch level, PNC Retail Banking is divided into regions and markets.[7] *Id.* ¶ 12. Under this structure, there are six levels of management above a BM.[8] *Id.* ¶ 13. In contrast, non-exempt employees that do not report directly to the BMs do not have the same management structure.[9] *Id.* ¶ 14.

---

event is staffed solely by the BDO in charge of the region and his or her assigned WBFSCs. *Id.* FSCs work at a WB event only if a BDO determined that he or she needs additional assistance beyond the WBFSCs. *Id.* From February 22, 2009 to October 1, 2013, at least one FSC from each branch in the putative class participated in at least one WB event. *Id.* ¶ 9. That said, the number of WB events in which branch FSCs were asked to participate varied greatly from branch to branch. *Id.* For example, since July 2011, FSCs from the Orland Park West branch have assisted at three WB events, while FSCs from the 35th & State Street branch and the State & Huron branch have assisted at 35 and 86 WB events, respectively. *Id.* All WBFSCs and FSCs must strictly adhere to PNC's Overtime Policy and Travel Time Policy for Non-Exempt Retail Employees, and their time away from the branch counts as hours worked. *Id.*

[7] The State of Illinois is composed of two markets, the Chicago/Wisconsin market and the downstate Illinois market. Alvarez Decl. ¶ 12. The Chicago/Wisconsin market has nine regions with approximately fifteen to sixteen branches in each region. *Id.* The downstate Illinois market is considerably smaller and has only two regions with approximately fifteen to sixteen branches each. *Id.*

[8] BMs report to RMs, RMs report to Market Managers, Market Managers report to Territory Managers, Territory Managers report to the Head of Retail Distribution, the Head of Retail Distribution reports to the Head of PNC's Retail Bank, and the Head of the Retail Bank reports to PNC's CEO and President. Alvarez Decl. ¶ 13.

[9] These employees are part of PNC Mortgage or PNC Investment Banking. The PNC Mortgage and PNC Investment Banking divisions both report to the Head of PNC's Retail Bank. Alvarez Decl. ¶ 14.

**B.      PNC Has Written Policies Requiring Employees To Properly Record All Time Worked And To Pay Time And A Half For Overtime.**

During the entire class period, PNC has had a written Hours of Work ("HOW") Policy that explicitly requires all employees to work according to their assigned work schedules, to record all their time worked on a daily basis, and to be paid for all hours that they worked.  *See* APX 166-72, 76-78 at 56:18-57:10, 62:8-17; Alvarez Decl. ¶ 16.  PNC also has had a written Overtime Policy that explicitly requires payment of time and a half for any time worked over 40 in any workweek.[10]  *See* APX 162-166, 76-78 at 56:18-57:10, 62:8-17; Alvarez Decl. ¶ 17.  PNC's Code of Business Conduct and Ethics contained within the Employee Handbook also prohibits falsification of time records.[11] *See* APX 162; Alvarez Decl. ¶ 18.

**1.      Pursuant To PNC's Overtime Policy, It Has Paid Overtime At Every Branch In The Putative Class Every Year During The Class Period.**

Consistent with PNC's Overtime Policy, PNC has paid overtime to non-exempt branch employees at every branch in the putative class during each year from 2009 to October 2013 for a total of $432,290.85 for approximately 17,673 hours of overtime.  Alvarez Decl. ¶ 20.  The amount of overtime PNC paid has varied from branch to branch and within each branch depending on the needs of each branch, the year, and the job position.  Alvarez Decl. ¶ 21.  This variation is expected given the multitude of individualized factors that affect whether an employee would need to work overtime.  *Id.*  Some of these variables include whether a branch has Saturday hours (two of the twenty-seven do not), whether the branch has extended drive up hours (nine of the twenty-seven do not), location of branch, high customer volume, the number

---

[10]  All overtime, including overtime paid as the result of all ER investigations, was paid at time and a half.  Alvarez Decl. ¶ 20.

[11]  During the entire class period, PNC has also had a Travel Time Policy for Non-Exempt Retail Employees that requires payment for all approved travel time and mileage to and from training sessions and meetings, and that their time away from the branches counts as hours worked.  *See* APX135-175; Alvarez Decl. ¶ 19.

of employees on leave, the unanticipated absence of a non-exempt employee, a late-day customer account opening, or teller shortages from counting and balancing the Teller's cash drawers each night.  *Id.*

## 2. PNC Takes Regular Steps To Ensure Its Policies Are Understood And Followed.

PNC requires all of its non-exempt branch employees in Illinois, including Plaintiff, to sign a document affirming each employee's understanding that he or she must strictly adhere to PNC's Overtime Policy, without exception, in compliance with federal and state law.  Alvarez Decl. ¶ 23, Ex. A.  PNC also has each of its policies readily available online, including FAQs for non-exempt employees, to ensure understanding and compliance.  Alvarez Decl. ¶ 24, Ex. B.

For low-level managers, like BMs, PNC provides online guidelines, to-do lists, FAQs, and training modules to ensure that they understand and comply with wage and hour laws, and know how to handle related policy violations.  Alvarez Decl. ¶ 24; Ex. C.  PNC explicitly communicates these policies to its Illinois BMs, reminding them of state and federal overtime obligations and meal and rest break requirements under Illinois law.  Alvarez Decl. ¶ 24, Ex. D. PNC also routinely conducts (in person) wage & hour training seminars.[12]  Alvarez Decl. ¶ 25.

## 3. PNC's ER Ensures Strict Compliance With Its Policies And The Prompt Investigation Of Any Violations.

ERIC is one of the ways by which PNC ensures that all employees strictly comply with all of its policies.[13]  Alvarez Decl. ¶ 26.  Because PNC's Employee Relations ("ER")

---

[12] For example, in 2012 alone, PNC's in-house counsel conducted wage & hour training for BMs in Illinois, and BMs attended a training called, "Managing Human Capital Risk" conducted by Human Resources ("HR") and Employee Relations ("ER").  Alvarez Decl. ¶ 25.  In 2012 and 2013, ER, the Market Operations Manager, the HR Business Partner, and the Market Administrative Manager attended multiple meetings with each of the BMs in Illinois to discuss various topics, including the payment of overtime.  *Id.*

[13] ER has 26 Investigators, including two full-time Illinois-specific Investigators, one of whom is Ms. Margaret Alvarez, plus Consultants and Specialists, who investigate complaints received by ERIC.  Alvarez Decl. ¶ 26.

Investigators are qualified professionals and every investigation is inherently different, PNC does not require them to be tied to a specific procedural manual or protocol for conducting investigations.  *Id.* ¶ 30; APX103 at 46:4 to 47:19.  Rather, PNC's ER Investigators have considerable discretion in how to conduct an investigation.  Alvarez Decl. ¶ 30.  ER Investigators' goal is to ensure that any violations of PNC's policies are promptly addressed and that all employees are paid for all hours worked.  *Id.* ¶ 29.

PNC's Overtime Policy requires supervisors, including BMs, to "contact ERIC if a policy violation occurs . . . including not getting prior approval to work overtime, working off-the-clock, and not reporting overtime."  APX162-166.  Complaints also come from employees either anonymously reporting through PNC's Code of Business Conduct and Ethics hotline or reporting directly to their manager, ERIC, or PNC's Corporate Ethics Office.  Alvarez Decl. ¶ 28; *see also* APX99 at 31:3-33:18.  PNC's policies and its reporting compliance measures work.  Indeed, PNC investigated allegations surrounding Ms. Flores-Poole's conduct because of a complaint filed with ERIC.  Alvarez Decl. ¶ 28.

Most employees abide by PNC's policies, and any violation is an exception.  *Id.* ¶ 27. Indeed, only 22 of approximately 216 branches in Illinois had allegations of off-the-clock work. *Id.*  Moreover, of these branches investigated, some branches only had a single reported complaint of off-the-clock work in 2010 and none thereafter.  *Id.*; APX154-158.  Finally, at many branches where complaints were alleged, PNC's investigation revealed there were no off-the-clock issues.  Alvarez Decl. ¶ 27; APX154-158.

While each investigation was and is individualized, each one revealed that any off-the-clock work was due to either a rogue employee or BM violating PNC's policies in different ways.  Alvarez Decl. ¶ 33.  As a result of each investigation, PNC not only fully paid every

employee who was owed money for off-the-clock work, but also appropriately disciplined every

delinquent BM or employee for any policy violation, including Ms. Flores-Poole. *Id*. ¶ 34.

## III. ARGUMENT AGAINST CLASS CERTIFICATION

### A. Separate And Apart From The Requirements of Rule 23, Plaintiff Is Unable To Identify A Class At All.

"There are two implied prerequisites to class certification that must be satisfied prior to

addressing the issues raised by Rule 23(a).[14] First, the class must be sufficiently defined so that

the class is identifiable . . . [so] that a Court can determine whether a particular individual is a

member of the proposed class." *Humphrey v. Int'l Paper*, No. 02-4147, 2003 WL 22111093, at

*4 (N.D. Ill. Sept. 11, 2003) (quoting *Guillory v. Am. Tobacco Co.*, No. 97-8641, 2001 WL

290603, at *2 (N.D. Ill. Mar. 20, 2001)).[15] "However, the description must not be so broad as to

include individuals who are without standing to maintain the action on their own behalf." *Id*.

*Guillory*, 2001 WL 290603, at *2 (citation omitted); *Duffin v. Exelon Corp.*, No. Civ A 06 C

---

[14] To be certified under Rule 23(a), a proposed class must satisfy each of the rule's four requirements: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). If Rule 23(a) is satisfied, the proposed class must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because the risk that the class action adjudication would, as a practical matter, either dispose of the claims of nonparties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. The Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011). Plaintiff seeks to certify this action as a Rule 23(b)(3) class.

[15] In *Humphrey*, the court denied the plaintiff's motion for class certification on the grounds that the proposed class definition was overbroad. The Court stated:

> The proposed classes are untethered to any of the alleged misconduct by the defendants that forms the basis of this lawsuit. The proposed classes would include every African–American employee of International Paper's Chicago facility . . . during a certain time period, without reference to the conduct of the defendants that plaintiffs say violated their rights, and without reference to whether the proposed class members experienced that conduct. The Seventh Circuit has stated that the scope of a class may be defined by reference to the defendants' alleged misconduct. Here, that kind of point of reference is particularly important, since the plaintiffs allege varying types of discriminatory conduct that—if proved—would not invariably extend to every named plaintiff or to every African–American employee of the Chicago facility. 2003 WL 22111093, at *4 (internal citations omitted).

1382, 2007 WL 845336, at *3-4 (N.D. Ill. Mar. 19, 2007) (stating "[o]verbroad class descriptions violate the definiteness requirement because they 'include individuals who are without standing to maintain the action on their own behalf'" and denying class certification where plaintiff's class definition was "plainly overbroad" because the class was not limited to individuals who actually suffered harm) (quoting *Oshana v. The Coca-Cola Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005)). "Second, 'the named representatives must fall within the proposed class.'" *Humphrey*, 2003 WL 22111093, at *4 (quoting Guillory, 2001 WL 290603, at *2). In other words, "'[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Id.* (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

Here, Plaintiff's latest class definition fails both of these requirements. Plaintiff's definition purports to encompass all non-exempt employees at 27 branches under different working conditions. This class includes employees who (1) never performed off-the-clock work and suffered no injury, or (2) were injured, but have been made whole as the result of a PNC investigation. Indeed, only *one* person, Tess Claveria, has opted-into this lawsuit in two years.[16]

---

[16]Ms. Claveria opted into this lawsuit on January 23, 2013. (Dkt. No. 44.) Ms. Claveria is dissimilar from the putative class for several reasons. First, she is distinctly situated because she was a Teller Supervisor at Plaintiff's branch. Alvarez Decl. ¶ 38. Thus, unlike Plaintiff and Mr. Ward, she was not a platform employee and did not participate in off-site work. *Id.* Rather, her primary focus was to supervise the other Tellers and perform Teller duties. *Id.* As to her claim that she was owed 73 hours of unpaid overtime, PNC thoroughly and promptly investigated her claim. *Id.* PNC's investigation revealed that Ms. Claveria provided inconsistent statements and inflated the amount of time she allegedly worked. *Id.* PNC obtained the Teller electronic journals, alarm codes, log-in and log-out reports from payroll, and payroll reports for the dates Ms. Claveria reported unpaid overtime or missed meal periods. *Id.* Consequently, PNC confirmed that Ms. Claveria was owed 8.02 overtime hours and promptly paid her. *Id.* Further, Ms. Claveria told Ms. Alvarez that she was content with her payment at the close of her investigation. *Id.* Lastly, almost two years after PNC paid Ms. Claveria for all unpaid overtime, PNC placed her on administrative leave on December 26, 2012 to investigate whether she entered false information that enabled her to receive credit for unearned referrals and/or unearned incentive pay. *Id.* ¶ 39. As a result of her misconduct and her dishonesty during the investigation, PNC discharged Ms. Claveria on February 14, 2013. *Id.* It was only after she knew she was under investigation that she opted-in to this lawsuit. *See* (Dkt. No. 44.) Ms. Claveria's dissimilarity to the putative class and her credibility issues further exemplify the myriad of individualized inquiries, issues, and defenses that this Court would have to give each and every putative class member to determine if he or she is owed unpaid overtime.

Further, no other employee, besides Mr. Ward and Ms. Claveria, who PNC has paid as the result of an investigation into allegations of unpaid overtime, has come forward to seek more money. Thus, even if Plaintiff's allegations were proved, they would impermissibly exclude most, if not all, of the class. *See e.g.*, *Humphrey*, 2003 WL 22111093, at *3-4. Therefore, Plaintiff's putative class definition is overbroad and inappropriate because it is untethered to any alleged misconduct of PNC. *See e.g.*, *McManus v. Sturm Foods Inc.*, 292 F.R.D. 606, 610, 615 (S.D. Ill. 2013) (denying class certification because the class definition included individuals who were not harmed by the defendant's conduct).

Plaintiff also cannot show that she has suffered the same injury as the broad swath of employees she seeks to represent given that many of them have suffered no injury whatsoever and/or were not even subject to PNC's allegedly deficient investigation process.[17] *See, Abbott v. Lockheed*, 725 F.3d 803, 814 (7th Cir. 2013) (the class was appropriately limited to plan participants who invested in an allegedly misinvested fund during the class period, and it was further narrowed "to exclude from the class any persons who did not experience injury").

---

[17] Alternatively, even if Plaintiff claims her entire class is aggrieved because each putative member is owed overtime, the size of that class would not be ascertainable. The Seventh Circuit requires a class or subclass to be "ascertainable." *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). "To be ascertainable, a class must be identifiable as a class and membership within it must be determined by application of precise, objective criteria." *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 108 (N.D. Ill. 2013) (internal quotation marks omitted); *see also Franks v. MKM Oil, Inc.*, No. 10-00013, 2012 WL 3903782, at *7 (N.D. Ill. Sept. 7, 2012) (Chang, J.) (finding class not ascertainable where "identifying the class would be tremendously burdensome"). If it is necessary to engage in a person-by-person analysis to determine who falls within a proposed class, as is the case where the class definition incorporates a central issue of liability, the composition of the class cannot be ascertained through reasonable effort and class certification must be denied. *See e.g.*, *Northside Chiropractic, Inc. v. Yellowbook, Inc.*, No. 09-4468, 2012 WL 3777010, at *5 (N.D. Ill. Aug. 29, 2012) (denying class certification because class definition limited to customers who were denied "appropriate compensation" was "a redflag" in that "a ruling on the merits is being used to determine the scope of the class"); *Pastor v. State Farm Mut. Auto. Ins. Co.*, No. 05-1459, 2005 WL 2453900, at *2 (N.D. Ill. Sept. 30, 2005), *aff'd*, 487 F.3d 1042 (7th Cir. 2007) ("If the court is required to conduct individual inquiries to determine whether each potential class member falls within the class, the court should deny certification.") (citation omitted). Here, because Plaintiff cannot avoid the fact that, even if she qualifies her class as those who are owed unpaid overtime, this Court would have to impermissibly engage in a person-by-person analysis (in effect, mini hearings on the merits) to determine who falls within such class.

**B.**     **Rule 23 Requirements Are Rigorous And Plaintiff Cannot Meet Them.**

Here, even if Plaintiff met the initial prerequisites to certify her proposed class, Plaintiff does not meet the rigorous requirements of Federal Rule of Civil Procedure 23 ("Rule 23"). *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (stating certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied") (citation omitted). Indeed, the Seventh Circuit has directed district courts to exercise "caution in class certification generally." *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir. 2008). "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 131 S. Ct. at 2550 (citation omitted).

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 131 S.Ct. at 2551. "On issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ., HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rather, the named plaintiff bears the burden of showing that a proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence. *Id; see Smith v. Family Video Movie Club, Inc.*, No. 11 CV 1773, 2013 WL 1628176, at *2 (N.D. Ill. Apr. 15, 2013). ("Failure to meet any one of the requirements of Rule 23 precludes certification of a class.") (quoting *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993)). Moreover, "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889-90, n.6 (7th Cir. 2011) (same); *see also Dukes*, 131 S. Ct. at 2551 (class

certification analysis "[[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim").

1.    **Plaintiff Cannot Show Numerosity Under Rule 23(a)(1).**

The Court also should deny certification because Plaintiff has not met her burden under Rule 23(a)(1) to establish that the putative class is "so numerous that joinder of all members is impracticable." Rule 23 (a)(1); *see also Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The Seventh Circuit has instructed that speculative statements about numerosity are insufficient. *See Valentino v. Howlett*, 528 F.2d 975, 978 (7th Cir. 1976) (observing that a party may not rely on conclusory allegations that joinder is impractical); *see also Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989) (affirming order denying class certification and holding that plaintiffs failed to establish numerosity where they merely identified the total number of people who *could* satisfy their class definition, but "only speculated as to the number of persons who" actually satisfied the class definition); *Mungia v. Tony Rizza Oldsmobile, Inc.*, No. 01-460, 2001 WL 1104635, at *3-4 (N.D. Ill. Sept. 19, 2001) (denying class certification where plaintiff failed to produce "concrete evidence relating to the number of people" who satisfied all of the requirements of her class definition).

Here, Plaintiff suggests that numerosity is met because there must be "more than 300 class members" in Illinois during the relevant class period. (Dkt. No. 64 at 15.) Plaintiff, however, cannot circumvent the numerosity requirement based upon an overbroad class that includes individuals who have not been injured, *see supra* ¶ III(A). Otherwise, numerosity could always be met. This is especially true in an off-the-clock case where the fact that all the putative class members are non-exempt and eligible for overtime plays no role in resolving liability or damages. Rather, the appropriate inquiry is how many putative class members exist who

actually allege an injury. Plaintiff has set forth no actual evidence that there are more than *three* individuals (Plaintiff, Ms. Claveria, and Mr. Ward) who currently believe that they worked off-the-clock and are owed unpaid overtime.[18] A list of other non-exempt Illinois employees who were subject to an investigation by PNC's ER regarding unpaid overtime is also insufficient to establish numerosity because PNC paid every individual on that list who was actually owed unpaid overtime.[19] Unsurprisingly, in almost two years, no one besides Ms. Claveria has opted into this lawsuit. Further, Plaintiff has not secured even one declaration from another employee, including Mr. Ward and Ms. Claveria, attesting that he or she (1) either worked off-the-clock and is still owed unpaid time and/or (2) was subject to an ER investigation and is currently dissatisfied. To suppose that there "must be more" currently aggrieved employees that fall within a proper class definition is the precise type of speculation that the Seventh Circuit has rejected.

---

[18] Although there is no fixed numerical threshold under Rule 23(a)(1), the Supreme Court has held that a putative class of fifteen members "is too small to meet the numerosity requirement." *Gen. Tel. Co. of Nw., Inc.*, 446 U.S. at 330 (1980). Consistent with *General Telephone*, the Seventh Circuit held in *Pruitt v. City of Chicago*, 472 F.3d 925, 926 (7th Cir. 2006) that a proposed class of "fewer than 40," "flunked the numerosity requirement" where the named plaintiff did not explain why joinder of forty plaintiffs would not "be practical." Here, three class members are clearly insufficient to satisfy numerosity.

[19] In an attempt to support her claim that there are more employees who are currently owed unpaid overtime, Plaintiff offers the affidavit of Mr. Ward's spouse, James Cobb. (APX12-15). Mr. Cobb admittedly speculates that he is unaware of whether 37 employees (listed in APX15 and also APX159-60), were paid for working at an event ("Table Days") for the DePaul branch on September 1, 2010. *Id.* His speculation is based on the fact that Mr. Ward violated PNC's policies by not recording his own time that day, and therefore he wondered if other employees did too. (APX12-15). He also claims to have had repeated unspecified conversations with ER inquiring as to whether these employees were paid, but alleges ER never followed up. *Id.* PNC payroll records revealed, however, that consistent with PNC's HOW and Overtime Policies, all 37 employees recorded their own time and were paid for all hours worked at Table Days, including nine of whom who were paid overtime. Alvarez Decl. ¶ 22. Further, despite Mr. Cobb's assertions now, he did not at the time provide a list of these 37 individuals to ER (APX15). *Id.* Lastly, despite admitting the lack of evidence to confirm whether these 37 employees were in fact paid (*see* Dkt. No. 64 at n. 7), Plaintiff deceivingly adds all 37 of these employees' names to employees who she claims worked overtime without pay (APX159-60). That said, even if there was a question about the veracity of Mr. Cobb's account of these events, just that situation alone would present a host of individualized questions with respect to each and every employee's circumstances, the answers to which would have no bearing on any other employee.

### 2. Plaintiff Cannot Show That She Will Fairly And Adequately Represent The Class's Interests Under Rule 23(a)(4).

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Plaintiff must establish both "(1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). Adequate representation "is essential to due process, because a final judgment in a class action is binding on all class members." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)).

Adequacy requires Plaintiff to "possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor, Inc.*, 521 U.S. 591, 594, 625 (1997) (observing that adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent"); *see also Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (stating that "[a] class representative's conflict of interest is an independent ground for denial of class certification"); *Robinson v. Sheriff of Cook Co.*, 167 F.3d 1155, 1157 (7th Cir. 1999) (noting that "if [a plaintiff's] claim is atypical, he is not likely to be an adequate representative; his incentive to press issues important to the other members of the class will be impaired") (citations omitted).

### a. Plaintiff Is Inadequate As A Class Representative Because She Is Dissimilar And Subject To Individualized Defenses.

Here, there is no evidence that Plaintiff has suffered the same alleged injuries as the putative class. Instead, Plaintiff's allegations are contradicted by her own testimony, which reveals that her experience at PNC was dissimilar to every other member of the putative class, even those at her own branch.

-15-

First, Plaintiff's interests conflict with those putative class members who never worked off-the-clock work and suffered no injury. Second, Plaintiff attacks PNC's allegedly flawed overtime investigation methods on behalf of putative class members who were never subject to an unpaid overtime investigation. Therefore, unlike Plaintiff, these putative class members would have no interest in challenging how PNC investigates such claims. Third, Plaintiff is unlike those putative class members who were subject to an investigation, were paid, and are currently satisfied with the result. Fourth, Plaintiff alleges that she worked off-the-clock "when she made out-of-the-office visits to prospective customers" (Dkt. No. 64 at 2), yet purports to represent *all* non-exempt employees, including Tellers and Teller Supervisors, rarely, if ever, work outside the branch. Alvarez Decl. ¶ 7.

Plaintiff is even unlike every other putative class member who worked in her own branch. Ms. Flores-Poole misled Plaintiff to believe that she was hired as an ABM. APX 23 at 25:9-27:8; APX50 at 136:3-6. Plaintiff always saw herself, and was viewed by other branch employees, as an ABM. APX 23 at 25:9-27:8; APX29 at 50:18-21. Indeed, she was the only employee in the branch, besides Ms. Flores-Poole, who had an office and routinely performed managerial job duties[20] on a salary basis.[21] APX 27 at 41:1-23, 42:11-14; APX29 49:6-11. In an effort to get promoted, Plaintiff solicited and received letters from four other non-exempt branch employees, whom she supervised and mentored, to inform PNC that "basically [she] was performing the duties as office manager." APX29 at 51:8-52:18, 54:4-11; Alvarez Decl., Ex. E.

---

[20] Plaintiff's duties included "anything a manager would do at a branch," such as handling branch operations and authorizations, reviewing time sheets and "time-off," approving incoming checks, generating banking reports, handling more sophisticated/escalated customer service issues, and encouraging all employees to abide by PNC's policies. APX27-30 at 41:1-54:11. Plaintiff even reminded all non-exempt branch employees, whom she trained and supervised, to abide by all of PNC's policies. APX30 at 53:21-54:11.

[21] Plaintiff was an overtime eligible, salaried employee who received a yearly salary of $38,000 regardless of the number of hours that she worked. APX23 at 26:5-27:8. As a result, Plaintiff was compensated for 40 hours a week even during weeks when she recorded fewer than 40 hours. *Id.*

When PNC did not promote Plaintiff to an ABM position, as Ms Flores-Poole promised, Plaintiff resigned for another opportunity at a competitor. APX55-56 at 154:24-157:2; APX61 at 177:2-12. Plaintiff testified, however, that she still would return to PNC if she were to be promoted. *Id.* at 177:2-12.

Plaintiff's *de facto* managerial position will require this Court to devote significant time to the issue of whether Plaintiff was in fact exempt from overtime compensation under one or more exemptions under the Fair Labor Standards Act ("FLSA").[22] Moreover, even if this Court were to find that Plaintiff is owed unpaid overtime, the Court would have to offset for the time for which she was paid for 40 hours a week, even during weeks when she recorded less. APX23 at 26:22-27:8. Thus, Plaintiff is subject to unique defenses that alone make her claim atypical and make her an inadequate class representative. *See e.g.*, *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) ("A named plaintiff . . . who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative."); *see also Burk v. Contemporary Home Servs., Inc.*, No. C-06-1459-RSM, 2007 WL 2220279, at *2 (W.D. Wash. Aug. 1, 2007) (refusing to grant class certification of off-the-clock claims under Rule 23 in part because there were affirmative defenses potentially applicable to the named plaintiffs that rendered their claims insufficiently typical).

---

[22] For those entitled to overtime compensation, the FLSA requires that employees be paid a premium rate for hours worked above 40 in a workweek, unless they qualify for one or more exemptions. 29 U.S.C. §§ 207, 213. Where the FLSA and the Illinois Minimum Wage Law ("IMWL") are "coextensive," the same analysis applies to both sets of claims. *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993) (framing analysis regarding claims under the FLSA and IMWL "in terms of whether the system complies with the FLSA"). The Illinois Administrative Code provides that FLSA regulations are to be used as guidance in interpreting the IMWL. Ill. Admin. Code tit. 56, pt. 210.120 (2009); *see Bjornson v. Daido Metal U.S.A., Inc.*, 12 F. Supp. 2d 837, 843 (N.D. Ill. 1998); *Haynes v. Tru-Green Corp.*, 154 Ill. App. 3d 967, 977, 507 N.E.2d 945, 950-51 (Ill. App. 4th Dist. 1987). Here, Plaintiff salary coupled with her managerial responsibilities satisfy the administrative and/or executive exemption under the FLSA and the IMWL. *See* 29 C.F.R. § 541.100, 200.

**b.** **Plaintiff's Inconsistent Testimony Makes Her An Inadequate Class Representative.**

When plaintiff's credibility is at issue, the plaintiff is an inadequate class representative. *Howard v. Ray's LLC*, No. 1:08-CV-627-RLY-MJD, 2011 WL 4625735, at *5 (S.D. Ind. Sept. 30, 2011) (denying class certification and holding that plaintiff was not an adequate class representative due to his credibility); *see also Dotson v. Portfolio Recovery Assoc., LLC*, No. 08-3744, 2009 WL 1559813, at *2 (E.D. Pa. June 3, 2009) ("A district court may consider the credibility of the named plaintiff in determining adequacy of representation.").

Here, Plaintiff is also an inadequate representative because her testimony contradicts her allegations. *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) (false testimony during deposition warranted decertification of the class); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (upholding ruling that named plaintiff was an inadequate representative because of inconsistencies in his sworn testimony )); *Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir. 1981) (finding that plaintiff was an inadequate representative due to inconsistent statements that created a lack of credibility). Specifically, Plaintiff alleges that (1) she worked overtime without pay because of understaffing;[23] (2) her unpaid overtime occurred because of off-the-clock work during off-site visits, before/after work shifts, and during lunch breaks; (3) her superiors told her that PNC does not permit employees to record overtime; (4) after PNC investigated her claims, she was paid only for hours she documented; and (5) she is still owed additional money.

---

[23] Plaintiff's unsubstantiated allegation that understaffing caused her to work off-the-clock is not susceptible to common proof. Indeed, a number of factors affect staffing on a particular day and in a particular branch including, but are not limited to: employee turnover; leaves of absence; vacation days; sick days; whether the branch has a drive-through; whether the branch services safety deposit boxes; how many ATMs the branch has; branch location; and whether the branch is considered a "language branch." Alvarez Decl. ¶ 15. Notwithstanding the daily unpredictability of staffing levels within each branch, PNC uses tools to ensure that branches are staffed to a degree that meets operational needs and sales demands. *Id.* To that end, since 2009 PNC has staffed its Illinois branches with 20% more employees than the models have recommended for non-platform employees. *Id.*

The record, however, shows that the illegal, rogue behavior of Ms. Flores-Poole solely caused Plaintiff to have unpaid overtime.[24] Yet, Plaintiff now claims that PNC's "Top/Senior Management" told Plaintiff and Ms. Flores-Poole that overtime was not permitted. APX2-3 ¶ 6; APX10. But in Plaintiff's deposition, she could not name any other BM besides Ms. Flores-Poole who "with the knowledge and consent of PNC's Corporate Management systematically violated overtime laws." APX57-58 at 162:12-165:1. She also could not identify anyone from PNC's corporate management who knew or consented to Ms. Flores-Poole instructing employees not to record their overtime. *Id.* Further, although Plaintiff stated in her affidavit that RM Christina Ramos (deceased) told her that "PNC Bank would not permit overtime to be reported by employees,"[25] APX3 ¶ 6, Plaintiff later testified Ms. Ramos said to her, "I understand that you are going to have overtime, you may submit your overtime." APX58 at 166:9-167:4.

In July 2011, PNC paid Plaintiff 68.15 overtime hours as result of its investigation. Alvarez Decl. ¶ 36. Indeed, Plaintiff never mentioned or complained, either at that time or when she resigned, that she was owed additional unpaid overtime. *Id.* ¶ 37; Ex. F. Moreover, after Plaintiff resigned, she reported that "her case was closed, and was satisfied . . . and paid out what

---

[24] After three written warnings, PNC discharged Ms. Flores-Poole in November 2010 for her failure to comply with numerous PNC policies, including PNC's Overtime Policy, PNC's Employment Status Guidelines, and PNC's Retail Lending Policies, as well as her lack of leadership, inappropriate comments, and misuse of her position as the Broadway and Berwyn BM. APX 67 at 20:12-24; Alvarez Decl. ¶ 35. Yet, incredibly, Ms. Flores-Poole still attests that she "left PNC Bank in November 2010, for reasons that had nothing to do with overtime or off-the-clock hours." APX 11 ¶ 5. There have been no subsequent incidents or allegations of unpaid overtime involving any employee at Plaintiff's branch after Ms. Flores-Poole was discharged. APX53 at 145:17-146:1; APX124 at 67:22-68:24.

[25] Any alleged out-of-court statements of Ms. Ramos constitute inadmissible hearsay and should be stricken. *See Pfeil v. Rogers*, 757 F.2d 850, 860-61 (7th Cir. 1985) (excluding out-of-court statements of deceased witness related in affidavit where statements did meet any exception to the hearsay rule); *Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 840-42 (N.D. Ill. 2005) (finding that out-of-court statements of deceased plaintiff that were contained in interview notes and EEOC Charge were inadmissible hearsay); *House of Clean, Inc. v. St. Paul Fire &Marine Ins. Co., Inc.*, 775 F. Supp. 2d 302, 316 (D. Mass. 2011) (striking affidavits of deceased affiants as hearsay); *Rodriguez-Laboy v. R &R Eng'g Prods.*, Civ. A. No. 03-1367 (DRD), 2006 WL 852086, at *1 (D.P.R. Mar. 30, 2006) (striking affidavit of deceased affiant as hearsay). In any event, Ms. Ramos is not "Senior Management," as she has five levels of management above her. Alvarez Decl. ¶ 13.

she was owed." Alvarez Decl. ¶ 37; Ex. G. Plaintiff, however, has now curiously joined forces with Ms. Flores-Poole, the very manager who misled her and forced her to work off-the-clock, and claims she is owed "dozens of overtime hours."[26]

Plaintiff's dissimilarity and contradicting testimony make her an inadequate class representative. Furthermore, her testimony does not create circumstances suitable for class treatment. Rather, Plaintiff's unique circumstances surrounding her employment have no bearing on any off- the-clock issue outside the Broadway and Berwyn branch, let alone any other employee's individualized circumstances within that branch.[27]

### 3. Plaintiff Cannot Show Commonality Under Rule 23(a)(2).

Rule 23(a)'s commonality requirement, which requires "a plaintiff to show that 'there are questions of law or fact common to the class,' . . . is easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" *Dukes*, 131 S. Ct. at 2550-51 (citation omitted). A mere recitation of the questions contained in a class action complaint,

---

[26] Plaintiff has never been able to identify exactly what she was owed. APX50 at 135:14-18. Plaintiff argues that because PNC did not provide her with documentation to calculate the overtime hours to which she was owed, she was only paid for hours "she documented." To that end, Plaintiff testified that she was told to provide only "trackable" incidents of unpaid overtime. APX47 at 124:1-5. Plaintiff's summary, however, of instances of unpaid overtime includes, by her own account, instances of "untrackable" time, such as working through lunches. APX49 at 131:16-132:2. Plaintiff was also given the opportunity to express whether she felt that she was owed for any additional time irrespective of whether she had supporting documentation, and she responded that she was not owed for additional time. APX46 at 118:4-132:2; Alvarez Decl. ¶ 36.

[27] For example, Mr. Ward is not only dissimilar because of his bankruptcy, *see supra* n.1, but he alleged highly individualized issues, including that he was subject to retaliation for complaining about working off-the-clock overtime hours and being labeled a "troublemaker"; being downgraded in his 2011 performance review; and receiving less favorable work assignments. (Case No. 1:13-cv:005). He now claims that he is owed additional unpaid overtime despite being paid over 50 hours after stating that he was only owed 45.61 hours (APX272-78) and after representing to PNC on January 13, 2011 that he was owed no additional overtime pay. Alvarez Decl. ¶ 40. Mr. Ward was also subject to a Final Written Warning for violating PNC's Overtime and HOW Policies by working an unapproved and unscheduled shift and repeatedly failing to record properly all time worked. *Id.* ¶ 41. Almost two years later, on January 3, 2013, PNC placed Mr. Ward on administrative leave and under investigation for allegedly enabling branch employees to falsify bank referral reports. *Id.* PNC then discharged Mr. Ward on February 14, 2013 for his misconduct and for his dishonesty during the course of the investigation. *Id.* Mr. Ward's unique situation demands individualized treatment. Moreover, Mr. Ward's individual issues and defenses are emblematic of the types of inquiries upon which this Court would have to engage with respect to each putative class member, thereby making this case unsuitable for class treatment.

however, "is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* at 2551 (citation omitted).

> What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather, the capacity of a class-wide proceeding to generate common answers to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers. *Id.* (citation omitted).

The fact that putative class members have something in common does not matter if it is not a central issue to liability; rather, "the common question must be one that will resolve an essential fact or issue of the plaintiffs' claim." *Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 261265, at *8, *12 (W.D. Wis. Jan. 10, 2013) (denying Rule 23 certification for lack of commonality for state law wage and hour class that alleged off-the-clock work during meal breaks because "Plaintiffs have failed to show that this question [why off-the-clock work occurred] could be resolved on a class-wide basis" because it "depended on the day, the volume of work, the route, the supervisor and the technician's individual needs and desires").

In the Seventh Circuit, when the answer to why the alleged off-the-clock violation occurred is because of a rogue manager or a supervisory-level decision, commonality is not met and courts routinely deny class certification.[28] *Vang v. Kohler Co.*, 488 F. App'x 146, 147 (7th

---

[28] Tellingly absent from Plaintiff's brief are decisions certifying an off-the-clock case where there is a formal policy prohibiting off-the-clock work. Plaintiff's reference to *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 908 (7th Cir. 2012), is unavailing. On April 1, 2013, the Supreme Court granted RBS Citizens' petition for a writ of certiorari and vacated the Seventh Circuit's decision granting class certification in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (finding that because the damage model was not susceptible to common proof, individualized damages determinations "will inevitably overwhelm questions common to the class," making class certification under Rule 23(b)(3) inappropriate). That said, *Ross* is still distinguishable because in that case, Plaintiffs submitted 96 declarations, all of which specifically alleged denial of overtime compensation, and 89 of which further alleged that there was a policy instructing the declarants *not* to record earned overtime. *See Ross v. RBS Citizens, N.A.*, No. 09-5695, 2010 WL 3980113, at *6 (N.D. Ill. Oct. 8, 2010), *aff'd*, 667 F.3d 900 (7th Cir. 2012). Here, Plaintiff has not been able to obtain even one additional declaration from a putative class member claiming that he or she is owed unpaid overtime.

Cir. 2012) (vacating and remanding certification of state law off-the-clock wage and hour class

where employer had formal hours of work policy and stating that "[u]nless plaintiffs can

establish a firm-wide policy, Rule 23(a)(2) prevents class certification . . . [because *Dukes*] does

not permit certification of a class when store-level managers have varying policies'"); *Bolden v.

Walsh Constr. Co.*, 688 F.3d 896, 896 (7th Cir. 2012) (holding that under *Dukes*, when multiple

managers exercise independent discretion, conditions at different stores (or sites) do not present a

common question); *Smith*, 2013 WL 1628176, at *6 (denying class certification because off-the-

clock work "varied depending upon the particular store and personnel working at the store, [and

thus] Plaintiffs have failed to show by a preponderance of the evidence that their claims . . . are

capable of proof at trial through evidence that is common to the class rather than individual to its

members") (internal quotations & citation omitted); *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431,

444 (S.D. Ind. 2012) (denying certification of state law wage and hour class because "[a]t best,

the evidence shows that certain supervisors may have instructed their charges [to perform pre-

and post-shift work" and, therefore, plaintiff's "evidence does not establish a policy or practice

of requiring [hourly employees] to perform pre and post-shift work without compensation");

*Slayton v. Iowa Coll. Acquisition Corp.*, No. 09-6977, 2010 WL 3937455, at *3 (N.D. Ill. Oct. 5,

2010) (denying class certification based on commonality and typicality where different managers

handled issues differently and plaintiff could not identify which managers caused hourly

employees to be underpaid; "[g]iven this lack of detail, it is difficult to conclude from

[plaintiff's] statement that defendant had a widespread practice of directing employees not to

record time spent working before their scheduled start time").[29]

---

[29] *See also In re AutoZone, Inc., Wage & Hour Emp't Practices Litig.*, 289 F.R.D. 526, 538 (N.D. Cal. 2012)
(denying motion for class certification based on lack of commonality where defendant's official policy prohibited
off-the-clock work, making the reason for any off-the-clock work "particularly elusive" and inappropriate for class

Here, Plaintiff's motion ignored this critical guidance. Instead, Plaintiff did exactly what the Supreme Court in *Dukes* has said Plaintiff cannot do: rest her commonality argument on a mere recitation of the asserted claims. According to Plaintiff, if this class were to be certified, this Court would then be required to engage in a highly factual, individualized analysis to determine whether Plaintiff is overtime eligible, whether she is in fact owed additional overtime, and, if so, how much, and whether such underpayment was the result of an "improper investigation system." (Dkt. No. 64 at 11.) Thus, Plaintiff essentially concedes that commonality cannot be satisfied. The unavoidable fact is that the answers to each of these questions as to Plaintiff do not answer those same questions with respect to any other class member. *See, e.g.*, *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 498 (7th Cir. 2012) (commonality not satisfied because the central question "must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation"). Rather, in order to prove liability on a class-wide basis, the Court would be faced with different answers to the following questions with respect to each class member for every week of his or her employment:

---

treatment); *York v. Starbucks Corp.*, No. 08-7919-GAF (PJWx), 2011 WL 8199987, at *28-30 (C.D. Cal. Nov. 23, 2011) (where company had "a clear and unambiguous corporate policy mandating that all employees be paid for work performed," and plaintiff failed to present evidence of a systematic, corporate-wide practice of forcing employees to work off-the-clock, resolution of plaintiff's claim would "require individualized proof that she in fact did the work, why she did the work, why she did not use the [system for receiving compensation], and whether her managers had reason to know that she was in fact working without pay"); *Hinojos v. Home Depot, Inc.*, No. 06-00108, 2006 WL 3712944, at *1-3 (D. Nev. Dec. 1, 2006) (where plaintiffs alleged they worked off-the-clock, but statistics showed most employees received overtime, and Home Depot had an official written policy prohibiting off-the-clock work, the mere fact that multiple plaintiffs worked off-the-clock did not show an improper common policy justifying certification); *Robinson v. Dolgencorp, Inc.*, No. 06-122, 2006 WL 3360944, at *4 (M.D. Fla. Nov. 13, 2006) (denying certification where official policy does not permit off-the-clock work and challenged overtime decisions were decentralized); *West v. Border Foods, Inc.*, No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *6-9 (D. Minn. July 10, 2006) (holding that allegations that individual restaurant managers deprived six plaintiffs of proper compensation for overtime, and that there may have been pressure to meet budgets by encouraging off-the-clock work, did not warrant certification, especially in light of official written policy requiring proper payment for all overtime hours); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *6-7 (E.D. La. July 2, 2004) (holding that where plaintiffs were responsible for punching themselves in and out and defendant's official policy required payment for all working time, certification of off-the-clock claims was not warranted).

- Whether each branch employee actually worked over 40 hours in a given week.  *See* 820 Ill. Comp. Stat. 105/4a (requiring overtime only after 40 hours in a given week).

- Whether the request for overtime was approved or denied each time.  *See, e.g.*, *Newton v. City of Henderson*, 47 F.3d 746, 747, 749 (5th Cir. 1995) (reversing judgment for plaintiff where plaintiff was told not to work unauthorized overtime, but did so and turned in timesheets that did not include overtime hours); *Thola v. City of Liberty Lake*, No. 12-cv-0452-TOR, 2013 WL 5138943, at *11 (E.D. Wash. Sept. 13, 2013) (granting summary judgment for defendant where the plaintiff was instructed not to work more than 40 hours, but the plaintiff did so without permission and never reported or sought payment for the hours);

- Whether each branch employee recorded all of his or her time worked, and, if not, why not.  *See, e.g.*, *Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 3777251, at *8 (W.D. Wis. July 19, 2013) (granting summary judgment for employer where employees "chose voluntarily to underreport hours without telling any of their supervisors");

- Whether the individual was directed to perform such work.  *See, e.g.*, *id.* (granting summary judgment for employer where employees "chose voluntarily to underreport hours without telling any of their supervisors"); *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) (affirming dismissal of off-the-clock claim where the plaintiff was not directed by her supervisor to perform work off-the-clock, though she was directed to complete the duties);

- Whether the BM knew that the branch employee was working time that he or she did not record.  *See, e.g.*, *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177-78 (7th Cir. 2011) (affirming summary judgment for employer because the plaintiff failed to show that the defendant "had actual or constructive knowledge of her overtime work"); *Boelk*, 2013 WL 3777251, at *7 (granting summary judgment for employer where "plaintiffs have adduced no evidence that defendants had actual knowledge that plaintiffs were performing overtime work without compensation");

- Whether the amount of time unrecorded was *de minimis;* so as not to be compensable.  *See, e.g.*, *Kellar*, 664 F.3d at 176-77 (explaining *de minimis* doctrine); *Barvinchak v. Indiana Reg'l Med. Ctr.*, No. 3:2006-69, 2007 WL 2903911, at *16 (W.D. Pa. Sept. 28, 2007) (dismissing FLSA and PMWA claims for off-the-clock phone calls at home on the basis that they were either *de minimis* or defendant had no reason to believe they were anything other than *de minimis*); and

- Whether the work performed was preliminary or postliminary so as not to be compensable.  *See, e.g.*, *Kellar*, 664 F.3d at 174-75 (explaining that preliminary or postliminary work is non-compensable if it is not integral to the principle activities).

Further, these questions do not even apply to all of the putative class members who did not work off-the-clock and/or have now been fully paid as the result of an ER investigation.

Plaintiff's contention that PNC's investigations were "improper" also has no common answer because it necessarily would involve highly individualized, post-hoc inquiries into the adequacy of each investigation. Indeed, each investigation involves different BMs, branches, employees, and ER Investigators. Alvarez Decl. ¶ 31. Nor does PNC have a standard procedure or protocol for unpaid overtime investigations. *Id.* Rather, numerous variables affect the manner and method of each investigation. *Id.* For example, investigations differ with respect to the method of reporting of the complaint; the scope of the issue; the duration of the investigation; the number of Investigators involved; the number of employees interviewed, if any; whether an employee has supporting documentation;[30] the sources and types of documents and information utilized by PNC;[31] whether PNC's documentation supports or refutes the claim; and whether the investigation was escalated. *Id.* Because PNC allows considerable discretion to ER Investigators, it is just the opposite of a uniform employment practice that would provide for commonality needed to sustain a class action, even among a subset of the class here who were subject to an investigation. *Bolden*, 688 F.3d at 896 (quoting *Dukes*, and stating "'*[A]llowing discretion* by local supervisors over employment matters . . . is just the opposite of a uniform

---

[30] While each investigation is tailored to the specific set of facts surrounding the complaint, PNC has never "required" an employee to provide documentation to support a claim of unpaid overtime as a prerequisite to investigate a complaint and/or pay overtime. Alvarez Decl. ¶ 32. There is nothing unlawful, however, about asking an employee whether he or she has any documentary evidence to support his or her claim, and whether an employee has documentation depends on each investigation. *Id.* Rather, it would be negligent not to ask an employee whether he or she has any supporting documentation. Contrary to Plaintiff's assertion, there have been at least ten investigations where an employee provided a good-faith estimate, without documentary support, as to the number of overtime hours owed and PNC fully paid each employee. *Id.* Even Plaintiff was paid for hours that she was unable to document. APX47 at 124:1-5; Alvarez Decl. ¶ 32. Where appropriate, PNC shared its own documentation with the employee to help him or her determine any unpaid overtime hours. Alvarez Decl. ¶ 32.

[31] Sources of information include: payroll records; time and attendance records; log-in and log-off reports from payroll; video surveillance; alarm codes; and electronic journals. Alvarez Decl. ¶ 31.

employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices.'") (emphasis in original).

Attempting to create commonality, Plaintiff blatantly mischaracterizes the record.[32] Plaintiff tries to create the false impression that today there are many PNC employees who have worked off-the-clock and not yet been paid.  But in fact, PNC fully paid any employee of whom it was aware was owed money for off-the-clock work.  APX 154-158; Alvarez Decl. ¶ 34. Plaintiff repeatedly cites to the same selective excerpts from PNC's ERIC reports, which accompanied investigations of certain branches, without providing any requisite context or any contrary facts.[33]  Alvarez Decl. ¶ 42.  As the chart attached to Ms. Alvarez's declaration demonstrates, in each individual circumstance, the allegation was investigated and resolved appropriately.  Alvarez Decl. Ex. H.

Trying to avoid these inevitable individualized inquiries, Plaintiff attempts to equate a BM with "Senior Management" and/or "Top Management."  In fact, there are six levels of management above a BM and there are non-exempt branch employees who do not even report to a BM.  Alvarez Decl. ¶¶ 13-14.  So, even if there is an individual question as to whether a rogue BM at a particular branch violated PNC's policies in a particular way, this is the epitome of a disparate "supervisor-level practice" that is not appropriate (or capable) of class-wide resolution.

---

[32] Plaintiff also misrepresents the case law.  For example, *Driver v. AppleIllinois, LLC*, No. 06-6149, 2012 WL 689169, at *1-2 (N.D. Ill. Mar. 2, 2012), was not an off-the-clock case, as Plaintiff implies.  Instead, the court certified a class based on over 100 declarations that tended to show that the defendant did not properly calculate the tip-credit-wage rate for its tipped employees.  What plaintiff fails to mention is that the court refused to certify a very similar off-the-clock class pled by the plaintiff because "[w]hile there is certainly evidence that not all hours of all employees were recorded (and, therefore, not all hours were compensated), the practices that led to the under-reporting differed from restaurant to restaurant so that the common questions do not predominate across the proposed classes of workers in all restaurants."  *See*, No. 06-6149 (Dkt. No. 231 at 44 (Mar. 2, 2010)); *see* also *infra* n.32.

[33] ERIC reports are meant to be summaries of the allegations, and do not necessarily include all aspects of an ER investigation and the basis of its ultimate conclusion as to whether overtime is due, if so, how much, and what disciplinary measures, if any, need to be taken.  Alvarez Decl. ¶ 42.

*See* cases cited *infra* at 21-23.  Indeed, despite Plaintiff's repeated use of the words "management," "top management," and/or "senior management," all instances of unpaid overtime at each of the 22 branches investigated were the result of rogue BMs and/or employees violating PNC's policies.  Alvarez Decl. ¶ 33.

### 4. Plaintiff Cannot Show Typicality Under Rule 23(a)(3)

Distinguished from commonality, "typicality and adequacy of representation focus on the characteristics of the class representatives relative to the class." *Allen v. Chi. Transit Auth.*, No. 99-7614, 2000 WL 1207408, at *10 (N.D. Ill. July 31, 2000) (citations omitted).  "'If proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims.'" *Ruiz v. Stewart Assocs., Inc.*, 167 F.R.D. 402, 405 (N.D. Ill. 1996) (denying class certification for lack of typicality because "[c]ourts faced with an overbroad class definition may deny certification for want of typicality" and "[p]roof of [plaintiffs'] claims will not prove all of the putative class members' claims" (citation omitted)) (quoting *Hickey v. Great W. Mortg. Corp.*, No. 94-3638, 1995 WL 121534, at *8 (N.D. Ill. Mar. 17, 1995) (decertifying class for same reasons)); *see also Clarke ex rel. Pickard v. Ford Motor Co.*, 228 F.R.D. 631, 637 (E.D. Wis. 2005) (decertifying class for lack of typicality because "plaintiff cannot escape the problem that she wins and the class does not").

Here, what Plaintiff fails to grasp is that typicality requires much more than a bare assertion of the same legal theory.  Otherwise, every putative class action, and every complaint simply stating class-wide allegations, would meet the "test" of typicality.  That is not the rigorous analysis of the Rule 23 criteria required by *Dukes*, 131 S. Ct. at 2551.  Blind to this actual standard for typicality, Plaintiff simply ignores the specifics of her individual claims and PNC's defenses.  *See infra* sections III(A); III(B)2(a); and III(B)(3).  Plaintiff's claims are

atypical because the answers to the individualized questions necessary to prove her claim would have no bearing on the claim of any other putative class member. *Id.* Plaintiff fails to establish that a judgment on her own claims should fairly bind the class members, particularly where she is likely <u>exempt</u> from the overtime requirements by virtue of her job duties.

### 5.  Plaintiff Cannot Demonstrate That Common Questions Of Law Or Fact Predominate As Required By Rule 23(b)(3).

Even if Plaintiff had met all four requirements of Rule 23(a), which she has not, her class still could not be certified because she cannot meet the first requirement of Rule 23(b)(3) to show predominance of common issues.

The predominance inquiry is even more stringent than commonality and typicality, and tests "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc*, 521 U.S. at 623. Under Rule 23, class-wide issues predominate only if (1) the legal or factual questions common to the class can be achieved through generalized proof, and (2) these particular class issues are more substantial than the issues subject to individualized proof. *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir. 2002) ("Clearly, if proof of the essential elements of the cause of action require individualized treatment, then there cannot be a predominance of questions of law and fact common to members of the class."); *see, e.g., Smith*, 2013 WL 1628176, at *6, *10-11 (citing *Comcast* and denying class certification in part because plaintiffs failed to establish that common issues predominated over individualized ones including individual damage calculations unsusceptible to class-wide treatment); *Roach v. T.L. Cannon Corp.*, No. 10-0591, 2013 WL 1316452, at *3 (N.D.N.Y. Mar. 29, 2013) (quoting *Comcast*, and holding that certification by Magistrate Judge was improper under Rule 23(b)(3) "[b]ecause Plaintiffs have offered no model of damages susceptible of measurement across the entire putative 10-hour spread claim class,

[and thus] 'questions of individual damage calculations will inevitably overwhelm questions common to the class'").[34]

Conversely, when the nature of Plaintiff's claims are location and manager dependent, Rule 23(b)(3) predominance is destroyed. *Smith*, 2013 WL 1628176, at *11 (citing *Strait v. Belcan Eng'g Grp. Inc.*, 911 F. Supp. 2d 709, 734 (N.D. Ill. 2012) (no Rule 23(b)(3) predominance for proposed IMWL class where proposed class members worked at different locations for different managers); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 354-55 (N.D. Ill. 2012) (Rule 23(b)(3) predominance not satisfied in IMWL off-the-clock action where proposed class members worked in different locations, in different departments, and for different supervisors); *Franks v. MKM Oil, Inc.*, No. 10-00013, 2012 WL 3903782, at *6, *8 (N.D. Ill. Sept. 7, 2012) (predominance requirement not met by proposed IMWL class because "the Court would have to conduct an analysis of each individual employee, [and] how long they worked for [the company], and make individual calculations to determine whether they failed to receive the minimum wage or overtime pay. . . [S]o even if there was a common, uniform [off-the-clock] policy . . . determining which employees were affected . . . would require an extraordinarily individualized analysis that would predominate over any common issues").

---

[34] Plaintiff mischaracterizes the few cases she did cite where a court actually granted class certification. In these distinguishable cases, the courts' decisions were predicated on the fact that liability could be determined on a class-wide basis without having to delve into individualized inquiries as required here. *Healy v. IBEW Local Union No. 134*, --- F.R.D. ----, 2013 WL 4494685 (N.D. Ill. Aug. 22, 2013), involved a single common practice, the hiring of certain workers pursuant to certain agreements, and the resulting common injury it caused to the class members, who were all laid off. The court held that "the common issues concerning liability significantly predominate over any individual damages issues." *Healy*, 2013 WL 4494684, at *9. Thus, predominance could be established because the defendants engaged in a standardized course of conduct allegedly causing the same injury. *Id.* at *3. In *Johnson*, which challenged the defendant's tip-credit wage rate, the plaintiffs presented deposition testimony and manuals showing that the defendant, unlike PNC here, had a company-wide policy that violated tip-credit rules. *Johnson v. Pinstripes, Inc.*, No. 12-1018, 2013 WL 5408657, at *3 (N.D. Ill. Sept. 26, 2013). Lastly, *Butler v. Sears Roebuck & Co.*, 727 F.3d 796, 800-02 (7th Cir. 2013), is distinguishable because all damages stemmed from the same two alleged defects involving washing machines, negating the need for individual liability determinations on an individualized basis.

Here, neither liability nor damages can be determined on a class-wide basis. Whether each class member is owed unpaid overtime, and if yes, why and how much, will require highly individualized liability and damages questions, the answers to which will vary from person to person, from day-to-day, from week to week, and from branch to branch.[35]  *See supra* Section III(B)(3).  Because these questions inevitably overwhelm questions, if any, common to the class, Plaintiff has not, and cannot, establish class-wide liability or a damages model.

### 6. Plaintiff Cannot Demonstrate That The Class Action Is Superior To Other Means Of Adjudication Under Rule 23(b)(3).

Superiority is the second of the two Rule 23(b)(3) requirements that are designed to ensure that a class action does not "'sacrific[e] procedural fairness or bring[ ] about other undesirable results.'"  *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 236 (S.D. Ill. 2011) (denying certification) (quoting *Amchem Prods. Inc.*, 521 U.S. at 615).  To assess superiority, courts consider (1) the class members' interests in individually controlling their claims; (2) the extent/nature of other litigation concerning the claims; (3) the desirability of concentrating the claims; and (4) the difficulties in managing a class action.  *Lilly v. Ford Motor Co.*, No. 00-7372, 2002 WL 507126, at *1-2 (N.D. Ill. Apr. 3, 2002) (denying certification).  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) (citations omitted);  *Doe v. Guardian Life Ins. Co. of Am.*, 145 F.R.D. 466, 476 (N.D. Ill. 1992) (finding class action not superior where "a significant

---

[35] Even if Plaintiff could establish some unofficial policy that was uniformly applied across all of the branches  in the putative class requiring off-the-clock work, determining which employees were affected would require an "extraordinarily individualized analysis."  *Doyel v. McDonald's Corp.*, No. 4:08-cv-1198 CAS, 2010 WL 3199685, at *7 (E.D. Mo. Aug. 12, 2010) (Rule 23(b)(3) predominance was not satisfied because "Plaintiffs offer the Court no answer to resolve the off-the-clock claim on a class-wide basis . . . [and] the nature of the evidence that would be sufficient to prove such a violation is individualized and would vary from class member to class member.").

number of distinct and legally or factually complex issues would have to be addressed with respect to each plaintiff"). Thus, where "individualized questions of law and fact predominate . . . it is axiomatic that a class action is not superior." *Walsh Chiropractic, Ltd. v. StrataCare, Inc.*, No. 09-cv- 1061-MJR, 2011 WL 4336727, at *10 (S.D. Ill. Sept. 14, 2011).[36]

Here, a class action is unmanageable and inferior given the myriad of individualized inquiries that would be required to assess liability and damages with respect to each putative class member. *See supra* Sections III(B)(3) and III(B)(2)(A).

## IV.     ARGUMENT AGAINST CONDITIONAL CERTIFICATION

### A.     Plaintiff Misconstrues The Applicable Legal Standard To Conditionally Certify A Class In This Case.

Courts apply an "intermediate" level of scrutiny when deciding whether to conditionally certify a class after significant discovery has occurred. *Boelk*, 2013 WL 261265, at *14 (stating that when "the parties have conducted significant discovery . . . it is appropriate to apply more scrutiny to plaintiffs' claim than would normally be applied at the conditional certification stage") (citing *Hawkins*, 287 F.R.D. at 439 (applying "intermediate level of scrutiny" to conditional certification where substantial discovery had been conducted but was not yet complete); *Scott v. NOW Courier, Inc.*, No. 10-cv-971-SEB-TAB, 2012 WL 1072751 (S.D. Ind. Mar. 29, 2012) (same); *see also Bunyan v. Spectrum Brands, Inc.*, No. 07-cv-0089-MJR, 2008 WL 2959932 (S.D. Ind. July 31, 2008) (same); *Strait v. Belcan Eng'g Grp. Inc.*, 911 F. Supp. 2d 709, 718, 728-29 (N.D. Ill. 2012) (same).

---

[36]*See also Walker v. Bankers Life & Cas. Co.*, No. 06-6906, 2008 WL 2883614, at *12 (N.D. Ill. July 28, 2008) (decertifying class because "[r]esolving the core issue [of whether an employer] misclassifies its agents would result in mini-trials that would inhibit efficient resolution of this dispute" and thus "[t]he difficulties likely to be encountered in managing the class action substantially outweigh any possible benefits"); *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 500-01 (N.D. Ill. 2008) (finding class action not superior where it "could require a multitude of mini-trials pertaining to [ ] individual circumstances"); *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439-40 (N.D. Ill. 2003) (where individual liability determinations would render case unmanageable, plaintiff failed to show superiority).

Courts in the Seventh Circuit have repeatedly held that off-the-clock cases fail to meet this heightened standard because they are predicated upon supervisor-specific practices rather than any common unlawful policy or plan. *Boelk*, 2013 WL 261265, at *15 (denying conditional certification under the intermediate standard because "[t]he facts in the record fail[ed] to establish that plaintiffs and potential class members were victims of a common policy or plan that resulted in common injuries" and because the alleged off-the-clock work "varied depending on their individual practices and particular supervisor"); *see also Hawkins*, 287 F.R.D. at 440-41 (denying conditional certification under the intermediate standard because plaintiff's evidence merely suggested that some supervisors may have instructed employees to work off-the-clock, but "the company policy was the opposite of what [plaintiff] claims occurred in her case)."

Here, the Court should apply an intermediate standard of scrutiny because the parties have completed class-wide discovery.[37]  Accordingly, Plaintiff's motion for conditional certification should be denied for the same reasons this Court should deny Plaintiff's motion for class certification. *See supra* Section III.

### B.     Even Under The Most Lenient Standard, Plaintiff's Motion For Conditional Certification Still Fails.

Courts routinely deny conditional certification under a more lenient standard when the alleged unlawful policy stems from the acts of rogue managers or employees, and not from a corporate edict or other centralized management directive reflecting a company-wide policy. *See, e.g.*, *Thompson v. Speedway SuperAmerica LLC*, No. 08-cv-1107 (PJS/RLE), 2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009) (denying motion for conditional certification because "plaintiffs must submit evidence that the *reason* why the employees were not compensated for

---

[37] Defendant has responded to extensive written discovery requests, has produced over 55,000 pages of responsive documents, and has deposed Plaintiff.  Alvarez Decl. ¶ 32.  Plaintiff's counsel has also taken both individual and corporate depositions. *Id.*

these tasks is not because of human error or a rogue store manager, but because of a corporate decision to ignore [defendant]'s policies and refuse to pay for answering work-related phone calls or performing gas-price surveys"); *Saleen v. Waste Mgmt., Inc.*, No. 08-4959 (PJS/JJK), 2009 WL 1664451, at *4 (D. Minn. June 15, 2009) (denying motion for conditional certification because plaintiffs failed to show that the reason they were allegedly not compensated for all time worked was a corporate decision to ignore the company's published policies and refuse to pay for this work).[38]

Courts also routinely deny conditional certification when a collective action would be unmanageable, or if individualized adjudication is required to resolve plaintiffs' claims. *See, e.g.*, *Ruiz v. Serco, Inc.*, No. 10-cv-394-bbc, 2011 WL 7138732, at *6 (W.D. Wis. Aug. 5, 2011) (denying conditional certification because "it would be difficult to generate common answers in light of the individualized inquiries arising from the wide variations in duties, experience, responsibility, discretion and supervisors on the part of the potential class members"); *Hinojos*, 2006 WL 3712944, at *3 (denying conditional certification because "there would be a need for individualized determinations about each plaintiff's claims, making collective action treatment impractical and unmanageable").

Moreover, a collective is inappropriate when the named plaintiff does not perform the same job duties as the putative class. *See Gromek v. Big Lots, Inc.*, No. 10-4070, 2010 WL 5313792, at *5 (N.D. Ill. Dec. 17, 2010) (denying conditional certification because "significant differences are present between the job duties of individual [employees] that cannot be cured

---

[38] *See also Gonzales v. Hair Club for Men, Ltd.*, No. 6:06-cv-1762-Orl-28JGG, 2007 WL 1079291, at *3 (M.D. Fla. Apr. 9, 2007) (denying conditional certification and citing affidavit from defendant's director of human resources and noting that "the evidence shows a company-wide policy that prohibits the type of conduct alleged by [plaintiff]'s complaint"); *West*, 2006 WL 1892527, at *7 (denying motion for conditional certification and citing defendants' training materials prohibiting off-the-clock work and how plaintiffs' alleged violations were contrary to these official policies in denying conditional certification).

through discovery"); *Bunyan*, 2008 WL 2959932, at *7 (denying conditional certification

because "[p]laintiffs have failed to provide sufficient evidence that they and the potential class

members are similarly situated with respect to their work responsibilities and functions");

*Pfaahler v. Consultants for Architects, Inc.*, No. 99-6700, 2000 WL 198888, at *2 (N.D. Ill. Feb.

8, 2000) ("A collective action under the FLSA is only appropriate where those in the pool of

potential claimants perform the same duties as the plaintiff." (citations omitted)).

Courts also do not conditionally certify actions when a plaintiff fails to demonstrate that

there are other similarly situated employees who want to opt into that action. *See Hadley v.

Journal Broad. Grp., Inc.*, No. 11-147, 2012 WL 523752, at *5 (E.D. Wis. Feb. 16, 2012)

(denying conditional certification in off-the-clock action in part because "there is almost no

indication that any other employees either were affected by these alleged practices or, if they

were, that they are interested in joining this action. . . . [T]here has been almost no indication of

interest from other employees since this lawsuit was filed more than a year ago. . . . If FLSA

violations were as widespread as Plaintiffs allege, one would expect that more than one person

would have joined the lawsuit by now. . . . Regardless of the reason, a demonstrable lack of

interest in a collective action is a strike against certification.") (citations omitted).

Lastly, courts weigh some payment of overtime to plaintiff(s) against conditional

certification because it suggests that there is no company-wide policy or practice not to pay

overtime. *See, e.g.*, *Bond v. Nat'l City Bank of Pa.*, No. 05-0681, 2006 WL 1744474, at *5

(W.D. Pa. June 22, 2006) (affirming magistrate report holding that "the fact that Plaintiffs were

paid some overtime compensation" weighed against conditional certification); *Salinas v. O'Reilly

Auto., Inc.*, No. 3: 04-CV-1861-B, 2005 WL 3783598, at *6 (N.D. Tex. Nov. 17, 2005) (holding

that the fact that some opt-ins were paid no overtime while others were paid some overtime was

not "indicative of a company-wide policy or practice"); *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1235 (M.D. Ala. 2003) (denying motion for conditional certification in part because the plaintiff was "paid some overtime").

Here, even if this Court applies a more lenient standard, conditional certification should be denied for numerous independent reasons. First, the absence of a common, unlawful policy that was uniformly applied to all putative class members is fatal to Plaintiff's motion for conditional certification. *See supra* Section III(B)(3). Instead, the record paints the picture of isolated, inconsistent instances of alleged off-the-clock work stemming solely from different rogue acts of branch-level supervisors and employees. *Id*. Thus, requisite individualized liability and damage inquiries would render this case unmanageable. *See supra* Section III(B)(3), (B)(5). A collective action, therefore, would be a waste of judicial resources and defeat the efficiency purposes of a Section 216(b) notice. *See generally Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Second, Plaintiff performed exempt job duties, making her not similarly situated to any other member of the putative class, even those at her own branch. *See supra* Section III(B)(2)(a). Third, Plaintiff has also failed to show that there is any interest whatsoever on a class-wide basis to participate in this lawsuit. *See supra* Section III(A). Fourth, the fact that PNC paid overtime to Plaintiff, and to employees at every branch at issue during every year of the class period, also weighs heavily against conditional certification. *See supra* Section II(B). Accordingly, this Court should deny Plaintiff's motion for conditional certification.

### C. Under No Circumstance Is Plaintiff Entitled To Toll Putative Class Members' Claims.

Even if this Court were to grant Plaintiff's Motion for Conditional Certification, tolling here is simply unwarranted. It is well settled in the Seventh Circuit that equitable tolling is a

doctrine that is to be used "sparingly" and only in "extraordinary circumstances." *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 964 (7th Cir. 2005). Tolling a statute of limitations on the equitable doctrine of estoppel requires that "the defendant take[] active steps to prevent the plaintiff from suing in time." *Smith v. Potter*, 445 F.3d 1000, 1010 (7th Cir. 2006) (citations and quotations omitted).

Here, Plaintiff does not contend that prospective plaintiffs were unable to discover Defendant's alleged violations; rather the record shows just the opposite. The only thing that has stopped Plaintiff from securing additional opt-ins and moving for conditional and class certification is Plaintiff's own failure to set forth a viable theory conducive to class-wide discovery and treatment.[39] Surely, if there are employees who believed they are owed unpaid overtime for off-the-clock work, or were paid as a result of PNC's investigation, but believed that they were entitled to additional overtime, they would have come forward and sued separately and/or opted into this lawsuit. But, they did not.[40] *Schultz v. Am. Family Ins. Co.*, No. 04-5512, 2005 WL 5909003, at *5 (N.D. Ill. Nov. 1, 2005) (rejecting plaintiff's request in

---

[39] Plaintiff has not identified any facts supporting a finding of willfulness. The standard statute of limitations under the FLSA is two years. 29 U.S.C. § 255(a). A three-year statute of limitations is applicable only in the case of a "willful violation" of the FLSA. *Id.* To show a willful violation, Plaintiff bears the burden of establishing that Defendant "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoes Co.*, 486 U.S. 128, 133 (1988). As interpreted by the Supreme Court, if an employer acts reasonably in determining its legal obligation, its actions cannot be deemed willful. *Id.* at 134. Further, if an employer acts unreasonably but not recklessly, its actions are still not considered willful. *Id.* at 135. Here, Defendant has acted in good faith and is committed to its legal obligations under the FLSA. Defendant has formal Overtime and HOW Policies (*see supra* section II(B)); and it pays for all hours worked, including overtime pursuant to those policies (*see supra* section II(B)(1)). Moreover, PNC ensures that its employees understand and follow those policies (*see supra* section II(B)(2)) and it promptly and thoroughly investigates any alleged violations of those policies (*see supra* section II(B)(3)). That said, if there was any question whether a particular ER investigator acted willfully with respect to a particular investigation, this Court would have to assess willfulness on a case-by-case basis.

[40] If anything, because a plaintiff must show exceptional circumstances to entitle him/her to tolling, Plaintiff's request for equitable tolling "suggests yet another individualized layer of inquiry that would make certification of the class unwieldy. . . the Court would have to inquire into whether extraordinary or unusual circumstances exist as to each of an indeterminate number of proposed class members." *See Syrja v. Westat*, No. PJM 09-1956, 1956 WL 95230, at *6, n.9 (D. Md. Nov. 2, 2010).

Section 216(b) motion that limitations period be tolled for potential class members and stating that "[i]gnorance of a lawsuit, however, is not the same as ignorance of a claim. Because [plaintiff] does not contend that the prospective plaintiffs were unable to discover [Defendant]'s alleged FLSA violations, there is no basis for tolling."); *see also Powers v. Centennial Commc'ns Corp.*, No. 1:08–cv–208–PPS, 2010 WL 746776, at *3 (N.D. Ind. Feb. 26, 2010) (holding that equitable tolling was not warranted due to an over-one-year delay in deciding plaintiff's motion for conditional certification because "nothing prevented potential opt-in plaintiffs from filing a claim while the motion was under consideration"). Thus, tolling here would be inappropriate.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Amended Motion for Class and Conditional Certification should be denied.

Dated:  December 17,  2013                   Respectfully submitted,

                                             MORGAN, LEWIS & BOCKIUS LLP

                                             /s/ John R. Richards
                                             John R. Richards (Trial Counsel)
                                             1111 Pennsylvania Avenue, NW
                                             Washington, DC  20004
                                             Telephone:  202.739.5790
                                             Facsimile:  202.739.3001
                                             jrrichards@morganlewis.com

                                             Steven R. Wall (pro hac vice)
                                             Sarah E. Bouchard (pro hac vice)
                                             1701 Market Street
                                             Philadelphia, PA  19103
                                             Telephone:  215.963.5000
                                             Facsimile:  215.963.5001
                                             swall@morganlewis.com
                                             sbouchard@morganlewis.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of Defendant's Response to Plaintiff's Memorandum in Support of Her Amended Motion for Class Certification was served via the Court's ECF system, with a courtesy copy by email upon the following opposing counsel of record on December 17, 2013:

**BURKE LAW OFFICES LLC**
Alexander H. Burke
155 N. Michigan Avenue
Suite 9020
Chicago, IL 60601
Tel.: 312.729.5288
Fax: 312.729.5289
Email: ABurke@BurkeLawLLC.com

**SCHAD DIAMOND & SHEDDEN, P.C.**
James Shedden
Tony Kim
332 S. Michigan Avenue
Suite 1000
Chicago, IL 60604
Tel.: 312.939.6280
Fax: 312.939.4661
Email: jshedden@lawsds.com
Email: tkim@lawsds.com

**WEXLER WALLACE LLP**
Thomas A. Doyle
55 West Monroe Avenue
Suite 3300
Chicago, IL 60603
Tel.: 312.479.5732
Fax: 312.277.1992
Email: tadoyle@thomasdoyle.corn

/s/ John R. Richards
*Attorney for Defendant*

DB1/ 76871235.3