1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3  MARISELI GOMEZ BELL,        )  Docket No. 12 C 1274
    Individually, and on      )
4  Behalf of All Others Similarly  )
    Situated,                )
5                        )
                Plaintiff,   )  Chicago, Illinois
6                        )  March 12, 2014
            v.            )  10:03 a.m.
7                        )
    PNC BANK, NATIONAL ASSOCIATION,  )
8  a national banking association,  )
                        )
9               Defendant.   )

10

          TRANSCRIPT OF PROCEEDINGS - Oral Argument
11        BEFORE THE HONORABLE THOMAS M. DURKIN

12  APPEARANCES:

13

    For the Plaintiff,   WEXLER | WALLACE LLP by
14  Proposed Collective   MR. THOMAS A. DOYLE
    Action Members, and   55 W. Monroe Street
15  Proposed Class        Suite 3300
    Action Members:      Chicago, IL 60603
16

17                    BURKE LAW OFFICES LLC by
                   MR. ALEXANDER H. BURKE
18                155 N. Michigan Avenue
                   Suite 9020
19                Chicago, IL 60601

20

                    LAW OFFICES OF JAMES S. SHEDDEN by
21                MR. JAMES S. SHEDDEN
                   145 Deer Valley Drive
22                Deer Park, IL 60010

23

24

25

```
 1    APPEARANCES (Cont'd.):

 2

 3    For the Defendant:    MORGAN LEWIS & BOCKIUS LLP by
                            MS. SARAH E. BOUCHARD
                            1701 Market Street
 4                          Philadelphia, PA 19103

 5
                            MORGAN LEWIS & BOCKIUS LLP by
 6                          MR. JOHN R. RICHARDS
                            1111 Pennsylvania Avenue, NW
 7                          Washington, D.C. 20004

 8

 9
      Court Reporter:       LAURA R. RENKE, CSR, RDR, CRR
10                          Official Court Reporter
                            219 S. Dearborn Street, Room 1432
11                          Chicago, IL 60604
                            312.435.6053
12                          laura_renke@ilnd.uscourts.gov

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (In open court.)

2        THE CLERK:  All rise.

3        12 C 1274, Gomez v. PNC.

4        MR. DOYLE:  Good morning, your Honor.  I'm Thomas

5    Doyle for the plaintiffs, Mariseli Gomez Bell.

6        THE COURT:  All right.  Why don't we have everyone

7    identify themselves for the record.

8        MR. BURKE:  Good morning.  Judge.  Alexander Burke for

9    plaintiff.

10        MR. SHEDDEN:  Good morning, your Honor.  James

11    Shedden, also for the plaintiff.

12        THE COURT:  All right.

13        MS. BOUCHARD:  Your Honor, Sarah Bouchard from Morgan

14    Lewis on behalf of PNC Bank.

15        MR. RICHARDS:  Your Honor, John Richards from Morgan

16    Lewis on behalf of PNC Bank.

17        THE COURT:  All right.  Thank you.

18        All right.  This oral argument was asked for by the

19    parties, correct?

20        MS. BOUCHARD:  That's correct, your Honor.

21        THE COURT:  All right.  And I'm always happy to

22    entertain oral argument on cases.  Federal court you usually

23    don't have it, but -- at least in the Northern District of

24    Illinois, we don't have it.  But I'm happy to have it.  It's

25    often helpful to me.  And having read over the briefs and the

1     enormous number of footnotes in the briefing by both sides,

2     it -- I could use some guidance and some help on what you view

3     as the key issues.

4          So how do you want to do this?  Sound like plaintiffs

5     want to go first.

6          MR. DOYLE:  If we could, your Honor, yes.

7          THE COURT:  Sure.

8          MR. DOYLE:  Could I reserve five minutes for a

9     rebuttal?

10          THE COURT:  Yeah.  This is not going to be as formal

11     as an appellate argument.

12          MR. DOYLE:  Okay.

13          THE COURT:  You can take the time you want.  I want to

14     be done by noon, but -- and if we're done well before that, I

15     have no objection to that.  But some of you traveled in from

16     out of town, and I'm happy to give you as much time as you want

17     to either make an argument or respond to one.

18          So why don't you go ahead.  I'll probably interrupt

19     you with questions, and I may ask questions of either side even

20     if you have the floor.

21          So but go ahead, Mr. Doyle.

22          MR. DOYLE:  Thank you, your Honor.

23          Your Honor, in this case, there is no question that

24     there were employees at PNC Bank who were overtime-eligible who

25     worked off-the-clock overtime.  There isn't any question that

1   that happened.

2          There isn't any question also that there were

3   frequently instructions from managers at branches that

4   employees were not to record their overtime hours, and there

5   were various ways that the managers in the branches carried out

6   that practice.

7          The off-the-clock overtime happened in three typical

8   scenarios most often:

9          An interrupted meal break where someone might have

10  been a full-time teller, and during their half-hour lunch

11  break, someone comes and gets them in the break room and said,

12  "We're busy.  Please come up front."  That happened.

13         The second way is there are people who made visits

14  outside of branches to try and drum up business for the bank.

15         The third way -- and they did that on their own time,

16  off the clock.

17         The third way that it happened is there were meetings

18  and work obligations that people had before and after their

19  scheduled shifts.  Some of the managers said, "We want you here

20  20 minutes before your shift starts," or "five minutes before

21  your shift starts, and don't record the time."

22         There were other branches where they said, "We want

23  you to balance your drawer, but you have to clock out at the

24  end of your scheduled shift.  And if it takes you an extra

25  20 minutes, you're not to record that time."

1          All of this evidence is collected in our opening

2    papers.  I can discuss any of it in more detail.

3          But what it leads us to is a conclusion that there was

4    an unofficial policy or practice at the bank.

5          THE COURT:  You concede that the stated policy was no

6    overtime without getting paid.

7          MR. DOYLE:  Absolutely.

8          THE COURT:  All right.  Is there a -- one of the

9    things that struck me as I went through all these is do you

10   have anything above the branch manager level that there is --

11   you can -- and I'm not saying you can't draw a conclusion of an

12   unofficial policy based on a series of anecdotes.

13         But it might also be a series of anecdotes.

14         MR. DOYLE:  Mm-hmm.

15         THE COURT:  And that is where I'm -- I had some

16   question.  One -- and I'll focus on that a little more.

17         Do branch managers -- are they judged on profitability

18   at the branch?  In other words, is there an incentive for an

19   individual branch manager to not want to pay employees overtime

20   because there is profitability measurement at the branch level?

21         MR. DOYLE:  Ms. Flores Poole, the former manager at

22   the Broadway and Berwyn branch, describes the incentives that

23   the managers at the bank faced.

24         THE COURT:  Okay.  What are those?

25         MR. DOYLE:  She says, for example, that "We were under

1    constant pressure to generate new business."  She also says,

2    "We were very thinly staffed," and she says in her affidavit

3    that's in the appendix that they had instructions at the level

4    above her that they were not to allow recorded overtime.

5           She's not the only one who says that.  There are other

6    managers who said the same thing, and we have that from

7    PNC Bank documents.

8           THE COURT:  All right.  Let me stop you, though.

9    Trying to get new business doesn't go to the expense side of

10   the ledger at a branch.

11          MR. DOYLE:  It doesn't, your Honor, but it goes to the

12   scrambling around trying to get the work done side.  And that's

13   the situation that Ms. Poole describes, that they were thinly

14   staffed, barely able to cover the obligations that they already

15   had.  And then when something came along, like a chance for an

16   employee to go down the street and try and drum up new

17   business, they had no hours in the budget for it.  That's what

18   she describes.

19          THE COURT:  Well, that's where I'm going on this.  Is

20   there a disincentive for a branch manager to have overtime --

21   have employees ask for overtime or ask to be paid for overtime?

22   It may be that's not part -- if there's nothing from the bank

23   saying -- certainly there's nothing directly from the bank

24   saying don't pay overtime.

25          And if there is something that doesn't state it

1    directly, but it says you have a set number of -- you have a

2    budget for what your employees are going to be paid, the

3    expense for salary, there -- you know, you have a plus or minus

4    on overtime of 10 percent or 20 percent, if you go over that,

5    you, the branch manager, will not be eligible for a bonus or

6    you will not be eligible for some kind of merit pay increase.

7                 Is there evidence of that at all?

8                 MR. DOYLE:  There is not.  And I don't know the

9    specific reason why so many managers did it, but it happened

10   over and over again.

11                THE COURT:  Well, that's -- I mean, things don't

12   happen unless there's a reason.  And if the reason is there

13   just was not enough people to cover all the actions that should

14   have been covered, I'm not sure that's a policy, as opposed to

15   inefficiencies by the branch manager.

16                MR. DOYLE:  But, your Honor, if it's widespread, it's,

17   in effect, an unofficial policy or practice.  And for the

18   workers, it doesn't matter why it is that their managers are

19   telling them to do that.  They're still not getting paid for

20   the overtime that they're working.

21                THE COURT:  Understood.  And it's -- it's -- if

22   they're not getting paid for it, they have a legitimate beef on

23   it.

24                But we're here to decide whether or not there's common

25   questions of fact or whether -- and really what I've -- what

1    I'm left with, having read a lot of this, is, do we have any

2    common questions that would be resolved at trial, or would we

3    be resolving dozens and dozens of anecdotal situations?

4              MR. DOYLE:  I understand.

5              THE COURT:  And that's what troubles me, because I'm

6    not sure -- if it's the latter, a class mechanism is not the

7    way to resolve it.

8              MR. DOYLE:  I disagree, your Honor.

9              THE COURT:  All right.  Go ahead.

10              MR. DOYLE:  Even if we were at that, I would disagree

11   with that.  But we aren't there.

12              THE COURT:  All right.

13              MR. DOYLE:  Let me tell you the first reason why we're

14   not there.  There's two ways -- and this is -- I've thought

15   about this same thing that you're getting at in maybe a

16   slightly different way.  There's two ways that you could prove

17   an unofficial policy or practice.  You could prove it top-down,

18   or you could prove it bottom-up.

19              And to prove it top-down, you would hope to find the

20   great e-mail from someone senior at the bank says, "Ah, to heck

21   with whatever it is Policy No. 105 says in writing in the

22   manual.  We all know that we all have to have off-the-clock

23   overtime and don't dare let anyone record it."

24              That would obviously be the sort -- those kinds of

25   cases don't get litigated because everybody sees what a massive

1    problem that is.  We don't have that e-mail here.  I don't have

2    a single instruction that guided everyone and led to that.

3           There is some evidence in addition to it happening

4    over and over again.  There is, for example, the e-mail that's

5    in our appendix -- and I can get you the exact page cite --

6    where they're encouraging people to drum up business while

7    you're out on your lunch hour shopping.  Plainly this is

8    someone from above the branch level instructing branches that

9    they ought to be working off the clock.

10          There was a promotion that went out --

11          THE COURT:  Well, does that encourage them to work off

12   the -- maybe work -- it encourages them to work during lunch

13   hour.  But doesn't the official policy say if you're working

14   outside of your normal hours, you should record it and you'll

15   get paid for it?

16          MR. DOYLE:  But, your Honor, that didn't happen.  So

17   why didn't it happen?

18          So you add that -- I agree, that e-mail is not a home

19   run.  That e-mail doesn't create the top-down kind of proof.

20          THE COURT:  Mm-hmm.

21          MR. DOYLE:  But it is circumstantial, and it fits very

22   well with what it is that we saw happening all over in these

23   branches.  That's the first piece of it.

24          The second piece of it, though, Judge, is you could

25   prove it from the bottom up.  You could show that this happened

1    so often and so similarly in so many branches that it is

2    plainly an unofficial policy or practice.

3         That's exactly what happened in the *Ross v. Citizens*

4    *Bank* case.  In that case, it was a statewide class, the entire

5    state of Illinois.  There were affidavits from 90 different

6    employees, all class members, describing that there was an

7    off-the-clock overtime practice at the bank.  That's what

8    happened.

9         We have better proof than that here, Judge, because we

10   aren't relying on 90 statements from people that would be class

11   members; we're relying on PNC Bank's documents.  And PNC Bank's

12   documents show that people worked off the clock.

13        THE COURT:  Those were all complaint -- was the

14   majority of your exhibits --

15        MR. DOYLE:  Yes.

16        THE COURT:  And I can't tell you I studied every one.

17        MR. DOYLE:  I understand.

18        THE COURT:  But when I flipped through them, it looked

19   like the majority of them were you were taking information from

20   the complaint files that were the subject of the -- of a lot of

21   back and forth earlier when you were in court.

22        MR. DOYLE:  Yes.  They call them ERIC tracker reports.

23        THE COURT:  Right.

24        MR. DOYLE:  It's Employee Relations, their database.

25   And the investigator would go out.  When someone would say,

1    "There's an overtime issue at Branch A," the investigator would

2    go out and would write down who said what to whom; who did what

3    kind of work around here.

4        The problem is, Judge, that what ended up happening is

5    they didn't bother to pay everybody.  They often disciplined

6    the managers, but there are dozens of examples that we've

7    already identified from those documents where there are people

8    who said, "I was subject to an off-the-clock overtime policy,

9    but I" -- the documents show that they never got paid.  There

10   is nothing produced in the record that shows that those people

11   got paid.  This is the chart.  It's at pages 159 to 161 in our

12   appendix.

13       And we list 50 people who turned up in those

14   investigation reports describing the off-the-clock problems

15   that they had who were never paid.  They don't appear on the

16   bank's master list of payments.

17       The bank's master list is the document that's

18   immediately before that in the appendix at pages 154 to 158.

19       And in the bank's master list, they say, "Here are all

20   the investigations we did.  Here are all the people we paid.

21   Here's the amounts of money we paid."

22       So we went through in the course of preparing this

23   motion and compared those investigation reports to what they

24   actually did.

25       You can see those 50 people that are at 159 and 160 in

1   the appendix are all identified by name already.  And there's a

2   cite for each of them for where their reference is otherwise in

3   the appendix.

4       We already know that there are 50 people who worked

5   off-the-clock overtime at these various branches, and they

6   weren't paid.  They weren't paid as a result of these

7   investigations.  And the documents show it as plainly as could

8   be.

9       THE COURT:  Well, is there anything in the report that

10   indicates why they weren't paid?  In other words, was it -- was

11   the complaint found to be unsubstantiated?

12       MR. DOYLE:  No.  For example, your Honor -- no.  And I

13   can give you a couple of -- a couple of reasons --

14       THE COURT:  All right.

15       MR. DOYLE:  -- why it happened that way.

16       Those 50 people don't turn up on the master list of

17   who got paid.  And in the investigation reports along the way,

18   they're not -- they're not mentioned.

19       For example, at the -- at the branch at Chicago -- the

20   Chicago branch at 87th and Cottage Grove --

21       THE COURT:  All right.

22       MR. DOYLE:  -- they fired manager Gloria Gayle from

23   the branch because she was requiring employees to not record

24   their overtime.

25       There are two people from this branch, Ruth

1   St. Fleurose and Tanya Guerrero.  They both said that their

2   meal breaks in the course of the overtime investigation had

3   been missed or interrupted.  The master list that's shown at

4   154 to 158 of the appendix makes no mention of Ms. St. Fleurose

5   or Ms. Guerrero.  Neither one of them were paid.

6           THE COURT:  Do you have -- have you talked to either

7   one of them?

8           MR. DOYLE:  We have not.

9           THE COURT:  Okay.  So the basis -- your basis for

10  saying they weren't paid is the list from 154 to 159 are

11  those -- or 158 are those people who were paid.

12          MR. DOYLE:  That's right.

13          THE COURT:  You go -- you start first with the

14  complaints, and you see a complaint that says manager got fired

15  because she had a policy -- branch manager got fired because

16  she told employees to work over lunchtime but don't record it.

17          MR. DOYLE:  Mm-hmm.

18          THE COURT:  You have names of people who were -- in

19  the complaint filed, you have the names of Guerrero --

20          MR. DOYLE:  Yes.

21          THE COURT:  -- and -- okay.

22          MR. DOYLE:  Yes.

23          THE COURT:  So Guerrero and --

24          MR. DOYLE:  St. Fleurose is the other.

25          THE COURT:  -- St. Fleurose names are in the complaint

1    file or the ERIC file --

2            MR. DOYLE:  Right.

3            THE COURT:  -- that indicated these were the -- were

4    they the only employees who complained about it, or --

5            MR. DOYLE:  No, there were some at that branch who did

6    get paid.

7            THE COURT:  Okay.  And -- pardon me?

8            MR. DOYLE:  I'm sorry, your Honor.  I didn't mean to

9    interrupt.

10           THE COURT:  Oh, no.  There were some that got paid?

11           MR. DOYLE:  Mm-hmm.

12           THE COURT:  All right.  So you take the complaint

13   file.  You have a branch manager fired.  You have let's say

14   four people who were implicated in the -- or mentioned in the

15   ERIC file as being told to work over lunch but don't record it.

16           MR. DOYLE:  Mm-hmm.

17           THE COURT:  You then go to the pages 154 through

18   158 --

19           MR. DOYLE:  Yes.

20           THE COURT:  -- which are the -- yeah, 158, which are

21   the listing by the bank of those who were paid, and what you

22   then extracted -- not just for 87th and Cottage Grove, but

23   DePaul, Loves Park, North and Homan and a variety of other

24   locations, you extracted those names of people who were

25   identified in the complaint file who are were not on the list

1    of people paid.  And that's where you come up with the

2    50 names.

3              MR. DOYLE:  That's right.

4              THE COURT:  Okay.  All right.

5              MR. DOYLE:  The next page, the chart that's

6    immediately after that list of 50 --

7              THE COURT:  Right.

8              MR. DOYLE:  -- is six people whose names do appear on

9    the -- is six people whose names do appear on the master list.

10             THE COURT:  And it's page 161?

11             MR. DOYLE:  Correct.  But no overtime was paid to

12   them.

13             THE COURT:  Oh, all right.  So they're on the -- I

14   thought the list of people on the master list were those who

15   have been paid.

16             MR. DOYLE:  No, I'm sorry.  The 159 and 160 is the

17   people whose names are nowhere on the official master list.

18   Okay?

19             THE COURT:  Right.  Okay.

20             MR. DOYLE:  The master list makes mention of some of

21   these other people but shows that they weren't paid.

22             THE COURT:  I see.  Okay.  All right.

23             MR. DOYLE:  So we have already at this stage in this

24   case identified 56 people who have said that they worked

25   off-the-clock overtime hours and that they weren't paid.

1    The branch proof is replete with instructions from

2  managers and employees saying, "We understood that we were not

3  to record our overtime hours."

4    This is an awful lot like the *Ross v. RBS* approach

5  that Judge Lefkow certified in that case, and the 7th Circuit

6  affirmed it.

7    THE COURT:  And what is the -- there is some

8  controversy over the --

9    MR. DOYLE:  The status of that case?

10    THE COURT:  The status of the 7th Circuit affirmance

11  of Judge Lefkow.

12    MR. DOYLE:  Here's what happened.  After -- the

13  7th Circuit affirmed Judge Lefkow's certification order.  After

14  that --

15    THE COURT:  That was post *Dukes*, post *Wal-Mart v.*

16  *Dukes*.

17    MR. DOYLE:  Correct.  And after the *Comcast* decision

18  came out, there was a petition to the U.S. Supreme Court.  The

19  U.S. Supreme Court issued a grant, vacate, and remand order and

20  sent it back to the 7th Circuit.  It's one of these

21  two-sentence orders that says, you know, "We grant the

22  petition, vacate the 7th Circuit's ruling, and remand it for

23  further consideration."

24    The -- it goes back to the 7th Circuit.  Before the

25  7th Circuit did anything with it, the case was transferred to

1     New York to be part of a larger settlement.

2            THE COURT:  Okay.

3            MR. DOYLE:  The *Ross* case was never -- was never

4     vacated by the 7th Circuit.  The 7th Circuit case, according to

5     some of the cases that we cite in our brief, remains good law

6     in these circumstances.  Moreover --

7            THE COURT:  Remind me what the *Comcast* case said.

8            MR. DOYLE:  Pardon me?

9            THE COURT:  Remind me what the *Comcast* case said.

10           MR. DOYLE:  *Comcast* is an antitrust case, and the

11    plaintiffs in that case had four theories of damages, three of

12    which got knocked out, only their damages model was not

13    flexible enough to allow for only Damages Model D.  It was

14    impossible to unpack the overcharge in that case.

15        The Supreme Court said in *Comcast* that that was a

16    failure of classwide proof because there was no longer a way to

17    measure impact or damages on a classwide basis given that

18    circumstance.  *Comcast* was solely about how damages are proven

19    on a classwide basis.

20        By the way, we've not asked for damages on a classwide

21    basis.

22           THE COURT:  I understand.

23           MR. DOYLE:  Your Honor, there's another way that all

24    of this that we've paid attention to what's going on in the

25    cases and that distinguishes us from *Dukes*, from *Comcast*, from

1    a lot of the cases that have really tried to rein in abuses in

2    the class action practice, where the courts have tried to do

3    that.

4          We have been careful, your Honor, to not try and do a

5    blunderbuss nationwide class or to try to not do a statewide

6    class.  There are 200 branches in the state of Illinois, I

7    believe, of PNC Bank.  We chose the 27 where you can see that

8    this unofficial policy or practice exists.

9          THE COURT:  All right.  Yeah, I -- well, Illinois, I

10   guess, there's southern Illinois or -- there's Chicago,

11   Wisconsin, and then there's the rest of Illinois.

12         MR. DOYLE:  Mm-hmm.

13         THE COURT:  The 23 branches you are seeking to -- in

14   your class definition are all in the Illinois/Wisconsin?

15         MR. DOYLE:  It's 27 branches.

16         THE COURT:  27, rather.

17         MR. DOYLE:  All, I believe, except for one.  There's

18   one in Bloomington-Normal --

19         THE COURT:  Okay.

20         MR. DOYLE:  -- that's -- that's listed in the 27.

21         THE COURT:  All right.  And are the 26 all in the

22   Chicago area, or are any of them in Wisconsin?

23         MR. DOYLE:  They're -- if you call Rockford the

24   Chicago area.

25         THE COURT:  It is.

1          MR. DOYLE:  There's none in Wisconsin.

2          THE COURT:  Okay.

3          MR. DOYLE:  If you call Rockford the Chicago area,

4    then yes.

5          THE COURT:  Okay.  All right.  How did you pick that

6    group?

7          MR. DOYLE:  We went through the investigative reports

8    and tried to figure out where -- where do we have evidence of

9    this and tried to be conservative.

10         I believe, your Honor, that this practice happened all

11   over the state.  And the reason I believe that is because these

12   pressures were all over the state and because of the way that

13   we see it in the branches that we've got.

14         But to avoid sweeping in branches that could make for

15   a certification that would be overbroad, we focused on these

16   27.  It's a conservative approach.

17         THE COURT:  Is there any commonality between the 27

18   other than what happened at each particular branch?

19         MR. DOYLE:  The only --

20         THE COURT:  In other words, is there a -- I know you

21   talked about top-down/bottom-up.  But is there anything that is

22   common among the 27 branches other than your -- other than

23   complaints about one of these three forms of overtime abuses?

24         MR. DOYLE:  To be fair, your Honor, that's the most

25   important common thing about them --

1          THE COURT:  Right.

2          MR. DOYLE:  -- is that all of them have the issue that

3    is up on this case.  All of them have unpaid off-the-clock

4    overtime.

5          And all of -- and, yes, so there -- but is there --

6    are they all subject to the same district manager, for example?

7    No, I don't believe they are.  Are they all in the same place

8    on the organizational chart?  I don't believe they are.  Are

9    they all in some same reporting structure?  I don't know that.

10   I suspect that they are not.

11         THE COURT:  Given what the defendants have put out in

12   an affidavit, I don't think they are.

13         MR. DOYLE:  Well, your Honor, I don't know that that

14   matters.  And the reason it doesn't matter is, for example, in

15   *Ross v. Citizens Bank*, they certified a statewide class with

16   more than 100 branches, some of which they had no proof at all

17   that there was off-the-clock overtime happening at.

18         And the Court there certified a statewide class, and

19   it proceeded.  And surely they weren't all part of the same

20   business units.  There wasn't proof that they were all part of

21   the same management team, that they were all part of the same

22   organizational chart.

23         The thing is, your Honor, the most important common

24   fact is the most important fact in the case.  And the most

25   important fact in the case is there was off-the-clock overtime

1    and it happened over and over.

2            There are other issues that we can try classwide.  We

3    can try classwide how did the bank respond to all of this.  In

4    other words, did the bank act willfully, or did the bank act in

5    good faith?

6            Those not only can be tried classwide, they ought to

7    be.  And the reason they ought to be is because everyone ought

8    to be working from the same statute of limitations.

9    Willfulness drives the statute of limitations.  Everyone ought

10   to be working from the same measure of damages as a

11   possibility, the same methodology.

12           Is there liquidated damages?  Good faith is about

13   liquidated damages.  We can try those issues on a classwide

14   basis because there is -- and that reminds me of something

15   else, your Honor.

16           There is another way that all of these branches have

17   something in common:  They were all subject to an

18   investigation.  They were all subject to an investigation that

19   left people unpaid, an investigation that didn't go through and

20   figure out who in this branch didn't get paid.

21           At the Bloomington branch, the manager told people in

22   a meeting that if you've got overtime hours, record them next

23   week, and that will keep it off this week's budget.

24           THE COURT:  Do you have anything from the 50 people

25   that were not on the list that indicates they think they're

1    entitled to overtime?

2         MR. DOYLE:  Other than what they say in the

3    investigation reports where they say that they worked off the

4    clock.

5         THE COURT:  Okay.

6         MR. DOYLE:  No, I do not.  I do not have affidavits

7    from them.  I do not have witness statements from them.

8         THE COURT:  Wouldn't you expect them to complain if

9    they see a coworker who presumably was similarly situated who

10   complained along with them?  The coworker gets paid and they

11   don't.  Wouldn't you have -- I would be surprised if -- I'm

12   surprised there's this many people who were not paid if there

13   were others in the same boat who did get paid.

14        MR. DOYLE:  I'm not surprised, your Honor.

15        THE COURT:  All right.

16        MR. DOYLE:  And the reason I'm not surprised is in

17   this economy, employers get more than they do in a different

18   economy.  People are worried about their jobs, your Honor.  And

19   people aren't as likely to complain or rock the boat in this

20   economy.  It doesn't surprise me.

21        THE COURT:  But why would the bank, if they're going

22   to pay some, not pay them all?  To --

23        MR. DOYLE:  I -- perhaps the bank paid the squeakiest

24   wheels.  Perhaps the bank paid the people who complained the

25   loudest without really trying to figure out what's the scope of

1    the problem?  Who really is owed money here?

2              THE COURT:  Well, you went through these complaint

3    files very carefully, as did the defendants.  Is there anything

4    in the complaint files to indicate any reason why the 50

5    weren't paid?  In other words, was there something about the

6    complaint they made themselves?  In other words, was there

7    some -- basically a studied reason why they didn't get paid?

8              MR. DOYLE:  No.  I don't believe so, your Honor.  And

9    there are -- there are examples of that that we didn't include

10   on that list.

11             THE COURT:  All right.

12             MR. DOYLE:  There are examples of people who the bank

13   said, well, you've asked for 90 hours; we'll pay you for 66.

14   Or you've asked for -- in the case of Tess Claveria from the

15   Broadway and Berwyn branch, she asked for I believe 68 hours,

16   and they paid her for four.

17             Your Honor, there is -- there are people who they made

18   decisions about.  These people they didn't.  And these people

19   they did not say so and so is definitely not entitled to

20   overtime.  Therefore, we're not going to pay them overtime.

21             Your Honor, they have branches where they fired the

22   manager and then didn't pay the people who complained.  This

23   was not an effort to get to the bottom of the overtime problem

24   in the sense that they wanted to make sure everyone got their

25   dollars.  This was -- if it was anything by the bank, it was an

1  effort to put out a fire and move on.  It was an effort to stop

2  the bleeding and move on.

3         That's not a good-faith effort to comply with the Fair

4  Labor Standards Act, and that's the kind of conduct that

5  exposes companies to liquidated damages under that statute.

6  That ought to be tried on a classwide basis.

7         THE COURT:  Well, if we had a trial on a classwide

8  basis, what would your -- other than Ms. Bell, who would you

9  call?

10         MR. DOYLE:  Who would we call?  We would put in a lot

11  of it with the documents that we've already got.  We would put

12  in some of it with hostile witnesses from the defendants.  I'd

13  put on some of the authors of these reports and find out what

14  it is that they did and find out -- Margaret Alvarez is someone

15  I would put on the stand in a moment at a trial, your Honor,

16  and she is the employee relations person who wrote a lot of

17  these reports.

18         The questions -- the way we would try this case we

19  laid out in the trial plan that we put in our brief.  And --

20         THE COURT:  Well, I saw that.  And I had a question on

21  that.

22         MR. DOYLE:  Yes.

23         THE COURT:  It says at the top of page 12 of your

24  brief --

25         MR. DOYLE:  Right.

1      THE COURT:  -- "Ms. Bell will" -- well, on the bottom

2  of 11, it says, "Ms. Bell will offer evidence of her own

3  experience," and the rest of your paragraph deals with that.

4  And that's fine.  She can do that in a class case; she can do

5  it in an individual case.

6      But then moving to page 12, you say, "Ms. Bell will

7  also prove the existence of PNC Bank's companywide unofficial

8  policy or practice that required employees to work overtime on

9  an off-the-clock basis."

10      How will her testimony of her own individual

11  circumstance offer evidence of a companywide unofficial policy?

12      MR. DOYLE:  Her manager's testimony can do that, your

13  Honor.

14      THE COURT:  And her manager was?

15      MR. DOYLE:  Is Letticia Flores Poole.  And her manager

16  said, "I didn't create this system.  I didn't come up with this

17  idea.  This was pressure that was imposed upon me from the way

18  the bank is set up."

19      We can put her on in the course of Ms. Bell's case,

20  and she would also offer proof that would be probative of was

21  there an unofficial policy or practice at the bank.

22      THE COURT:  Now, she was the branch manager, correct?

23      MR. DOYLE:  At Broadway and Berwyn.  That's right.

24      THE COURT:  Does she identify -- remind me -- and she

25  was deposed, correct?

1           MR. DOYLE:  She was not.

2           THE COURT:  She was not deposed.

3           MR. DOYLE:  She was not.  We have an affidavit from

4     her.  The defendants never took her deposition.

5           THE COURT:  All right.

6           MR. DOYLE:  She's a former employee.

7           THE COURT:  Right.  But her affidavit says what?

8           MR. DOYLE:  Her affidavit says that I -- we were

9     thinly staffed.  We had pressure to -- it's -- it appears in

10    the appendix.  I can point you to it fairly quickly.

11          THE COURT:  Sure.

12          MR. DOYLE:  It appears in the appendix -- I don't want

13    to misstate what it is that she says.

14          THE COURT:  I remember seeing it --

15          MR. DOYLE:  Yes.  It's at pages --

16          THE COURT:  -- when we were fighting about discovery.

17          MR. DOYLE:  -- 8 to 11 of the appendix.

18          THE COURT:  All right.

19          MR. DOYLE:  She says, "We had a lean staffing model.

20    We had pressure to generate accounts."

21          She says, "PNC Bank would not permit me to report

22    overtime for the branch."

23          She says that she passed along PNC Bank's solution as

24    it had been communicated to her, to the branch employees,

25    telling them that overtime would not be permitted.

1          THE COURT:  Say that last -- what paragraph are you on

2     for the last --

3          MR. DOYLE:  On page 10.

4          THE COURT:  Yeah.

5          MR. DOYLE:  (d) and (e).

6          THE COURT:  All right.  Give me a moment to read it.

7          Is Romis the person who has passed away?

8          MR. DOYLE:  She is deceased.  That's right, your

9     Honor.

10         THE COURT:  Is she the only regional manager who there

11    is -- admittedly, it's hearsay, but the only regional manager

12    who says that PNC would not permit a branch manager to report

13    overtime?

14         MR. DOYLE:  I'm looking for one other thing.

15         The -- she's the only one I think of at the moment.

16         THE COURT:  All right.  No, and if it's in there.

17         MR. DOYLE:  There was one other thing, I thought, and

18    I don't see it, your Honor.

19         THE COURT:  All right.

20         MR. DOYLE:  The -- and she says she -- she did not

21    create the situation.  It was dictated to her by the business

22    model created by the bank, created by the bank's top

23    management.  That model relied on thin staffing, required

24    branches to meet aggressive targets on new business.

25         THE COURT:  All right.  Was Romis ever -- did she ever

1   give an affidavit?

2           MR. DOYLE:  She did not.  She died before this case

3   started.

4           THE COURT:  Okay.  All right.

5           Okay.  Go ahead.

6           MR. DOYLE:  So, your Honor, it's one of these -- it's

7   one of these cases where I do not stand here in front of you

8   with that e-mail from a regional manager that was in charge of

9   all of these branches.  Instead, we're doing a bottom-up style

10  approach, relying on PNC Bank's documents.  We --

11          THE COURT:  Okay.  Well, one of the things -- two

12  questions.

13          MR. DOYLE:  Yes.

14          THE COURT:  Is *Ross* your best case?

15          MR. DOYLE:  *Ross*, I believe, is the case that is most

16  on point.  There are others that talk about unofficial policy

17  and practice.

18          THE COURT:  Right.  But *Ross* you would view as the one

19  that's most analogous to your situation.

20          MR. DOYLE:  I think that's right.  It's a bank. it's

21  off-the-clock overtime.  Class was certified.

22          THE COURT:  Okay.  And the 7th Circuit affirmed it.

23          MR. DOYLE:  Correct.

24          THE COURT:  Affirmed the objection to it and then, as

25  said, there's some fights about its vitality.  But I think the

1  7th Circuit has at least cited it --

2       MR. DOYLE:  Yes, they have.

3       THE COURT:  -- since the time the Supreme Court asked

4  it to revisit the decision based on *Comcast*.  Did they outright

5  reverse it, the Supreme Court, or did they just --

6       MR. DOYLE:  It's a GVR order.  And it's grant, vacate,

7  and remand is what they stand for.  And then there's some

8  discussion among the district courts what that means.

9       The one thing that's true is there's no question that

10  Judge Lefkow's opinion remains standing.  Judge Lefkow's

11  opinion had been affirmed by the 7th Circuit, and Judge

12  Lefkow's opinion is certainly still good law.

13       THE COURT:  Okay.  What about -- you know, the

14  defendants at pages I think 21 or 22, maybe 23 of their brief,

15  go through a long list of cases where class certification has

16  been denied when there is an official policy prohibiting the

17  nonpayment of -- or prohibiting people from not getting paid

18  for overtime.  And the Court's commenting that with an official

19  policy, we are often to anecdotes when we are considering the

20  exceptions where people violate that policy.

21       I get it if an entity has no policy and then the

22  practice, similar to *Monell* in a 1983 situation, the practice

23  becomes the policy.  But when you have a written policy that

24  says no, it seems like there's an overwhelming number of cases

25  that have not certified classes in those situations.

1          MR. DOYLE:  There are two that have that I can think

2     of as I stand here.

3          THE COURT:  All right.

4          MR. DOYLE:  One of them is *Ross*.  In *Ross*, there was

5     an official policy --

6          THE COURT:  Right.

7          MR. DOYLE:  -- you must pay overtime.  That did not

8     sway Judge Lefkow, and it did not sway the 7th Circuit.  Both

9     of them deal with that fact in their opinions.

10          The second case is *McReynolds v. Merrill Lynch*.  And

11     in that case -- it's a race discrimination case; it's not an

12     overtime case.  But there was an official policy at Merrill

13     Lynch we do not discriminate on the basis of race.

14          And the 7th Circuit said that there were two ways that

15     would support a race discrimination claim in that.  It had to

16     do with staffing, and it had to do with work assignments.  It

17     was a disparate impact case.

18          And even though there was a written policy at Merrill

19     Lynch that we will not discriminate based on race, race

20     discrimination happened at the bank -- or at the investment

21     bank, and the class certification was allowed because there

22     were these practices going on that were flatly inconsistent

23     with the major premise that the investment bank was touting as

24     their defense.

25          In addition, your Honor, there's one more fact not to

1   lose track of.  If it is correct, if the written policy is a

2   defense for the bank, that's a classwide issue.

3           THE COURT:  How so?

4           MR. DOYLE:  Because it would apply to everybody.  If

5   you certified the class, it would apply to everybody.  That can

6   be answered for all class members.  Is that a complete defense

7   or not a complete defense?  That can be answered for the entire

8   class and, in fact, should be.

9           THE COURT:  Well, how would that -- there's a jury

10  demand in this case, correct?

11          MR. DOYLE:  Correct.

12          THE COURT:  So how would a jury in a class action --

13  how would that play out?

14          MR. DOYLE:  We have -- in the trial plan, we -- it's

15  like under Rule 23(c)(4), you certify individual questions for

16  trial.

17          THE COURT:  Right.

18          MR. DOYLE:  We list what the questions are.  One of

19  the questions is, does PNC Bank's written policy provide the

20  bank with an absolute defense in this case?

21          THE COURT:  Well, if it's an absolute defense, isn't

22  that a legal question, or would that be a factual?

23          MR. DOYLE:  Well, I don't know if it's a factual or --

24  I haven't thought that through, your Honor, to be honest.

25          THE COURT:  All right.

1          MR. DOYLE:  And if it is a jury question, you could do

2     it by special interrogatory.  You could do all of these by

3     that.

4          THE COURT:  All right.  But if it's a jury question,

5     they come in and -- you start, but maybe you put it in too.

6     You put in their written policy because they're going to do it

7     in their case if you don't.

8          MR. DOYLE:  Mm-hmm.

9          THE COURT:  They'll put in their -- you'll put in

10    their written policy to blunt the effect of it.  And then you

11    will bring in what sounds like will be scores and scores of

12    people who will say maybe that written policy existed, but I

13    didn't get paid overtime and I worked overtime.

14         MR. DOYLE:  Scores and scores would be true if we were

15    talking about a nationwide class.  We're talking about

16    something much smaller than that.  There are documents -- we

17    could put in one witness who would put in a bunch of these

18    reports that could show without a doubt that there was

19    off-the-clock overtime happening at a whole list of branches.

20         THE COURT:  Well, how would you -- what's your

21    evidentiary basis to put in the reports?  Were they admissions?

22         MR. DOYLE:  Sure they're admissions.

23         THE COURT:  You've got hearsay within them, although,

24    you know -- are they really a -- they may very well be

25    admissions, but would there be an issue about whether the

1      variety of hearsay statements within the reports ought to be

2      admissible because --

3              MR. DOYLE:  I don't think so.

4              THE COURT:  -- the -- PNC is collecting the

5      information and taking statements from people.  These are not

6      necessarily attributable statements to PNC the entity.

7              Now, maybe they are.  And I'm just -- I'm a little

8      confused on, you know, typically just about anything produced

9      by a party you call an admission.  It's an easy call on an

10     evidence question.

11             But here where you have a variety of statements of

12     people who are not subject to cross-examination, you know,

13     you'd put on the investigator or the -- there's, what,

14     20 investigators.  I don't know how many were involved here.

15             MR. DOYLE:  There were two investigators assigned to

16     the state of Illinois.

17             THE COURT:  Okay.  So you've got two investigators.

18     And really the cross is going to be, well, was this person

19     telling the truth when they told you this or weren't they?

20     That's not effective cross-examination.  I'm not sure that's

21     fair to either side and fair to the jury.

22             Ultimately wouldn't you -- wouldn't you have to bring

23     in the people who claim they worked and didn't get paid?  And

24     if you do that, aren't we off into an area of -- isn't that

25     what we're not supposed to be doing in a class action, where

 1     you get dozens and dozens and dozens of people coming in?

 2     Because even if it's not scores, it's going to be dozens and

 3     dozens.

 4              MR. DOYLE:  Well, your Honor, we have -- our standard

 5     of proof would be by preponderance a class certification.

 6              THE COURT:  Right.

 7              MR. DOYLE:  And then at trial, we'd have to prove

 8     those facts by a preponderance also.

 9              Do we have to prove for all 600 class members that

10     they worked off-the-clock overtime?  I don't think so.  I think

11     we have --

12              THE COURT:  Well, *Ross* had --

13              MR. DOYLE:  They had 90.

14              THE COURT:  90 affidavits, right?

15              MR. DOYLE:  Yes.  They did not have statements from

16     Citizens Bank saying that it had happened.

17              THE COURT:  Yeah, but these are -- but they were --

18     you have statements from investigators who say people said

19     something.

20              MR. DOYLE:  Correct.

21              THE COURT:  You don't have -- do you have anything

22     from the people themselves?

23              MR. DOYLE:  Well, we have --

24              THE COURT:  You've got the named plaintiff.

25              MR. DOYLE:  We have the named plaintiff.  We have

1   Ms. Poole.  We have Mr. Cobb's affidavit describing what

2   happened at DePaul.

3           THE COURT:  Mm-hmm.

4           MR. DOYLE:  It would be one thing, your Honor, if we

5   had one stray little document that looked unreliable.  This is

6   how the bank addressed the problem.  That's the reliability to

7   it.

8           THE COURT:  I see.

9           MR. DOYLE:  The bank sent out the employee relations

10  investigator to try and figure out what do we do because

11  they're saying out there that somebody's working off-the-clock

12  overtime.

13          I don't think the bank is going to want to object to

14  these things getting in.  Maybe they will.

15          But, your Honor, the bank wants to try and prove these

16  in -- put these in because the bank will want to try and say we

17  responded to overtime as it was happening out there.  The real

18  question in this case -- and it can absolutely be tried on a

19  classwide basis -- is, was there an unofficial policy or

20  practice?  We don't have to prove that for 600 individual

21  instances.

22          And is it more sensible, Judge, to have one person

23  prove that and then fire up another jury and have another

24  person prove it and fire up a third jury and have another

25  person prove it and a fourth jury and have another one prove

1   it?

2          THE COURT:  Well, that's always the argument of

3   plaintiffs posing class certification.  The question is,

4   though, is, in my mind -- is at what point do you -- what is

5   the quantum of evidence you need to convince me to certify a

6   class of a -- basically a series of vignettes that in total

7   amount to an unofficial policy?  Is there a magic number?  Is

8   it, you know, you have to come up at this stage with -- not

9   with your trial proof, but with enough that I -- is there any

10  law about what you need to -- short of what you put in at

11  trial, which is going to have to be more.  Doesn't have to be

12  more, but it certainly can be more, and you don't have to prove

13  your case as if you were trying it in front of me for me to

14  certify a class.

15         But there's got to be a level of proof that makes this

16  a -- makes an unofficial policy a -- makes a series of acts by

17  individuals at branch levels and turns it into an unofficial

18  policy.

19         Policy is a classwide issue.  But to get to that, I

20  have the bank saying we have a bunch of rogue branch managers

21  or -- that's the primary one -- rogue branch managers who are

22  telling people don't sign up for overtime and a fair amount of

23  evidence that, when caught, they get fired or disciplined in

24  some way.

25         So at what point does what they say -- where do you go

1    from these vignettes to what would amount to an unofficial

2    policy?  I guess that's where I'm going.

3              MR. DOYLE:  I guess I don't have a number for you.

4    The test --

5              THE COURT:  No, there probably isn't.

6              MR. DOYLE:  But the test is a preponderance of the

7    evidence.  Is there a -- at this stage.  Is there a

8    preponderance of evidence to suggest that this can be tried on

9    a classwide basis?  And of course it can based on the mountain

10   of evidence that's in front of you.  It kept happening.

11             The other safeguard that we have on all of this is

12   that we have been careful to avoid sweeping in branches that

13   would be an overreach.  So we aren't including branches from

14   Peoria or from suburban St. Louis.

15             THE COURT:  Well, what's the difference between Peoria

16   and Rockford?  Why would you include Rockford and not Peoria?

17   Why would you include Bloomington and not Peoria?  What is

18   common between all your classes and Rockford and Bloomington

19   and not Peoria?  Why do you have --

20             MR. DOYLE:  The proof that I have.

21             THE COURT:  All right.  All right.  That's --

22             MR. DOYLE:  I don't have proof for Peoria.

23             THE COURT:  All right.

24             MR. DOYLE:  Wouldn't surprise me --

25             THE COURT:  Well, that's a little different.

1     MR. DOYLE:  Wouldn't surprise me for a moment if

2  branches in Peoria had exactly the same thing going on.  But

3  because I can't stand here in front of you and say by a

4  preponderance of the evidence Peoria ought be included we

5  didn't include it.

6     THE COURT:  All right.  So the basis of your including

7  27 branches is I assume you have complaint files indicating

8  complaints at those 27 branches.

9     MR. DOYLE:  Correct.

10     THE COURT:  Okay.  And if they're not -- if you didn't

11  have a complaint or ERIC file for a branch and it was roughly

12  in the geographical area of Chicago, you simply didn't -- well,

13  that's really where your discovery was focused anyway.

14     MR. DOYLE:  As it turns out, that's where they all

15  happened.

16     THE COURT:  Right.

17     MR. DOYLE:  There's one exception to that, I believe.

18  I believe there is not an official ERIC report for the DePaul

19  branch.

20     THE COURT:  All right.

21     MR. DOYLE:  We have Mr. Cobb's affidavit, and we have

22  him describing the conversations he had with the ERIC

23  investigators where they told him leave that alone; we're not

24  going to investigate that farther.

25     THE COURT:  All right.

1       MR. DOYLE:  And he describes 37 people in his branch

2  who worked hours that he thinks may have been off the clock,

3  but no one ever wanted to look at it and figure it out.

4       There is one other fact, your Honor.

5       THE COURT:  All right.

6       MR. DOYLE:  There are many cases beyond *Ross* and

7  *McReynolds*.  *Ross* and *McReynolds* I answered the way I did

8  because in both of those there was the major premise written

9  policy that seemed to be flatly inconsistent with what was

10  actually happening out in the workforce.

11       There are many other cases where unofficial practice

12  or policy classes have been certified.  We cited the *Chavez v.*

13  *Stoltzner Mason* case in our reply brief at page 4.  That's a

14  common practice on off-the-clock work.

15       We cited *Clark v. Honey-Jam* in our opening brief at

16  page 16.  That's a tip credit case where there was common

17  practices about what they required tipped employees to do and

18  whether they abused the tip credit rules.

19       There's *Driver v. AppleIllinois*.  Very interesting

20  case, also a tip credit case.  That's cited in our opening

21  brief at page 16.

22       There's *Gallardo v. Scott Byron*.  That's in our reply

23  brief at page 12.  That's a 216(b) case, but in that case --

24  and it's just from a few weeks ago.  That's an off-the-clock

25  case, I believe.

1          *Jankuski v. Health Consultants* is in our reply brief

2     at page 12.  Also a 216(b) case.

3          Courts certify these classes all the time based on an

4     unofficial policy or practice that is in violation of the wage

5     laws.

6          THE COURT:  Let me go back.  This is more fundamental,

7     I guess.  You have a two-count complaint.  One alleges a Fair

8     Labor Standards Act case, which is an opt-in class.

9          MR. DOYLE:  Yes.

10          THE COURT:  And then one alleges a violation of the

11     Illinois wage protection laws, which is the Rule 23 class.

12          MR. DOYLE:  That's right.

13          THE COURT:  Remind me of the history of your opt-in

14     class because I know there have been very few, if any, opt-ins.

15     But give me -- remind me of when -- what notices have been sent

16     out, when they were sent out, what your return have been on all

17     that.

18          MR. DOYLE:  Okay.  No notice has gone out yet.  This

19     is the first step asking for notice to go out to the class.  In

20     these cases you do a two-step notice where in step one you look

21     and see is there some evidence -- this is *Jirak* is the case

22     that's the lead case in this district from Judge Castillo --

23     and say is there some evidence that people are similarly

24     situated.  You send out the notice.

25          After you get the opt-ins and all of the discovery has

1  then been completed on the merits, the Court often does a

2  decertification motion at stage two and says now we see who it

3  is that we have.  Are they really similar now that we know the

4  opt-in list?

5      No notice has gone out here.  We have one opt-in who

6  has opted into the case, even though notice has not gone out.

7  Her name is Tess Claveria.

8      THE COURT:  All right.  So the practice would be to

9  have -- and I'm -- I'm not -- I haven't had these cases before,

10  so bear with me.

11      MR. DOYLE:  Sure.

12      THE COURT:  But the practice would be -- your

13  suggestion would be that -- what?  How do the -- how does the

14  opt-in notice on a -- on the collective action and the Rule 23

15  class notice, how does that interact?

16      MR. DOYLE:  It goes out in a single notice.  And

17  people are advised of their rights under both statutes.  If

18  they don't opt out, then they're in the Rule 23 class.  If they

19  wish to participate under Illinois law, then they're -- they

20  would opt in as a response.

21      People only recover once, obviously, for the hours

22  that they work.  They don't get to recover under both statutes.

23  But people would only recover once.

24      Some people will inevitably have both claims.  Some

25  people probably will not.

1          THE COURT:  Why wouldn't the claim be the same?

2          MR. DOYLE:  It's from the same core facts.  What I

3    mean, some people would not have the same legal claim because

4    some people -- if -- for example, if Fred gets a notice and

5    Fred never opts out of the Rule 23 case, then he's proceeding

6    under Illinois law.  If he also never sends in anything, then

7    he does not get FLSA rights.

8          THE COURT:  Right.  But if -- is there anything

9    different about what your recovery could be under federal law

10   versus state law?

11         MR. DOYLE:  Slight differences.  There are slight

12   differences in the math of how damages are calculated.  Under

13   Illinois, there's a 2 percent punitive damages provision that

14   applies.  And under federal law, there is, for example,

15   liquidated damages under the FLSA.

16         But that's to figure out at the very back end.  The

17   fundamental feature of the proof, especially on liability,

18   isn't different for one statute versus another.

19         THE COURT:  I think Judge Guzman said you can't do

20   both, and I think he got -- I think the 7th Circuit said, in

21   fact, that was proper to do.

22         MR. DOYLE:  There's -- and the case is *Ervin v.*

23   *Outback Steakhouses*.  That went to the 7th Circuit.  And my

24   recollection is that it's Judge Wood in the 7th Circuit who

25   wrote that no, this could be managed.  You can manage this on a

1    notice and do both notices to a single class.

2            There have been some cases -- for example, we cite

3    this one in our brief.  I don't have the page number in front

4    of me.  But we cite *Johnson v. Pinstripes*, and I believe it's

5    Judge Gettleman.  And he certified both notices to go out.

6            THE COURT:  All right.

7            MR. DOYLE:  And it's a -- I think a tip credit case at

8    one of these bowling alley restaurant places.

9            THE COURT:  So procedurally, if I thought there

10   were -- the requirements of Rule 23 were met and the

11   requirements for a collective action -- for at least

12   notification of collective action were met, it would be done

13   simultaneously.

14           MR. DOYLE:  That's right.

15           THE COURT:  Okay.

16           MR. DOYLE:  And after that notice period, we would

17   have some idea of who had opted in --

18           THE COURT:  Well --

19           MR. DOYLE:  -- and also who had opted out, if anyone.

20           THE COURT:  -- the defendants make much of the fact

21   only one person has opted in.

22           MR. DOYLE:  Right.

23           THE COURT:  But is that of any moment since there's

24   been no notice sent to people?

25           MR. DOYLE:  It's of no moment for exactly the reason

1    you said, because notice hasn't gone out.  And there are cases

2    that say that also.

3              THE COURT:  All right.  Okay.

4              Go ahead, unless you --

5              MR. DOYLE:  Your Honor, I think that we have offered

6    you the answer to the question this morning.  And the question

7    is if this happened over and over again, what is the most

8    sensible response for the Court?  Should we try and deal with

9    this to the extent that we can in one proceeding or should we

10   not?  In other words, should we certify this for

11   collective/class treatment or not?

12             And if we don't, there isn't any doubt about what

13   happens.  Either there will be multiple lawsuits proving up the

14   same thing or maybe, just as likely, a bunch of people might

15   never pursue their claims.

16             A class case is superior to the alternatives if the

17   alternative means that people look at this and say the money

18   isn't worth it for me to bring an individual lawsuit.  That's

19   the cases we cited in our reply brief on superiority.

20             THE COURT:  That always happens.  I mean, every class

21   that is not certified inevitably -- for reasons unrelated to

22   whether or not this is a better mechanism than not, there

23   are -- it's -- it's always easier for a plaintiff to join in

24   with a hundred other plaintiffs and have a single lawyer do it

25   for them than try and find a lawyer to collect on a $100 or

1  $1,000 or even a $5,000 claim in federal court.

2         So that -- that I'm not -- that I don't find a

3  determinative fact.  You're always going to have the situation

4  where if I deny class certification, people who are -- have to

5  live with that order are going to be worse off than if I

6  granted it.

7         MR. DOYLE:  I understand.  That's the reality that we

8  all live with.

9         THE COURT:  Yeah, that's the reality of what attorneys

10  cost and what time is involved in bringing a lawsuit and

11  what -- you know, the bank has a single set of lawyers.  I'm

12  not sure the -- if there were 100, 200 people that would have

13  to bring these claims individually if any of them brought them,

14  I don't know if they would go out and hire someone less

15  expensive than you.

16         MR. DOYLE:  It -- it ought to matter, your Honor.  And

17  the reason why it ought to matter is because if the alternative

18  is to leave people unremedied, to leave the bank with the

19  benefit of the work that the bank never paid for, that goes to

20  Rule 23(b)(3) superiority.  A class mechanism is superior to

21  leaving people sitting in the -- in the winter without --

22  without any remedies.

23         Your Honor, the question is, is a class better?  Can a

24  class be done?  A class can be done.  We've offered I believe

25  some thoughtful, some careful answers to the problems that the

1    cases present.  We offered a narrow class.  We offered an

2    issue-only class.  And we identify the classes.

3            In these circumstances, your Honor, a class ought to

4    be certified because it can happen and because it makes sense

5    to happen.

6            If you have no further questions, your Honor, I'll

7    cede the floor.

8            THE COURT:  Well, one more.

9            MR. DOYLE:  Yes.

10           THE COURT:  Remind me again how you would -- so you'd

11   put on Ms. Bell to talk about her own experience.  You'd put on

12   as admissions the files of the bank showing a series of

13   incidents where various people complained about having to work

14   overtime when they didn't get paid for it.

15           MR. DOYLE:  Mm-hmm.

16           THE COURT:  Presumably you would take away from those,

17   from that proof -- well, maybe not.  Maybe you'd then show the

18   bank responded to some people and not to others.

19           MR. DOYLE:  Mm-hmm.

20           THE COURT:  And I suppose if you got -- if class

21   notice went out and you learn of a lot of other people who had

22   complaints, presumably you'd -- at least on the opt-in class,

23   you'd get names of people who will say me too, and they might

24   be on the list of people who complained in the first place;

25   they might not be.  And so if they're not, that would give you

1    additional people to give their complaints.

2          That's how you'd -- that's how this would proceed if

3    we were -- you had people right there and people right there.

4          MR. DOYLE:  There's two other people that I can think

5    of as I stand here that I can name by name that I would be

6    interested in as trial witnesses.  I'd be interested in

7    Ms. Poole and Mr. Cobb, who were both managers, who can both

8    describe how it is that off-the-clock overtime happened at

9    their branch and why.

10         And all of that together, plus whatever other -- you

11   know, I don't know who my other trial witnesses would be.  I

12   don't think I have to know exactly at this stage.  But I think

13   if there are other managers like them that would come testify,

14   I'd be interested in hearing their testimony.

15         THE COURT:  Well, this is why I went back.  This is

16   where I started at the very beginning, with the issue of

17   whether or not there is an incentive that is driven by PNC's

18   structure to cause branch managers to want to minimize

19   expenses, to allow for a branch manager to show greater

20   profitability and presumably get a bonus, a pay raise, some

21   feather in their cap.

22         The few -- at least the one person you have the

23   affidavit from -- I think it was called -- well, the branch

24   manager who managed Ms. Gomez said that they just didn't have

25   enough people to cover the work that they had to do.  Well,

1    that's, you know, welcome to the world.  Everyone says that.

2    And so they have people do more than they should do -- more

3    than they're getting paid to do.

4          If that is just bad management by a branch manager,

5    there's a lot of branch managers that can live within their

6    budget, and so they pay the people the overtime.

7          And maybe this is just a factual defense.  But it

8    seems as if if they -- if branch managers can live within the

9    budget and run their branch without having people work off the

10   clock, then those that can't do it -- I'm not sure that's a

11   class issue, as opposed to just some -- a classwide issue

12   that's capable of economies being obtained through a class

13   trial, as opposed to back where I started, a series of

14   vignettes about some managers who were inefficient and couldn't

15   run their branch in a manner in which -- in a manner within

16   their budget.

17         MR. DOYLE:  Your Honor, I don't know that I agree.

18   And the reason I don't agree is if there was proof, and the

19   defense was for each of these 27 managers they brought them in

20   and they said, gosh, I sure tried, but I was not very good at

21   my job, and I wasn't able to make it all meet, and I couldn't

22   cover all the staffing.  So, yeah, I did have people working

23   off the clock, and they didn't get paid.

24         That was their defense?  I think a jury could look at

25   that and say it happened at 27 different branches?  That's an

1    unofficial policy or practice.  That's a widespread practice

2    classwide.  If it kept happening over and over again?  It would

3    be one thing if we were talking about two branches and I was

4    trying to get a class for the state of Illinois.

5          But we're focusing on the branches where we know it

6    happened.  The precise reason why it happened -- for example,

7    did the vice president of operations for the state of Illinois

8    region order people to do it?  That would be great proof.  If,

9    for example, there was a bonus structure that the managers were

10   all incentivized to do this, that would be great proof.  Or if

11   there was just widespread incompetence in the way that the bank

12   hired their branch managers, that may be where we are.

13         THE COURT:  All right.  Let me -- okay.  Go ahead,

14   finish, and then I have a follow-up.

15         MR. DOYLE:  But I don't know that it matters.  And the

16   reason it doesn't matter is because it kept happening over and

17   over.

18         THE COURT:  Well, that was my next question then.  You

19   say it kept happening over and over.  And I thought I read in

20   the defense papers that they -- these were -- they may have

21   happened on -- on an occasion or more than one occasion at all

22   27 branches you selected because you selected them based on the

23   fact it happened.

24         MR. DOYLE:  Mm-hmm.

25         THE COURT:  But if you take 365 days or 300 workdays

1    or whatever it is and then you look at the number of complaints

2    where it occurred, are we talking about a small -- when you say

3    over and over, are you talking about over and over at each

4    branch or over and over collectively at the 27?

5            MR. DOYLE:   There are some branches where there was

6    more than one manager, for example, that one manager replaced

7    another and that it happened over again.

8            The one that I'm thinking of as I stand here where I

9    know that happened is at -- give me just a second, and I'll

10   have it -- at the Loves Park branch where the two managers were

11   Darlene Apgar, and the other manager was her predecessor.  And

12   I only have a first name.  The person's name is Larry.

13           There are four different employees that reported that

14   they worked under the same instruction from both managers that

15   they could not record overtime if they stayed past the end of

16   their shift.  The four employees are Danielle Green, Randall

17   Heims, Jacki Mendoza, Nikia Nelson.  The bank never paid any of

18   them.

19           THE COURT:   All right.

20           MR. DOYLE:   Your Honor, I can't tell you that it

21   happened every single day at every single branch for the entire

22   class period.  That's a damages issue to be dealt with at the

23   very end of the case.

24           THE COURT:   Well, it's a little more than a damages

25   issue.  I think it's an issue of whether or not -- it goes back

1    to whether or not you've met your preponderance standard as

2    showing that it's a pattern and practice.

3              MR. DOYLE:  But surely I don't have to show 365 days a

4    week.

5              THE COURT:  No, no.  You don't.  And this goes back to

6    the question which is probably unanswerable.  You've got what I

7    referred to earlier as anecdotes or vignettes, and then you've

8    got a -- you know, that's the least amount of evidence.  And

9    then the most amount, obviously, is a companywide policy that

10   says we won't pay.

11             MR. DOYLE:  Mm-hmm.

12             THE COURT:  Somewhere in between is where you have to

13   meet your standard to get me to certify, and then you can let a

14   jury decide whether or not you've met your proof of a

15   companywide policy or the company acts responsibly and fires

16   people who engage in the practice when they catch them.

17             MR. DOYLE:  The other piece of it, your Honor, is when

18   they did address it, did they actually try and get people paid?

19   That happened over and over again, that even when the bank

20   responded, for example, fired a manager, they left people

21   unpaid.

22             We have the list.  The list -- we know that there's at

23   least that many who worked off-the-clock overtime.

24             Now, I understand the point that it's one thing to

25   talk about something as a class case, and it's another thing to

1  talk about it as a mashed-together bunch of branches that have

2  been cobbled -- quilted together into a class.  I understand.

3  　　　　　But, your Honor, it's the same.  It keeps happening.

4  And if you keep hearing the same song every time you switch the

5  station on the radio, it's the same song playing everywhere.

6  And it means that all of the stations have a common playlist.

7  That, your Honor, is what we're looking at.  You keep seeing

8  the same thing over and over again, and it qualifies as an

9  unofficial policy or practice.

10  　　　　　That's the question.  And I think that's the question

11  that's hard about this case.  I also think that we meet that

12  standard.

13  　　　　　Your Honor, I can answer whatever else.

14  　　　　　THE COURT:  No, that's it.  That's all I have for now,

15  Mr. Doyle.  Thank you.

16  　　　　　MR. DOYLE:  I appreciate it.  Thank you very much,

17  your Honor.

18  　　　　　THE COURT:  Why don't we take five minutes before we

19  start.  I just want to get some water.  And we'll start up in

20  five minutes.

21  　　　　　MS. BOUCHARD:  Sure.

22  　　　　　THE COURT:  All right.  Thank you.

23  　　　　　MS. BOUCHARD:  Thank you.

24  　　　　　THE CLERK:  All rise.

25  　　　　(Recess at 11:04 a.m., until 11:11 a.m.)

1          THE COURT:  Okay.  Why don't you identify yourself for

2     the record again.

3          MS. BOUCHARD:  Absolutely, your Honor.  My name is

4     Sarah Bouchard.  And along with my colleague John Richards, we

5     represent PNC Bank in this matter.

6          THE COURT:  Okay.  Mr. Richards has been here before.

7     I don't think you have.

8          MS. BOUCHARD:  Once before.

9          THE COURT:  Once before.  All right.

10         MS. BOUCHARD:  Once before.  Thank you.

11         THE COURT:  All right.  Go ahead.

12         MS. BOUCHARD:  Your Honor, this case has been going on

13    for two years with significant amounts of discovery.

14         As you may recall, there were e-mail searches that

15    involved the production of 55,000 pages of documents.  And

16    based on those extensive e-mail searches, plaintiff has

17    conceded that there is no top-down policy other than isolated

18    acts which are set forth in both the ERIC reports, as well as

19    Ms. Alvarez's affidavit.

20         And interestingly, if you read Exhibit H to her

21    affidavit, it does not suggest that people were not paid.  It

22    suggests that there were employees who voluntarily worked off

23    the clock and, as a result of an investigation, were reminded

24    of the hours of work policy and paid.

25         At times there were managers who were violating

1    policies, including Ms. Poole, of which they rely so highly on.

2    She was terminated for violating the hours of work policy.  And

3    you see, as you stated earlier in the argument, that many

4    people were terminated or disciplined.

5           So rather than not paying people for off-the-clock

6    work, what you see is a very robust process and a very legal

7    practice of having a policy prohibiting off-the-clock work.

8    And then where those instances are reported -- and employees

9    reported this, meaning that this is a policy that works in

10   practice -- people were investigated, disciplined, terminated.

11   And where it was supported, hours were paid.  So I just want to

12   put that out there.

13          If this class were certified, it would comprise

14   individuals who either never worked off the clock and therefore

15   suffered no injury or no longer have an injury because PNC

16   investigated their claim and paid for all hours worked.  This

17   is not the basis for a class action.

18          Now, instead of going through a little bit of my

19   argument, I wanted to address some glaring misrepresentations

20   in the record.  And the way I -- the reason I say that is

21   because Mr. Doyle really emphasized the 50 people listed in 159

22   and 161 of his appendix.

23          And what you should know is that 37 of those 50 are

24   people who worked at what's called a table day in the DePaul

25   branch.  And he stated that those people worked off the

1 clock -- okay? -- and that that's one of the reasons why he

2 believes he has numerosity here.

3   But actually, if you go back and look at Mr. Cobb's

4 declaration, which is supporting those 37 individuals -- and

5 that's at Appendix page 14 -- he states, "I do not know whether

6 these people have been paid for those hours through their home

7 branches."

8   And then in page -- on paragraph 7 he states, "Even

9 today, I do not know if any of those 37 employees were paid for

10 the hours that they worked when they were assigned to work

11 table days at DePaul."

12   Now, what's interesting about some of the declarants

13 in this case is that Mr. Ward is Mr. Cobb's spouse.  And

14 Mr. Ward chose to voluntarily work at the table day and not get

15 paid.

16   Well, when his own manager, Mr. Ward's manager,

17 realized that, he was disciplined for both not letting him know

18 that he was going to work at the DePaul branch and for not

19 letting him know that he actually worked instead of volunteered

20 because there is no practice of volunteering at PNC Bank.

21   So --

22   THE COURT:  These table days are what?  You just go to

23 a branch and hand out free coffee and try and get people to

24 sign up?

25   MS. BOUCHARD:  Basically.

1        THE COURT:  All right.

2        MS. BOUCHARD:  Basically.

3        So what we have here is a class that's both

4   unidentifiable and lacks numerosity under (a)(1) of Rule 23.

5   And there are many cases that support the fact that when the

6   class is so broad to include individuals who are without

7   standing and where the named representatives fall within the

8   class but they don't suffer the same injury, there cannot be

9   any class certification.

10       And the case to support that is *Humphrey v.*

11  *International Paper*, and that's included in our brief.

12       Also -- and what really wasn't discussed here is the

13  plaintiff is not an adequate class representative.  She in all

14  respects worked as a manager.  Although she was overtime-

15  eligible as a financial sales consultant, she really was doing

16  day-to-day duties that were a manager, and, in fact, Mr. Ward

17  and Ms. Claveria both wrote her recommendations to support a

18  promotion which stated -- and they're attached to Ms. Alvarez's

19  declaration -- that she was doing managerial duties.

20       So the cases state that where the individual named

21  plaintiff lacks any typicality, faced with an overbroad class,

22  that does not support commonality and typicality for purposes

23  of Rule 23.

24       Moreover, her own testimony is contrary to her

25  complaint, and this fact alone in this circuit is sufficient to

1    make her an inadequate class representative.

2          So as you correctly pointed out, we only have one

3    person through hearsay testimony from the regional level that

4    stated in some form or fashion to someone else you can't

5    work -- you need to work off the clock.

6          But plaintiff herself stated in her testimony that

7    Ms. Romis said to her, "I understand that you're going to have

8    overtime.  You may submit your overtime."  So even for that

9    deceased regional manager, Ms. Gomez stated that she stated,

10   "You may submit your overtime."

11         THE COURT:  All right.  Well, and I -- I get that.

12   And I assume -- really what they're saying is we don't have

13   a -- we have a series of incidents at a variety of branches.

14   We picked our class to mirror those branches.

15         MS. BOUCHARD:  Mm-hmm.

16         THE COURT:  But if you look at 27 branches, we've got

17   a series of complaints, sometimes a single complaint, sometimes

18   multiple complaints.  Some of the complaints involve a single

19   incident; some involve a practice.  You'll never -- you always

20   work over lunch or you always have to open up before -- you

21   know, do some work on your teller drawer before the bank opens,

22   and you never get paid for it.

23         So you've got those types of different fact scenarios.

24   And they're saying you add them all together and they meet

25   their standard of preponderance that there is a common -- there

1    is a practice that they can establish through that proof.

2         How would you respond to that?

3         MS. BOUCHARD:  I would respond to that by stating

4    exactly what you stated.  This is a bunch of historical -- and

5    I use the word "historical" -- vignettes of investigations that

6    previously occurred and were resolved.  Just because someone

7    did not get any money doesn't mean that that's evidence of any

8    illegal activity.

9         Now, let me just give you one example.  In the

10   Naperville branch, Naperville South, they seek to include that

11   branch.  That branch is based on conduct from 2010 for a case

12   that was already litigated and settled and had six opt-ins.  So

13   why should those people be allowed to relitigate a claim that

14   was already resolved in this federal court?

15        THE COURT:  I guess -- well -- and I should have asked

16   this of Mr. Doyle, but I'll ask it of you.

17        Has there been a case where the proof is the fact of

18   the investigation?  In other words, you know, the proof is

19   what -- much of the proof, beyond the named plaintiff and

20   possibly Ms. Cobb -- Mr. Cobb and the other individual, but the

21   main proof comes from the fact of -- from these investigations.

22        But isn't the fact of an investigation -- and I don't

23   mean to be giving you a layup question.  This is probably a

24   tougher question for Mr. Doyle.

25        And you can respond to it from there.

```
 1              But isn't the fact that your proof comes from the --
 2     their investigative files means they're looking at it?  In
 3     other words, it's one thing to come up with a series of
 4     affidavits because the bank had no internal structure when they
 5     investigated allegations of failure to pay overtime.
 6              MS. BOUCHARD:  May I answer?
 7              THE COURT:  Yes, and then I'll allow Mr. Doyle to
 8     answer too.
 9              MS. BOUCHARD:  Okay.  Great.
10              THE COURT:  But I'm not going to cut you off.  It's --
11     I do want -- because it's a tougher question for him.
12              MS. BOUCHARD:  Right.
13              THE COURT:  Go ahead.
14              MS. BOUCHARD:  Right.  It goes to whether common
15     questions predominate.  And even if PNC's investigations were
16     improper, that would require a series of mini trials as to
17     which ones were improper and which ones were not.  And the case
18     of which we rely on is Bolden and where in Bolden, the case
19     said where the company allows considerable discretion to
20     managers or here, the employee relations investigators, it's
21     just the opposite of a uniform employment practice that
22     provides commonality.
23              And, therefore, there's no -- there's no superior way
24     of litigating this in the class context.
25              THE COURT:  Okay.
```

1          And, Mr. Doyle I should have asked you this, but I

2     think Ms. Bouchard's argument has raised it with me, is I see

3     some difference between, as in *Ross*, where you have 60 or 70 or

4     90 affidavits, whatever it was, you know, that that's some

5     proof that something was going on, and you can infer from it a

6     policy.

7          But the fact that the majority of your proof comes

8     from -- comes from the bank itself having recognized -- having

9     gotten the complaint and dealt with it, adequately or

10    inadequately, is -- you know, maybe that's another issue.  But

11    the fact is they dealt with it because it's in their files.

12         Doesn't that indicate a -- at least a structure that

13    shows they aren't tolerating this policy?

14              MR. DOYLE:  No.

15              THE COURT:  The way you're proving it almost in some

16    ways proves their point.

17              MR. DOYLE:  I don't believe so, your Honor.  The -- a

18    couple of responses.  Number one, there's two investigators

19    assigned to the state of Illinois.

20              THE COURT:  Right.

21              MR. DOYLE:  Number two, they tell us -- and we cite

22    this in our papers.  They tell us that there is no standard for

23    those people to conduct investigations.  The bank doesn't offer

24    them approaches on how they ought to do this.  There's no

25    standard way to do it.

1     Number -- and, you know --

2     THE COURT:  But they say they have good reason for

3 that, and that's because they don't want to have a -- and I --

4 I kind of get this.  I think if you put standards -- you know,

5 basic standards: get to the bottom of it, be truthful, record

6 information you receive.

7     I don't know if those are implicit, explicit, or

8 followed.

9     But, you know, telling an investigator you've got

10 to -- every case you've got to go interview the complainant

11 first as opposed to look at records or you've got to look at

12 records first before you interview the complainant or you've

13 got to talk to the boss of the complainer before you talk to

14 the complainant.  I mean, that kind of minutiae is

15 counterproductive for investigators.

16     MR. DOYLE:  Absolutely.  But they don't even have

17 standards like -- you know, we asked, "Do you have any

18 standards?  Are there any?"  And the answer is unequivocal.

19 They say, "We have none."

20     THE COURT:  All right.

21     MR. DOYLE:  So, your Honor, to say that that is a

22 lawful good-faith response is -- is a reach on the way these

23 facts work.

24     In addition, your Honor, the proof is in the pudding.

25 We believe there are people who were not paid.  We believe that

1     those 56 that are listed on those -- on those three pages

2     didn't get paid.

3          THE COURT:  Well, that -- and I'll go back to

4     Ms. Bouchard.  That was a question I did have.

5          MS. BOUCHARD:  Mm-hmm.

6          THE COURT:  And I think you alluded to it, but I

7     didn't hear an answer about what the reason was.

8          One, do you disagree about these 56 not being paid?

9          MS. BOUCHARD:  Absolutely.

10         THE COURT:  Okay.

11         MS. BOUCHARD:  And what happened is when they

12    presented these 56 people for the first time in their brief --

13         THE COURT:  All right.

14         MS. BOUCHARD:  -- the -- we went back -- and

15    Ms. Alvarez, because what happened with the DePaul table days

16    is they would not have been paid through Mr. Cobb at the DePaul

17    branch.  They would have been paid through their home offices.

18    So at Alvarez, paragraph 22, she confirms that all 37

19    individuals were paid.  And Mr. Doyle suggests that we should

20    strike that testimony because it wasn't produced in discovery.

21         Well, we're just responding to this list of 56 that

22    was presented for the first time in his brief, and I would

23    imagine that your Honor would want to know that information,

24    that they were, in fact, paid.

25         So, again, the DePaul branch and the table day

1    situation is a very unique circumstance.  I can imagine if my

2    husband said, "Hey, will you help me out at a table day?" I

3    would say, "Sure."  But it doesn't mean that 37 of my friends

4    are also going to volunteer from other different branches.

5              THE COURT:  All right.  So --

6              MS. BOUCHARD:  And --

7              THE COURT:  So your point is that the majority of the

8    50 that Mr. Doyle said were not paid were -- at this DePaul

9    table day, in fact, they were paid, but not through -- they

10   wouldn't be on the list -- the list that he has at pages --

11             MS. BOUCHARD:  159 through 161, your Honor.

12             THE COURT:  Correct, and that -- well, 159 through 161

13   is his list of people who weren't paid.  But he's saying

14   they're on this list because they were not on the list in

15   pages 154 through 158.

16             MS. BOUCHARD:  Right.  There was no investigation of

17   the DePaul branch because there was not one necessary.

18             THE COURT:  Okay.

19             MS. BOUCHARD:  Mr. Cobb states in his declaration that

20   he raised these 37 names to an employee relations manager.  But

21   both Mr. Cobb and Mr. Ward were terminated, Mr. Ward for

22   falsification issues and policy violations and Mr. Cobb as a

23   result of a reduction in force.

24             The employee relations center has no record of these

25   37 names, so that's simply why they're not on the ERIC sheet.

1   But we're telling you here today that all of these people were

2   paid, and, additionally, nine of those people were paid

3   overtime for -- on the weeks that that occurred.

4           With respect to the remaining individuals on those --

5           THE COURT:  Why wouldn't they -- I assume they weren't

6   all paid overtime because some of the time where they went over

7   and did this was on their normal clock at the branch they came

8   from?

9           MS. BOUCHARD:  Absolutely.

10          THE COURT:  All right.

11          MS. BOUCHARD:  And for the remaining 19 individuals,

12  they were either investigated on the ERIC report and not paid

13  because the investigator determined that no additional money

14  was owed or they weren't on the official investigation list

15  because there was no issue with them.  They simply were in the

16  branch of which a violation occurred.

17          So even under this list of 56, there's no "there"

18  there, your Honor.

19          I'd like to address 216(b), if I might, because what

20  we have here is normally what happens in the 216(b) context is

21  that conditional certification motion is filed by the

22  plaintiffs right off the bat, or at least a couple of months

23  after the complaint is filed.

24          And here we've had two years of discovery and, as I

25  said, 55,000 pages of documents and a complete ERIC report.

1     And so when a counsel waits that amount of time and

2  that amount of discovery has taken place, there is a heightened

3  standard to evaluate 216(b), not that much different than the

4  Rule 26 context, which makes sense.  You've had all of this

5  discovery to determine whether there is a policy or practice

6  that's illegal, and here we have none.

7     So you have an intermediate level of scrutiny, and

8  that's under *Boelk v. AT&T*.  And courts have held that in

9  off-the-clock cases, they failed to meet this heightened

10 standard because there haven't been any other practices other

11 than these historical vignettes at the supervisor level.  And

12 as I would even state here, if you go back and look at

13 Exhibit H, not only are they not just at the supervisor level,

14 they're a level below that.

15     As I've stated, you'll see if you review Exhibit H,

16 these are just employees who may not have realized what is time

17 worked and what is not time worked.  One example is a single

18 employee who was a new employee and looked at training

19 materials while he was home.

20     THE COURT:  Where was that, which page?

21     MS. BOUCHARD:  That was -- let me pull that up.

22     Give me a moment, your Honor.

23     THE COURT:  No, I'm -- I just want to make sure I'm

24 reading all these things correctly --

25     MS. BOUCHARD:  Right.

1              John, can you find that one?

2              THE COURT:  -- which is why I want to go through this.

3              MS. BOUCHARD:  Yeah, we'll find that one.

4              THE COURT:  All right.

5              MS. BOUCHARD:  But the courts in this intermediate

6     scrutiny look at four key issues.  And they routinely deny

7     off-the-clock cases where you don't have a common policy or

8     practice.

9              Now, let's even go to the more lenient standard,

10    supposing that the plaintiff had filed the conditional

11    certification motion right off the bat and there wasn't hardly

12    any discovery.

13             They, again, routinely deny where the unlawful policy

14    stems from alleged acts of supervisors and employees at a very

15    low level.  They also deny where it's undisputed that the

16    plaintiff was not performing the same types of job duties.

17             So here, not only was she a financial sales consultant

18    and she wants to be compared to tellers and teller supervisors

19    and other people, her own affiants are stating that she did

20    exempt work.  So that's yet another reason why she's not

21    similarly situated to the class that she purports to represent.

22             THE COURT:  What's the interplay between the two?

23    Have you seen or is there -- are there cases suggesting

24    certification under one standard and not under the other, or

25    are they pretty much lockstep?

1          MS. BOUCHARD:  Well, under the more lenient standard,

2     that's generally when discovery hasn't taken place --

3          THE COURT:  Right.

4          MS. BOUCHARD:  -- and when the plaintiff doesn't have

5     access to names and witnesses.

6          THE COURT:  Right, and I've had a couple cases where

7     I've allowed a conditional certification under 216(b) in an

8     opt-in class early in the case where I've looked at the

9     allegations, I've looked at the number of employees and thought

10    that that was a prudent way to go.

11         MS. BOUCHARD:  Mm-hmm.

12         THE COURT:  They didn't have a Rule 23 class

13    certification request either.  It was simply a straight FLSA

14    opt-in class request.

15         But where we have a dual request, are there -- do I

16    look at each one of them independently?  Because they seem to

17    have different standards.

18         MS. BOUCHARD:  Well, I would agree that if this -- if

19    the 216(b) motion had been filed at the outset, they would be

20    subject to a different standard.

21         THE COURT:  Okay.

22         MS. BOUCHARD:  It would -- it would be, as you've

23    stated, you know, let's see if there's any "there" there.

24         But here, where we've had two years of discovery, I'm

25    not sure what more we could produce.  And even -- and this is

1    very important.  Even under the lenient standard, courts look

2    at interest.  In *Ross*, 90 affidavits.  There was interest

3    there.

4              And that's why in all of the wage and hour cases that

5    I litigate, what the plaintiffs do is they do pre-complaint

6    solicitation.  They get -- garner interest.  They go on

7    websites.  They gather that interest because they know courts

8    are looking for it.

9              And in *Hadley v. Journal Broad. Group* -- it's an

10   Eastern District of Wisconsin case -- the Court denied

11   conditional certification saying that after a year, there's

12   been no one who opted into the case.  There's no interest.

13             THE COURT:  Well, what --

14             MS. BOUCHARD:  So it's a very real issue.

15             THE COURT:  And that confused me.  And Mr. Doyle

16   reminded me that there had been no notice sent out.

17             I don't think I had this case at the very beginning,

18   if I'm --

19             MS. BOUCHARD:  No, Judge Chang did, your Honor.

20             THE COURT:  Okay.  And I just needed to be reminded.

21   I could have gone back to the docket sheet, but I didn't have

22   time to see what happened.

23             But how would a person express interest and opt in if

24   no notice had gone out?

25             MS. BOUCHARD:  Well, it happens all the time.  I mean,

```
 1        in the cases I routinely litigate in the wage and hour context,
 2        the plaintiff's counsel puts out solicitations before the
 3        complaint is even filed.
 4               THE COURT:  All right.  But if -- but let's say they
 5        didn't.
 6               MS. BOUCHARD:  Okay.  So --
 7               THE COURT:  After the complaint is filed, how would
 8        there be a mechanism for -- you want to -- and I found this
 9        compelling, and that's why I want to get to the bottom of it.
10               MS. BOUCHARD:  Mm-hmm.
11               THE COURT:  If no one has an interest in getting
12        involved in this case, then that -- under 216(b), were they
13        given the opportunity, you know, who is going to be in a class,
14        a Rule 23 class?  And that's --
15               MS. BOUCHARD:  Right.
16               THE COURT:  -- so what -- let's say they didn't go out
17        and drum up plaintiffs --
18               MS. BOUCHARD:  Mm-hmm.
19               THE COURT:  -- before they filed their complaint.
20        They had a class rep who told them about what she perceived as
21        being a companywide policy, or at least a policy she observed
22        in her experience as being companywide.  They don't have an
23        obligation to go out and get more people at that point I don't
24        think.
25               But what -- how would other people go out -- are
```

1    they --

2              MS. BOUCHARD:  How would they opt in?

3              THE COURT:  Well, how would they opt in before a

4    notice is sent out giving them a mechanism to opt in?

5              MS. BOUCHARD:  Well, as I said, it happens all the

6    time.  It happened in *Ross*.  It's happened in some other PNC

7    cases that we had that were certified and resolved, and those

8    were exemption cases, which are very different than

9    off-the-clock cases.

10             THE COURT:  Was the Naperville case that Mr. Doyle

11   talked about where a class was certified, were those exempt

12   employees?

13             MS. BOUCHARD:  No, that was an off-the-clock

14   allegation.

15             THE COURT:  Okay.

16             MS. BOUCHARD:  And six people opted in -- okay? -- and

17   it was branch-specific.

18             THE COURT:  Single branch.

19             MS. BOUCHARD:  Single branch.

20             THE COURT:  Okay.

21             MS. BOUCHARD:  *Jarmasek*.  But that's on the list of

22   people that should be included in this class.

23             THE COURT:  Yeah, that's --

24             MS. BOUCHARD:  Which makes no sense.

25             THE COURT:  Right.

1      MS. BOUCHARD:  And so what you would need to do if you

2   were going to take a class is you'd have to go through and look

3   at each one and say, well, was everyone paid?  Because what you

4   see in Exhibit H to Ms. Alvarez's declaration, there's many

5   instances where every single person was paid everything that

6   they wrote down.

7      In other cases, some were paid and some were not

8   because their requests were incredible.  There were other cases

9   where some people simply would not submit what they believed

10   they were owed or thought better of it.

11      But let's just take interest.  The 56 people that are

12   listed on 159 to 161, plaintiff counsel knows their names and

13   he knows -- he knows where they work.  They're not in this

14   case.  No one has reached out to them to see if they wanted to

15   opt in, or maybe they have -- we don't know that because that's

16   privileged -- and they simply have no interest here.

17      So --

18      THE COURT:  Well, you're suggesting 37 of them

19   wouldn't have an interest because they were paid.

20      MS. BOUCHARD:  Exactly.

21      THE COURT:  So those -- under your representation,

22   they don't really have a beef.

23      MS. BOUCHARD:  There's no injury.

24      THE COURT:  They have no fight.

25      MS. BOUCHARD:  Right.  And that's sort of my -- my

1   overreaching theme here is that most of the class has

2   absolutely no beef at all.

3          And even Ms. Gomez was paid 68 hours.  And she filed

4   the lawsuit, understandably, after she left.  And when I took

5   her deposition -- or I believe John took her deposition -- she

6   could not testify to how many additional hours she was owed.

7          Now, she has since changed that and say I believe

8   dozens.

9          But, again, even she was paid.  It shows that the

10  policies, the lawful policies that PNC implemented, work.  She

11  made a complaint about her supervisor, and it resulted in an

12  investigation of that entire branch.  And her manager was fired

13  because of making her work off the clock, the same person that

14  has filed an affidavit in this case.

15         THE COURT:  All right.  Well, back to the other

16  question, though.  There's no real way for people to opt in --

17  certainly they could go out and get affidavits if they wanted

18  to, but there's no federal rule that requires opt-ins to occur

19  before notice is sent out.

20         MS. BOUCHARD:  No, but the case law is clear that

21  courts are looking for some -- some modicum of interest.

22         So even though you don't have to do that, you risk

23  having denial of 216(b) certification even under the lenient

24  standard.  And I just know that the plaintiffs' counsel that I

25  deal with who do this on a day-in, day-out basis, they've got

1    50 affidavits ready at the complaint stage to show that that

2    level of interest.

3         Now, let's go to -- they -- they said that the cases

4    that they relied on are *Ross* and *Merrill Lynch*.  Well, even

5    though *Ross* may technically be good law, there are two *Family*

6    *Video* decisions, one in April and one in August, that based on

7    the Supreme Court's GVR, the vacating and remanding, denied

8    Rule 23 class certification based on that.

9         *Comcast* is real.  It's not just a damages issue.  You

10   need to look at whether you can have a manageable trial or are

11   you going to be looking at whether damages are being looked at

12   on a case-by-case individualized basis.

13        And so plaintiff's counsel has suggested that they can

14   just certify a class based on liability only.  But the cases

15   that they've cited are tip credit cases where there was a

16   common policy related to that tip credit, as well as issues

17   with a washing machine defect.  That's clearly a common

18   liability issue that allowed for damages to be looked at in a

19   slightly different way because the liability had a common

20   thread, which doesn't happen here.

21        In the *Merrill Lynch* case, of which I'm familiar that

22   they cited to, the race discrimination case, there was a common

23   policy of disparate account assignments in that case.  That was

24   the common thread.

25        Again, plaintiff conceded that in the 55,000 pages of

1   documents, there is no such common thread that exists here.

2          THE COURT:  Was there actually a stated policy, or was

3   there a practice that the Court viewed as a policy?

4          MS. BOUCHARD:  Well, the Court viewed it as a policy

5   because it applied throughout the class.  Here we don't have

6   that.  We don't have anyone saying to Sally Sue work off the

7   clock.  There is no stated policy.  Sally Sue, based on

8   Exhibit H, was paid or, if she wasn't paid, it was because

9   there was a thorough investigation conducted, and the ER

10  investigator determined that that person shouldn't be paid.

11         THE COURT:  Merrill Lynch actually had a policy to

12  assign --

13         MS. BOUCHARD:  No, there was no written policy.

14         THE COURT:  All right.

15         MS. BOUCHARD:  But the policy was in writing.  And

16  how --

17         THE COURT:  Oh, I see.

18         MS. BOUCHARD:  And the policy --

19         THE COURT:  The policy prohibiting it was in writing.

20         MS. BOUCHARD:  No, there was no policy prohibiting

21  disparate account assignments, but there was a policy of

22  teaming in the *Merrill Lynch* case --

23         THE COURT:  All right.

24         MS. BOUCHARD:  -- that statistically showed that there

25  was a disparate impact to African Americans.

1          THE COURT:  I see.  Okay.

2          MS. BOUCHARD:  Which is much different than what we

3    have here.

4          THE COURT:  Okay.

5          MS. BOUCHARD:  Your Honor, for these reasons, we

6    believe that both Rule 23 class certification and 216(b)

7    conditional certification should be denied.  It does not mean

8    that Ms. Gomez is without a remedy.  In fact, she has and will

9    continue to proceed with her claim.

10          If Mr. Ward -- Ward's claim is lifted out of the stay

11    of bankruptcy, he can proceed with his -- his filing, which is

12    separate from this.  And if Ms. Claveria seeks to put herself

13    on the caption rather to be an opt-in, she can also have a

14    claim.

15          So there's no prejudice here to the three people who

16    have exhibited some interest, albeit that Ms. Claveria and

17    Mr. Ward only did so after they were subject to investigations

18    for fraudulent practices.

19          THE COURT:  All right.  Let me just go through my

20    questions.

21          MS. BOUCHARD:  Sure.

22          THE COURT:  I had some written questions when I went

23    through the briefs that I may have -- many of them have been

24    answered.

25          All class discovery is completed at this point.  Is

1  that correct?

2  　　　　MS. BOUCHARD:  That's correct.

3  　　　　THE COURT:  Okay.

4  　　　　MS. BOUCHARD:  And all individual discovery for

5  Ms. Gomez's claims as well.

6  　　　　THE COURT:  Okay.

7  　　　　I think every question I had has been answered,

8  although, Mr. Doyle, I'll give you a chance to respond if you'd

9  like.

10  　　　　Thank you.

11  　　　　MS. BOUCHARD:  Thank you, your Honor.

12  　　　　THE COURT:  Thank you.

13  　　　　MS. BOUCHARD:  I appreciate the time.

14  　　　　THE COURT:  Sure.

15  　　　　MR. DOYLE:  A few random points, your Honor.

16  　　　　The first is I'm not aware of an order in the case

17  that closes individual discovery for Ms. Bell.  I'm just not

18  aware of that order.

19  　　　　THE COURT:  All right.  But that's --

20  　　　　MR. DOYLE:  I don't know that it matters, but I'm not

21  aware of it.

22  　　　　THE COURT:  It doesn't matter, I think, to the issue I

23  have at hand.

24  　　　　MR. DOYLE:  Okay.

25  　　　　THE COURT:  I just want to make sure that there's

1  nothing by way of class discovery or if this issue is ripe for

2  me to decide as we sit here now.

3          MR. DOYLE:  Class -- class discovery is closed.

4          THE COURT:  Fine.  Okay.

5          MR. DOYLE:  The closing date for class discovery was I

6  believe October 1st.

7          THE COURT:  Okay.

8          MR. DOYLE:  And then we filed the papers November 1st.

9          THE COURT:  Right.

10          MR. DOYLE:  Your Honor, there was a fair amount of

11  discussion about the 37 people from the table day --

12          THE COURT:  Yes.

13          MR. DOYLE:  -- at DePaul.  And the bank says that

14  they've looked at their records and all of those people got

15  paid.  The chronology, if that is true and there are records

16  that show that, that is a serious abuse of the fact the class

17  discovery has been closed.  The chronology of this issue is

18  laid out at page 14 of our brief.

19          Here's what happened.  Mr. Cobb sent a list of names

20  to his supervisors back in 2010.  We cite the pages, and the

21  e-mails are in there, the e-mails with him listing people.

22  Mr. Cobb described how PNC Bank then buried the issue.

23  Mr. Cobb gave his list of 37 names of the people from the table

24  days list in an affidavit that was filed with this Court and

25  served on the defendants on March 15th of 2013.

1      We then had six months of discovery.  The bank never

2   produced any discovery relating to those 37 people getting

3   paid.

4      In a 30(b)(6) deposition on July 10th, PNC Bank said

5   it had no knowledge of any investigation regarding overtime for

6   the 37 people on Mr. Cobb's list.  We put that 37 -- the list

7   of 37 people in front of the 30(b)(6) witness and said, "Were

8   these ever investigated for overtime?"  The answer was "No.  I

9   don't know what this list is.  I've not investigated any of

10   these people."

11      PNC Bank's official list confirms that the bank never

12   investigated or paid overtime regarding those 37 people.

13      So then what happens?  We include them in the class.

14   We include them on the list of 50.  Ms. Alvarez then files a

15   declaration with the Court that says, "Oh, after I saw the

16   plaintiff's opening brief, I looked up those 37 people.  And

17   they got paid."

18      Your Honor, how am I supposed to respond to that?  I

19   have no ability to respond to that given that it happens

20   entirely outside of discovery.  We asked specifically for

21   PNC Bank to give us all of the documents that they were going

22   to be relying on in opposing class certification.  They said

23   they did.  They also told us their document discovery was

24   complete.

25      Your Honor, it is patently unfair at this point for

1    them to show up with a witness who says, "I've now looked it

2    up.  And I won't give you the" -- by the way, they've never

3    even given us the records even still -- "I've looked it up, and

4    trust me, they got paid."

5              THE COURT:  Well, how would you remedy it?

6              MR. DOYLE:  How would I remedy it?

7              THE COURT:  Yeah.

8              MR. DOYLE:  I would say that these 37 people have not

9    been paid.

10             THE COURT:  Yeah, that may not comport with the truth,

11   though.  How would you remedy the discovery issue?  Because

12   I -- I don't -- I haven't yet in my brief career assumed things

13   to be true because rules weren't followed --

14             MR. DOYLE:  I understand.

15             THE COURT:  -- to get there.  And I'd rather we get to

16   the bottom.

17             MR. DOYLE:  And for merit -- on the merits at trial,

18   we may end up someplace different.

19             THE COURT:  Well --

20             MR. DOYLE:  The question is, where are we for the

21   preponderance of the evidence when it existed when class

22   discovery closed?

23             THE COURT:  But this is a -- this -- this is one of

24   the key parts of your argument.

25             MR. DOYLE:  Their argument.

1          THE COURT:  Well, also your argument that people

2    weren't paid, the 50 people as part of your argument and 37 of

3    them as part of their argument.

4          MR. DOYLE:  Okay.

5          THE COURT:  And you're saying it's unfair for them to

6    come up with this in a -- after discovery is closed and

7    basically put an affidavit out that says they, in fact, were

8    paid.

9          How would you -- were I to briefly reopen discovery to

10   allow this fact to get nailed down, what would you do?

11         MR. DOYLE:  I would -- if all 37 of those people got

12   paid, the first thing they ought to do is they ought to give us

13   the documents that show the payments that went to those

14   37 people and when it happened because it hadn't happened as of

15   July 10th of 2013 because we asked the 30(b)(6) investigator.

16   We asked, "Have you investigated these people?"  They said,

17   "No, I don't know what this list is."

18         THE COURT:  All right.  Well, that --

19         MR. DOYLE:  So --

20         THE COURT:  -- doesn't mean the records didn't exist.

21         MR. DOYLE:  All right.  Well, let's find out.

22         THE COURT:  That means 30(b)(6) witness --

23         MR. DOYLE:  Your Honor, I don't --

24         THE COURT:  -- didn't know the answer.

25         MR. DOYLE:  I am skeptical that the records exist

 1   given the circumstances of how it is that it has come up in

 2   this case.  So perhaps the first thing that the defendant ought

 3   to do is give us the proof for each of those 37 people when

 4   they were paid for the table days at DePaul.  Then we can

 5   figure out what should happen to those 37 people on this.

 6           THE COURT:  Well --

 7           MR. DOYLE:  Give us the records that Ms. Alvarez is

 8   referring to for those 37 people.

 9           THE COURT:  All right.  Because if they were working

10   there during their regular work hours at another branch, I

11   don't know what would be shown.  Ms. Alvarez made an

12   assertion -- did you ever depose Alvarez, or no?

13           MR. DOYLE:  Yes.

14           THE COURT:  Okay.  But -- and that's when you asked

15   her about this?

16           MR. DOYLE:  Yes.

17           THE COURT:  Okay.

18           MR. DOYLE:  She was the 30(b)(6) witness.

19           THE COURT:  Okay.  Very good.

20           She apparently has greater knowledge now than she did

21   at the time of your deposition because -- I assume in large

22   part because you put the information in your appendix, your

23   appendices, and she -- they did what lawyers do.  They talked

24   to her and say how do we respond to this, and they came up with

25   the affidavit.  It's just --

1      MR. DOYLE:  But, your Honor, they had the list when

2   Mr. Cobb sent it in 2010, and they had the list when we served

3   it on them on March 15th of 2013 --

4      THE COURT:  I see.

5      MR. DOYLE:  -- in an affidavit from Mr. Cobb.  It's

6   attached to his affidavit.  And it was filed as one of the

7   court papers in this case.

8      THE COURT:  Go ahead.  What's your response?

9      MS. BOUCHARD:  Yes.  The list of 37 was never supplied

10   to the employee relations department.  And the e-mails that

11   they contend support that don't support that.

12      If you look at 526 through 530, they provide some

13   names, but it's about training.  It's not about this list of 37

14   at all.  And Ms. Alvarez states in her declaration that she

15   never received it.  These people were paid, your Honor, in the

16   normal course of their duties as you've described.

17      THE COURT:  Well, that's why I'm wondering how much --

18   what records there would be -- I mean, if they were paid in the

19   normal course -- and, Mr. Doyle, if you made a request to

20   get -- show me the records to show they got paid, they're going

21   to give you payroll records that show they got -- presumably

22   they got paid in the ordinary course of their 40 hours a week

23   or, you know, maybe some overtime.

24      I don't know how that will get you to the point of

25   where they -- it would seem more -- the more germane issue may

1    be -- and I don't know if these records exist -- showing time

2    records to show that the DePaul day was, you know, from 10:00

3    in the morning till 4:00 in the afternoon and they have a --

4    you know, they have a time record showing they were working at

5    the bank that day and, you know, they worked from 10:00 to 4:00

6    somewhere other than their Belmont and Cragin branch.

7           MS. BOUCHARD:  But, your Honor, there's no reason to

8    reopen discovery.  Mr. Cobb's affidavit, which is the support

9    for the list of 37, doesn't say that these people worked off

10   the clock.  He said, "I don't know."

11          MR. DOYLE:  Your Honor, if I may.

12          THE COURT:  Go ahead.

13          MR. DOYLE:  What Mr. Cobb said in that declaration was

14   he said, "I alerted the people in employee relations that

15   people might not have gotten paid."  That is entirely

16   consistent with the -- with the e-mail that he sent that's

17   dated September 30th, 2010.  It appears in our appendix at

18   APX526.

19          Line number 1 of the body of it says, "Here are some

20   dates for after-hours training that people may not have clocked

21   time for."  And it gives the day and the people.

22          The response that Mr. Cobb got from employee relations

23   was "Leave that alone.  We're not going to investigate that

24   farther."  They never took Mr. Cobb's deposition.  They never

25   produced any of these records relating to these dates.  They

1    never produced any records relating to the 37 people.  And now

2    they say, "Trust me; we paid them."

3              MS. BOUCHARD:  These e-mails, your Honor, don't relate

4    to table days; they relate to training.  And they don't list

5    37 people.

6              MR. DOYLE:  Your Honor --

7              THE COURT:  It does say "training."

8              MR. DOYLE:  And it says "may not have clocked time

9    for."

10             THE COURT:  Right.  But that's --

11             MR. DOYLE:  And it says --

12             THE COURT:  -- not the DePaul situation, is it?

13             MR. DOYLE:  The notes that follow --

14             THE COURT:  Okay.

15             MR. DOYLE:  -- on 531 over to 532, I believe, are

16   someone from employee relations writing down conversation notes

17   with Mr. Cobb.  We saw these first in -- in discovery.

18             Your Honor, they have -- they knew long before class

19   discovery closed who these 37 people were.  They never produced

20   a stitch of documents showing payments to them.  We asked them,

21   "Produce everything you're going to rely on."  In their

22   opposition brief, for the very first time, we get a "trust me."

23             Surely it wouldn't be hard for them to tell us if the

24   people were paid for the table days at DePaul and produce the

25   records now, if nothing else, the exact records that

 1   Ms. Alvarez says she is relying on.

 2          THE COURT:  Well, what's --

 3          MR. DOYLE:  In fairness.

 4          THE COURT:  -- what's the -- what would be the

 5   disadvantage to the bank of doing that?

 6          MS. BOUCHARD:  Of doing what, showing the time

 7   records?

 8          THE COURT:  Well, whether it's time records, payroll

 9   records, or interviews Ms. Alvarez did, whatever she did to

10   satisfy herself that the assertion she made that all 37 people

11   were paid that she put in through her affidavit at page -- I

12   think you referred me to the --

13          MS. BOUCHARD:  Right, 22 of her affidavit.

14          THE COURT:  Yeah, let me reread 22.

15          MS. BOUCHARD:  Your Honor, we can certainly provide

16   you supporting documentation in order for you to make your

17   decision.  And we will do so if that is what you would require.

18          But, again, that would just show -- again, there's no

19   person in that list of 37 that's saying that they worked off

20   the clock.  Mr. Cobb is speculating because his husband

21   volunteered that -- and in every document that they attached to

22   their appendix, there's no statement that these people worked

23   off the clock.

24          THE COURT:  Well, how do you -- here's my dilemma.  I

25   have paragraph 22 of your -- your investigator's affidavit

1    saying that "Payroll records reveal that consistent with PNC's

2    HOW and overtime policies, all 37 employees listed at

3    Appendix 15" --

4            MS. BOUCHARD:  Right.

5            THE COURT:  -- "and also at Appendix 159-60 recorded

6    their own time and were paid for all hours worked at table

7    days."

8            MS. BOUCHARD:  We would be glad to provide you those

9    records if it helps with your decision, your Honor.  That's not

10   an issue for us.

11           THE COURT:  Okay.  And the -- she is obviously

12   responding to the assertion at those pages by the plaintiffs --

13           MS. BOUCHARD:  Right.

14           THE COURT:  -- that they weren't paid and that --

15           MS. BOUCHARD:  Well, and they don't make that

16   assertion.  They make that assertion in their brief.  But the

17   underlying affidavit on which they rely says, "I don't know."

18           THE COURT:  Oh, I understand that.

19           MS. BOUCHARD:  Yes.

20           THE COURT:  But their brief and Mr. Doyle's argument

21   was the reason I can't consider this to be a robust

22   investigative scheme --

23           MS. BOUCHARD:  Mm-hmm.

24           THE COURT:  -- where the bank -- when they have rogue

25   branch managers deal with this, you deal with rogue branch

1    managers by investigating, firing them, disciplining them, and

2    you pay people who have not gotten paid for overtime, and

3    "Here's my proof.  Here's these 50."

4         You come back and say no.  The majority of them, or

5    certainly more than half of them were paid.

6         I can't -- short of a hearing, I couldn't resolve

7    that.  But if there is discovery that either would inform --

8    and Mr. Doyle says it's unfair for your affiant to come in with

9    this at the last minute or during briefing because discovery is

10   closed.

11        I'm happy to allow brief reopening of discovery to

12   nail this issue down.  Either they got paid or they didn't.

13        MS. BOUCHARD:  Right.

14        THE COURT:  Either they got paid for working at DePaul

15   or they didn't.  And that would seem in the interest of all

16   parties to know the answer.

17        I don't want to make a ruling when there's an -- a

18   ruling based on conflicting -- I don't know.  I don't want to

19   say stories, but conflicting views of this by both sides when

20   it may be ascertainable.

21        MS. BOUCHARD:  And we'll certainly provide those

22   records.

23        There was no investigation at -- the DePaul branch is

24   not on the ERIC report because there was no investigation

25   because, as you see, there is no evidence that he provided a

1    list of 37.

2         So it is Ms. Alvarez's word against Mr. Cobb's.

3    Mr. Cobb is now stating in his affidavit he provided this list

4    of 37, but the supporting documentation does not support that.

5         So what you're going to see from us are payroll

6    records that show that people worked.  There were no subsequent

7    payments.  There are no investigation records to support that.

8         THE COURT:  Do you expect there to be anything showing

9    people -- you know, a memo or anything saying, "Rather than

10   come in to work today, go over to DePaul"?

11        MS. BOUCHARD:  No, because these people came from all

12   different branches.  And the issue --

13        THE COURT:  Isn't there something to indicate -- and

14   maybe it doesn't exist anymore.  But if they came from all

15   different branches, I assume somebody made a direction saying,

16   "I need two from this branch, three from this branch, four from

17   this branch because I have to staff 20 tables at DePaul."

18   Anything like that?

19        MS. BOUCHARD:  It's not there.

20        THE COURT:  Okay.

21        MS. BOUCHARD:  And we went through -- I mean, we

22   produced 55,000 e-mails.

23        THE COURT:  Okay.

24        MS. BOUCHARD:  And, again, we will certainly produce

25   those payroll records for you.

1          But what that will show is --

2          THE COURT:  Well, it's not for me; it's for Mr. Doyle.

3          MS. BOUCHARD:  Okay.

4          THE COURT:  And then --

5          MS. BOUCHARD:  It doesn't go to class certification.

6  I mean, it doesn't go to whether there's a common thread.

7          THE COURT:  Well, it goes a little to the issue of

8  whether the -- their claim is your investigations were

9  inadequate and that that --

10          MS. BOUCHARD:  But that's -- that's not a -- that's

11  not a class certification issue either, your Honor.

12          THE COURT:  No, I saw the cases you brought for that.

13          MS. BOUCHARD:  Right.

14          THE COURT:  But it's a contested factual issue.

15  They're relying upon it, and I'd much rather have this nailed

16  down --

17          MS. BOUCHARD:  Sure.

18          THE COURT:  -- than not.

19          I'm not sure the records they have, Mr. Doyle, though,

20  to produce is going to nail this down to give an answer on --

21  you know, you've got Alvarez saying, "They got paid.  I reached

22  that conclusion" -- for whatever reason.  She must have looked

23  at something.

24          MR. DOYLE:  Yep.

25          THE COURT:  And she may have drawn conclusions from

1    records that she's entitled to as an affiant that may be

2    logical conclusions but may not -- that you may challenge and

3    say, well, that was an unwarranted conclusion for her to draw.

4           But I'd rather -- I hate to reopen discovery that's

5    been long closed, but I -- this appears important to the

6    plaintiffs' version of why there ought to be a class certified.

7    It's -- as far as the defendants are concerned, it's

8    irrelevant, but it's -- it's -- nonetheless, I'd rather let

9    everyone have their -- have their say on this.

10          MR. DOYLE:  There's --

11          MS. BOUCHARD:  Your Honor, that's fine.  If you'd just

12   give us a time frame on which you'd like us to exchange those

13   records, we'd be glad to do so.

14          THE COURT:  All right.  Mr. Doyle, any problem with

15   that?

16          MR. DOYLE:  No problem.

17          THE COURT:  Okay.  All right.  I'm not sure after you

18   give them the records we're going to be any further along.  If

19   the records are not something saying -- as explicit as "You

20   37 people should go to DePaul and work today and" --

21          MS. BOUCHARD:  No, they're just going to be time

22   records that show, you know, someone worked 40 hours in a given

23   week; someone worked 42.  You know, that's all they're going to

24   show.

25          THE COURT:  How will that help you, Mr. Doyle?  Or

1  will it?

2  MR. DOYLE:  Your Honor, there may be records in each

3  of their branches too that say where they were that day.  But

4  separate from that.

5  THE COURT:  Well --

6  MR. DOYLE:  Their claim is all these people got paid.

7  I want to see -- and that they put in a witness for the first

8  time six months after they first saw this list of 37 people.

9  They put in a witness who says, "They all got paid.  I've

10  looked at the records, and I know it's true."

11  First of all, I'd like to see whatever it is that

12  convinced Ms. Alvarez that those people got paid.

13  Second of all, I don't know precisely what the

14  documents are going to say until I see them.

15  THE COURT:  All right.  Well, why don't you produce

16  what it is Ms. Alvarez looked at --

17  MS. BOUCHARD:  Mm-hmm.

18  THE COURT:  -- to form the basis for her sworn

19  statement at paragraph 22 that these people were paid.

20  I may -- and I'll have you probably on a short phone

21  conference.  I'm not even going to have you come in.  But I may

22  have a short phone conference after those records are produced

23  to decide whether or not I'll allow Ms. Alvarez to be deposed

24  for about half an hour.

25  MR. DOYLE:  Okay.

1    THE COURT:  Maybe an hour, maybe half an hour.

2    MR. DOYLE:  I can take quick depositions, your Honor.

3    THE COURT:  I'm sure you can.  And it's going to be

4 limited to paragraph 22:  "How did you reach this conclusion?"

5    And it may be that she reached the conclusion through

6 logic.  I'm not -- it may be she reached the conclusion through

7 the records she looked at.  It may be her knowledge as a

8 longtime investigator with PNC.  I don't know how long she's

9 been there, but it may be based on her position at PNC and her

10 experience that she was able to reach this conclusion.

11    But I think in fairness, we ought to see why she

12 reached this conclusion because it's important enough, I think,

13 to the issues I have to resolve to make this a prudent way to

14 go.  Then we're done.

15    MS. BOUCHARD:  That's great.

16    THE COURT:  Then we are -- we have exhausted --

17    MR. DOYLE:  I -- I have a homework assignment that I

18 want to do for myself, your Honor.

19    THE COURT:  All right.

20    MR. DOYLE:  One of the things Ms. Bouchard talked

21 about was the Naperville branch.

22    THE COURT:  Right.

23    MR. DOYLE:  And there was a previous lawsuit that was

24 the *Jarmasek* lawsuit.

25    THE COURT:  Right.

1    MR. DOYLE:  I remember when we were putting together

2  these motion papers trying to be sure that we left the branch

3  from the *Jarmasek* lawsuit out of the class definition.

4    THE COURT:  Out of the class definition.  All right.

5    MR. DOYLE:  I want to check it.

6    THE COURT:  All right.

7    MR. DOYLE:  I want to check it, and I want to see what

8  the *Jarmasek* case was about again.  And I want to check and see

9  who the six people were who opted in, and I want to make sure I

10  haven't said something that is incorrect about the Naperville

11  branch.

12    I don't believe I have.  I don't believe it's the same

13  branch.  My recollection is that it's Bolingbrook where the

14  *Jarmasek* case was, but, you know, this is the suburbs.

15  Bolingbrook looks an awful lot like Naperville.  And one person

16  might call it one thing, and 75th Street may run through them

17  both.

18    THE COURT:  Right.  No, that's fine.  And --

19    MR. DOYLE:  So I want to be sure I've got that right,

20  your Honor.  And if I have it wrong, then I will make sure I

21  file something that makes sure that it's correct.

22    THE COURT:  Okay.

23    MR. DOYLE:  Your Honor, there's a number of other

24  points that I don't think need responses, but I will focus on

25  just a couple.

1    Ms. Bouchard said that our argument was that there was

2    no top-down policy.  That's not what I was talking about

3    top-down on.  I was talking about proving a companywide

4    unofficial policy or practice with top-down proof or with

5    bottom-up proof.  That was the top-down and bottom-up

6    reference.

7    There isn't some written policy that says this.  We

8    all agree with that, that says, "Don't pay overtime."  We all

9    agree with that.  However, the proof is overwhelming that it

10   happened all over.

11   Your Honor, one more thing.  Ms. Bouchard talked about

12   people who had no injury who might be included in the class.

13   That's not the law in this circuit.  The law in this circuit

14   is, does the class include people who could not have injury?

15   And this class is not defined in any way that suggests that.

16   There's 600 people in this class is our best sense of it.  It

17   plainly meets numerosity.

18   Your Honor, they talked about the managerial duties

19   for Ms. Gomez Bell.  In our reply brief at page 7, we dealt

20   with that in some detail.  Most importantly, in their

21   opposition papers, PNC Bank said Ms. Gomez Bell was

22   overtime-eligible.  With that admission, they have no ability

23   at trial to now claim she is not overtime-eligible.

24   There are a number of cases that deal with

25   off-the-clock overtime in a 216(b).  We cite those in our reply

1    brief at page 12.

2             I have nothing further, your Honor, other than to say

3    what do we do in this case?  What do we do?  Do we wrestle with

4    whether the evidence suggests a common overall question?  Do we

5    wrestle with is this an unofficial policy or practice?

6             Or do we look at the pile of evidence that says it

7    happened over and over again, and we think there are people who

8    did not get paid?  And if we proceed with a narrow class on

9    specific issues with damages left for posttrial proceedings, is

10   that a better proceeding?

11            Your Honor, I think the answer in our briefs is that a

12   class certification is a better approach here.

13            Thank you very much.

14            THE COURT:  All right.  Thank you.

15            Okay.  How much time do you need to produce the

16   documents?  Whether -- I don't really know what they were, and

17   I don't want to characterize them.  But the documents that

18   Ms. Alvarez relied upon to make the assertion in paragraph 22,

19   how much time do you need to produce those?

20            MS. BOUCHARD:  I don't think we need more than 14 days

21   at the most.  I mean --

22            THE COURT:  All right.

23            MS. BOUCHARD:  -- just in case they're in archives or

24   something like that.

25            THE COURT:  Okay.  Produce them in 14 days.

1     I'm going to have you back for a status in 21 days.

2  And at that time, Mr. Doyle, I'll need you to tell me whether

3  or not -- and I'm not suggesting you should, but whether you

4  want to take Ms. Alvarez's deposition on that particular fact.

5           MR. DOYLE:  All right.

6           THE COURT:  You may decide you don't need to.  But I

7  would like some closure on this.

8           And then if there is a -- and then if that is closed

9  out, I'll allow each side two pages -- no footnotes -- two

10  pages to jointly file to tell me your belief as to what this

11  evidence has shown as it impacts what you've already

12  represented in your briefs and your affidavits.  I think that

13  should be enough paper.

14          So but we'll -- I'll have you back for a quick -- and

15  you both came in from out of town.  Is that correct?

16          MS. BOUCHARD:  That's right.

17          THE COURT:  Yeah, we can do this over the phone.

18          MS. BOUCHARD:  Okay.

19          THE COURT:  But I just want to know at that point

20  whether you're going to be seeking, Mr. Doyle, a dep of

21  Ms. Alvarez.  If you do, it will be very time-limited.  And

22  then I'm going to ask for a very, very quick turnaround to get

23  the paper in so we can be done with the briefing and I can jump

24  into this.

25          MR. DOYLE:  Thank you.

1       THE COURT:  All right.  So we'll give you a date in

2   21 days.  That should give you all enough time to get the

3   records, digest them, and see if you really need to take a

4   deposition.

5       MS. BOUCHARD:  Thank you, your Honor.

6       THE COURT:  Okay.

7       THE CLERK:  Either April 2nd or 3rd.

8       MR. DOYLE:  Either is fine.

9       MS. BOUCHARD:  Either is fine with us.

10      THE CLERK:  Okay.  April 2nd.

11      MS. BOUCHARD:  Sure.

12      THE COURT:  All right.  And on the plaintiff's side, I

13  know you're local, but you can call in too if you want.  It's

14  not -- it's your call, but certainly out-of-town counsel can

15  call in.

16      MR. DOYLE:  On the 9:00 call?

17      THE COURT:  Yeah.

18      MR. DOYLE:  Thank you.

19      THE COURT:  And we'll do it very briefly.  And then

20  we'll -- if I order a dep, we'll have that scheduled.

21      Ms. Alvarez is still employed by the bank, I take it.

22      MS. BOUCHARD:  Yes.

23      THE COURT:  And we would try and schedule that,

24  even -- it's up to you.  You can even do a phone dep.  She's

25  local, I take it.

1          MS. BOUCHARD:  She is.

2          THE COURT:  Okay.  Well, however, you want to proceed.

3   I want to minimize what has already been an enormous expense

4   for both sides, and I -- I'm doing this with some hesitation,

5   but it's -- I think it came up enough in the arguments today

6   that we ought to at least resolve it.

7          MR. DOYLE:  Thank you.

8          THE COURT:  And it seems resolvable, which is why I --

9          MS. BOUCHARD:  It's not going to be difficult, your

10  Honor.

11         THE COURT:  Yeah, okay.  Good.

12         All right.  That will be where we stand.  The briefs

13  were excellent by both sides.  Too many footnotes.  It would

14  have been -- but the pages would have been twice as long if you

15  didn't put them all in single-spaced footnotes.  But so I get

16  it.  I know that's why you did it.  But they were all very well

17  written.  They were very helpful.  And the arguments today were

18  very good by both sides.

19         MR. DOYLE:  Thank you.

20         MS. BOUCHARD:  Thank you.

21         THE COURT:  This was a -- I'm glad you suggested we do

22  this.  It's very helpful.  I got a lot more out of it hearing

23  what you had to say.

24         MR. DOYLE:  Thank you.

25         THE COURT:  All right.  We'll have a brief status on

1    April 2nd, and we'll go from there.

2           MS. BOUCHARD:  Thank you.

3           THE COURT:  Thank you all.

4           MR. DOYLE:  Thank you.

5      (Concluded at 12:08 p.m.)

6                C E R T I F I C A T E

7     I certify that the foregoing is a correct transcript of the

8   record of proceedings in the above-entitled matter.

9

10   */s/ LAURA R. RENKE*                    *April 23, 2014*
      LAURA R. RENKE, CSR, RDR, CRR

11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25