| | |
|---|---|
| MARISELI GOMEZ, individually and on behalf of all others similarly situated, | |
| Plaintiff, | No. 12 C 1274 |
| v. | Judge Thomas M. Durkin |
| PNC BANK, NATIONAL ASSOCIATION, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Mariseli Gomez Bell[1] alleges that her former employer, PNC Bank, failed to pay her overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* R. 1. In addition to her individual claims, Bell also brings her action on behalf of all others similarly situated, and moves to have the Court certify a class of plaintiffs pursuant to Federal Rule of Civil Procedure 23(b)(3) and a collective action pursuant to 29 U.S.C. § 216(b). R. 63. For the following reasons, Bell's motion is granted.

### Background

Bell worked as a Senior Banker at PNC's branch at Broadway & Berwyn in Chicago from June 1, 2009 through May 31, 2011. R. 65 at APX1 (¶ 2). Bell has

---

[1] The Plaintiff was known as Mariseli Gomez when the complaint was filed, but she is now known as Mariseli Gomez Bell. *See* R. 64 (caption). The Court will refer to her as "Bell."

submitted an affidavit describing her personal knowledge of PNC's overtime policies and practices. *See id.* at APX1-7. In her affidavit, Bell states that her "performance was evaluated (in part) based on how many new accounts [she] brought to the bank," and PNC gave her "targets for the number of accounts [she] was expected to open." *Id.* at APX1 (¶ 4). Bell says "it became clear to [her]" that in order to generate new accounts she needed to spend "significant" time outside of her regular work hours visiting prospective clients. *Id.* at APX2 (¶¶ 5-6). Bell says that she had to do this because PNC had understaffed her branch to the point that the branch could not afford to have her be physically absent from the branch during her shift. *See id.* at APX3 (¶ 7). Some of Bell's assignments to visit prospective clients outside the branch building came from Greg Bloden, a PNC vice-president who did not work at Bell's branch. *Id.* at APX2 (¶ 5). Bell also says that understaffing at the Broadway & Berwyn branch often caused her to work through her lunch breaks. *Id.* at APX3-4 (¶¶ 8-9).

According to Bell, when she submitted time cards reflecting overtime work, Bell's branch manager, Letticia Flores, rejected the time cards and told Bell that PNC "would not permit the overtime." *Id.* at APX3 (¶ 6). Flores has also submitted an affidavit describing her personal knowledge of PNC's overtime policies and practices. *See id.* at APX8-11. In her affidavit, Flores states that her supervisor, Christina Romis, a PNC regional manager, told her that "PNC would not permit [Flores] to report overtime for the branch," and "PNC expected its employees to handle their outside-the-branch work on their own time, without reporting any

extra hours that they worked." *Id.* at APX10 (¶ 3d). Bell also says that Romis told her that PNC "would not permit overtime to be reported by employees." *Id.* at APX3 (¶ 6).[2]

In January 2011, Margaret Alvarez, an Employee Relations Investigator for PNC, contacted Bell to ask her whether she had ever worked unpaid overtime hours, and Bell confirmed that she had done so. *Id.* at APX4 (¶ 10). Bell says that by fax on January 31, 2011, and in a phone conversation on February 1, 2011, Bell explained to Alvarez the circumstances of her unpaid overtime and that her time cards showing overtime had been rejected. *Id.* at APX4-5 (¶ 12). According to Bell, Alvarez told her that PNC "would not pay for hours that [Bell] could not support with documents." *Id.* at APX4 (¶ 10). On July 31, 2011, five months after Bell told Alvarez that she had worked unpaid overtime (and after Bell had resigned from PNC), Bell received an electronic deposit from PNC for $1,392.89. *Id.* at APX6 (¶ 16). Separately, Bell learned through communications related to this litigation that this payment was intended to compensate her for 68.15 unpaid overtime hours. *Id.* at APX6 (¶ 17). Bell believes that this payment fails to compensate her for the actual number of unpaid overtime hours she worked for PNC in 2009 and 2010. *Id.*

PNC has produced investigation reports documenting complaints of unpaid overtime. The reports show that in addition to Bell, two other employees at the

---

[2] PNC argues that the statements Bell and Flores attribute to Romis should be excluded as hearsay. R. 72 at 19 n.25. Romis, however, was a PNC regional manager whose responsibilities included supervising employee relations. As such, her statements regarding PNC's overtime policy are party admissions and are not hearsay. *See* Fed. R. Evid. 801(d)(2)(D).

Broadway & Berwyn branch complained that they were not paid for overtime they worked. Ernest Ward claimed that he was not paid for 45.61 hours of overtime and that he was "discouraged from submitting [overtime]." R. 66 at APX276-77. The investigation into Ward's claims revealed that Flores did not want employees at her branch working overtime and, instead, offered Ward permission to leave work early as compensation. *Id.* at APX276-77. After the investigation, Ward was paid for 50.18 hours of overtime. *Id.* at APX278-80.

According to Alvarez, on January 3, 2013, PNC began to investigate whether Ward "enable[ed] branch employees to falsify bank referral reports." R. 73-1 ¶ 41. The next day, Ward filed a lawsuit against PNC for failure to pay overtime wages. *See Ward v. PNC Bank, N.A.*, 13 C 95 (N.D. Ill.).[3] PNC fired Ward on February 14, 2013. R. 73-1 ¶ 41.

PNC's investigation reports also show that Tess Claveria—another former employee of the Broadway & Berwyn branch—claimed that Flores refused to pay overtime and instead directed Claveria to leave work early on a later day in an attempt to compensate Claveria for overtime hours. *See* R. 65 at APX188-89. The investigation reports also show that Claveria claimed she was deprived of her full lunch hour on certain occasions. *Id.* Claveria sought compensation for 73.40 overtime hours, but PNC determined that she was owed only 8.02 overtime hours. *Id.* at APX154. Alvarez states that Claveria only received compensation for part of her claim because an analysis of "the teller electronic journals, alarm codes, log-in

---

[3] Ward is currently prevented from prosecuting his case against PNC because he is in bankruptcy proceedings. *See Ward v. PNC Bank, N.A.*, 13 C 95 (N.D. Ill.), R.31.

and log-out reports from payroll, and payroll reports for the dates Tess Claveria reported unpaid overtime or missed meal periods," showed that Claveria "provided inconsistent statements and inflated the amount of time she allegedly worked." R. 73-1 ¶ 38. On December 26, 2012, PNC began to investigate whether Claveria "entered false information that enabled her to receive credit for unearned referrals and/or unearned incentive pay." *Id.* ¶ 39. Claveria opted into this lawsuit on January 23, 2013. *See* R. 44. PNC fired Claveria on February 14, 2013. R. 73-1 ¶ 39.

PNC fired branch manager Flores as a result of PNC's investigations into Bell, Ward, and Claveria's allegations of unpaid overtime. R. 73-1 ¶ 35. Bell testified that after Flores was fired, her new "manager [told Bell] that if [Bell] was working overtime to go ahead and report it." R. 65 at APX53 (145:17-23).

The investigation reports that PNC produced also show that some employees at other branches complained to PNC Employee Relations that they worked overtime for which they were not paid. PNC produced a table compiling these complaints and listing any overtime compensation PNC paid as a result of its internal investigations into these complaints. *See* R. 65 at APX153-58. Bell's counsel compared PNC's table to the investigation reports themselves and created a list of complaints found in the investigation reports that were not included in PNC's table, *id.* at APX159-60, and a list of employees who worked overtime but were not paid. *Id.* at APX161. The Court has reviewed PNC's table, Bell's counsel's lists, and the investigation reports themselves. The following is a summary of what this

documentary evidence reveals regarding complaints of unpaid overtime made by employees at each branch included in the class Bell seeks to certify:

- At the **Algonquin** branch, an employee alleged that he was not paid when he arrived early to work or when he traveled to customer locations to pass out flyers. R. 66 at APX302, APX308-09. The employee also stated, however, that the branch manager had never told him not to record overtime. *Id.* at APX308. Other employees at the branch stated that the employee purposefully arrived to work early so he could leave early. *Id.* at APX309. PNC told the employee he would need to provide documentation for any time for which he had not been paid, and the employee agreed that he would provide this if he could. *Id.* at APX302. The employee was fired for other misconduct unrelated to recording time, *id.* at APX301-02, and the employee never requested payment for unpaid hours.

- At a **Bloomington** branch on Market Street & JC Parkway, an employee alleged that the branch manager planned to shift overtime hours to the following week to avoid paying overtime rates. R. 66 at APX314. PNC contacted the manager, and he denied having said he intended to shift hours in this manner and promised to clarify with the branch staff that overtime hours would not be shifted. *Id.*

- At the **Bolingbrook** branch, a branch manager was informed that two employees had taken home information about new PNC products to study. When an employee noted that employees should receive overtime pay for such work, the branch manager said, "[W]e don't have that issue here at Bolingbrook." R. 66 at APX319-20. The manager was disciplined. *Id.* at APX321. The two employees did not request overtime pay, but PNC paid each of them an hour of overtime. R. 65 at APX155. Another employee stated that on rare occasions she did not record that she left work ten minutes late. R. 66 at APX328. PNC's records do not reflect that this employee requested overtime compensation for this time or that PNC paid her any such compensation.

- At the **Buffalo Grove** branch, several employees reported that the branch manager told employees that "PNC does not allow overtime and overtime would only be paid to employees who were deserving of it." R. 66 at APX364. The manager also told employees to take extra paid vacation rather than paying overtime. *Id.* PNC fired the manager, R. 66 at APX362, and paid seven employees a total of 148.45 hours of overtime. R. 65 at APX154.

- At the **Carpentersville** branch, an employee initially alleged that she had been denied a lunch break. The investigation revealed that the employee had formerly been allowed to take her lunch break late in the afternoon so she could pick up

her son, but had been told she could no longer do this because it violated PNC policy. The employee confirmed that she was fully compensated for her lunch break and was not owed additional pay. R. 66 at APX418.

- At a **Chicago branch at 18th & Clark**, an employee reported that her practice was to enter all of her time for the week at the beginning of the week and then adjust for any differences that occurred as the week progressed. R. 66 at APX424. She reported that on some occasions she worked past the time she had initially recorded but failed to adjust the time. *Id.* The employee stated that her branch manager never advised her not to record all the time she worked. *Id.* at APX424-25. PNC investigated whether the employee was owed any additional pay and determined that she was not. R. 65 at APX154.

- At a **Chicago branch at 35th & State**, an employee alleged that she worked through lunch breaks, but she also stated that she always recorded the time she worked, and she did not allege that PNC had failed to pay her overtime she was owed. R. 66 at APX438. PNC's investigation revealed that the branch manager thought the employee was exempt from overtime pay, and the manager was issued a warning for this mistake. *Id.*

- At a **Chicago branch at 87th & Cottage Grove**, an employee reported that the branch manager "made [the employee] feel as though she was not allowed to enter overtime on her time card," but "never specifically directed her not to enter overtime." R. 66 at APX475. PNC fired the manager due to "extensive discrepancies in the time [the employee] entered as compared to the time she was logged into her computer" over a three-month period, and the manager was "ultimately responsible" for errant time reporting. *Id.* PNC paid the employee for 251.6 hours of overtime as a result of its investigation. R. 65 at APX154. PNC's investigator's notes also show that another employee alleged that her lunch breaks were frequently interrupted due to inadequate staffing. R. 66 at APX487. PNC's records do not reflect that this employee's allegations were addressed.

- At a **Chicago branch at LaSalle & Kinzie**, the assistant branch manager reported that some employees had not reported overtime because "they may have been told there was 'no overtime.'" R. 67 at APX545. One employee reported that he did not always record his overtime because "he did not want the branch to incur overtime." *Id.* Another employee reported that she always recorded her time accurately. *Id.* Both employees stated that the branch manager communicated the importance of recording their time accurately, and no one had ever told them to enter time inaccurately. *Id.* Another employee consistently worked overtime and failed to record it, despite the manager telling the employee not to stay late and to accurately record his time if he did stay late. *Id.* at APX540. Alvarez states that this employee "was paid for all hours worked," R.

73-1 ¶ 49, but PNC's list of overtime paid does not show that the employee was paid. R. 65 at APX154.

- At a **Chicago branch in Lincoln Park**, an employee admitted that she sometimes interrupted her lunch break to assist customers. She did not allege that she was owed unpaid overtime or that her supervisor required her to interrupt her lunch break. R. 67 at APX557.

- At a **Chicago branch at Madison & Leavitt**, an employee admitted that he sometimes interrupted his lunch break to assist customers and would take additional lunch break time to compensate. He did not allege that he was owed unpaid overtime or that his supervisor required him to interrupt his lunch break. R. 67 at APX564.

- At a **Chicago branch at North & Homan**, several employees stated that the branch manager had interrupted their lunch breaks. R. 67 at APX570-71. The manager was disciplined with a verbal warning. *Id.* at APX571. None of the employees sought payment for unpaid off-the-clock hours, and PNC did not pay for any. R. 65 at APX157.

- At a **Chicago branch at State & Huron**, an employee alleged that he had not been paid for work he did at home. R. 67 at APX577. The employee was advised that he was not permitted to work at home without approval of his manager. *Id.* The employee was paid for 0.30 hours of overtime. R. 65 at APX154.

- Bell cites hand written notes of PNC investigators and alleges that these notes show that in 2009 at the **Downers Grove** branch on 75th Street, "employees reported that management refused to permit employees to record time for work performed before the bank opened," R. 64 at 5 (citing R. 67 at APX583-84, APX588, APX593), and that "[e]mployees were not paid for pre-shift work." R. 64 at 7 (citing R. 67 at APX583-85). The Court, however, cannot decipher the hand written notes. Alvarez states that the investigation at the Downers Grove branch did not involve an allegation of unpaid overtime, but rather allegations that employees were arriving to work late but recording their time as if they had arrived on time. R. 73-9 at 8-9. Alvarez, however, does not cite any documents in the record to support these statements, nor does she explain why she would have personal knowledge of the investigation at the Downers Grove branch.

- At the **Elgin** branch, an employee stated that "there used to be a rumor that the policy was if you had an outage and you did not find it you did not get paid for the time you took to look for the outage." R. 67 at APX599. The employee described this as an "unofficial rule." *Id.* The employee, however, also stated that he had recently attended a meeting at which a person from the PNC legal department explained that all overtime was to be paid. *Id.* The employee also

stated that he has always been paid overtime, despite the rumor of an unofficial policy. Another employee initially alleged that she thought the branch manager told her not to record overtime, but that she missed a meeting at which the manager instructed the employees to record all overtime accurately. *Id.* at APX599-600. The employee initially thought she was owed 200 hours of overtime pay but later clarified that she was owed less than $200 of overtime pay. *Id.* at APX600. The employee agreed that she was in fact owed 3.45 hours of overtime, *id.*, and PNC paid this. R. 65 at APX154.

- At the **Fox Lake** branch, an anonymous employee reported that the branch manager required employees to report to work five minutes early and not record that time. R. 67 at APX612-13. PNC investigators spoke with two other employees at the branch and they said that the manager had never given such an instruction. *Id.* No employees requested payment for unpaid overtime, and PNC did not pay for any. R. 65 at APX154.

- At the **Loves Park** branch, several employees reported that a former branch manager instructed them not to record overtime, but that their current manager instructed them to report any overtime they worked. R. 67 at APX623. Alvarez states that Employee Relations repeatedly asked the employees to report any overtime they were owed, but the employees failed to do so. R. 73-1 ¶ 46.

- At the **North Aurora** branch, employees reported that the branch manager required them to arrive at work five minutes prior to the start of their shifts but not record these five minute periods. R. 67 at APX652-53. The manager was fired, *id.* at APX653, and seven employees were each paid between 1.75 and 2.75 hours of overtime. R. 65 at APX155.

- At the **Orland Park West** branch, an employee was suspected of under-reporting her time. R. 67 at APX670. The employee admitted that she under-reported her time to hide her inability to work efficiently. *Id.* at APX670-71. PNC paid the employee 1.25 hours of overtime. R. 65 at APX155.

- At the **Park Ridge** branch, an employee reported a single instance of her manager telling her to record a lunch break she did not take in order to avoid overtime and allow the employee to take an extra paid break the following week. R. 67 at APX676-77. PNC told the manager this violated PNC policy. *Id.* at APX677. The employee did not request payment for unpaid overtime, and PNC did not pay for any. R. 65 at APX157.

- At a **Rockford** branch on Riverside Boulevard, an employee reported that the branch manager "requested" that employees take extra time off rather than report overtime. R. 67 at APX702. PNC investigators spoke with three employees at the branch and all three said they had never been instructed not to

report overtime. One employee skipped lunches without the manager's knowledge, and PNC paid that employee 2.75 hours of overtime. R. 65 at APX154. Another employee alleged that the manager had asked him to complete reports at home without overtime pay, but the employee indicated that he refused to do so. R. 67 at APX693.

- At the **Schaumburg** branch, in the course of a separate investigation, PNC learned that an employee had interrupted her lunch on several occasions to assist customers. R. 67 at APX714. PNC paid the employee 1 hour of overtime. R. 65 at APX155. Another employee stated that he also sometimes interrupted his lunch break to assist customers, but the employee stated that he would always complete his lunch break at some point during the day. R. 67 at APX714. Both employees stated that the decision to interrupt their lunch breaks was their own. *Id.*

- At the **West Aurora** branch, during a review of the branch's records, PNC Employee Relations noticed that an employee had worked every day from March 7, 2011 through March 18, 2011. R. 67 at APX726. The employee stated that "she thinks nothing of it if she comes into the branch to help out for a few minutes, and that she does not expect to get paid." *Id.* at APX725. The manager advised the employee that she must record all her time. *Id.* PNC's investigation report notes that the employee would be paid overtime for the unreported time, R. 67 at APX725, but PNC's list of overtime paid does not show that the employee was paid. R. 65 at APX156.

- At the **Wheaton-Danada** branch, two employees reported that the branch manager "reacted in a negative manner when they entered overtime on their time sheets." R. 67 at APX738. Both employees also reported that "they had inaccurately recorded their time on a number of occasions in order to make it appear as though they had only worked 40 hours per week." *Id.* at APX731. After an investigation into the amount of overtime pay the two employees were owed, PNC paid one employee for 39 hours of overtime and 27 additional hours of regular pay, and the other employee for 1.6 hours of overtime and 1.6 additional hours of regular pay. R. 65 at APX154.

In addition to the incidents recorded in PNC's investigation reports, Bell has submitted an affidavit from James Cobb, a manager of PNC's DePaul branches, in which he states that he had borrowed "more than 37 [PNC] employees . . . from branches all over the Chicago region" to staff "table days," which are PNC promotional events. R. 65 at APX14 (¶ 5a). Cobb attached to his affidavit a list of 37

employees he says he "borrowed." R. 65 at APX15. Cobb learned that his spouse, Ernest Ward (who as the Court has already noted, filed a related suit against PNC), had worked for him during a table day but had not recorded this time on his time card at the Broadway & Berwyn branch where Ward worked. *Id.* at APX13 (¶ 5). Cobb expressed concern to a PNC Employee Relations representative that he "did not know whether [the 37] employees had been paid for those hours through their home branches." *Id.* at APX14 (¶ 5b). Cobb says that the PNC representative "told [him] to leave that issue alone, that PNC Bank's ER Center was not going to investigate further into whether those 37 employees were paid for their hours at DePaul table days. . . . [because] it was too difficult to investigate the hours of so many people." *Id.* at APX14 (¶ 5c). Contrary to Cobb's concerns, however, Alvarez testified that she talked to PNC payroll personnel who told her that all 37 of the employees in question had been properly paid. R. 73-1 ¶ 22; R. 84-1 at 2 (7:24–8:3, 14-18). Alvarez did not provide business records to support this assertion.

PNC contends that it "has had a written Overtime Policy that explicitly requires payment of time and half for any time worked over 40 [hours] in any workweek," R. 72 at 6 (citing R. 66 at APX162-166, 76-78), and that pursuant to this policy PNC "has paid overtime at every branch in the putative class every year during the class period." R. 72 at 6. Specifically, according to Alvarez, "PNC has paid overtime to non-exempt branch employees at every branch in the putative class during each year from 2009 to October 2013 for a total of $432,290.85 for approximately 17,673 hours of overtime." R. 73-1 ¶ 20. Alvarez, however, does not

reference any business records to support this assertion nor does she explain how she has personal knowledge of these facts. Thus, the Court will not consider these assertions.[4] Nevertheless, Bell's affidavit and the investigation reports show that PNC has paid at least some overtime.

Despite PNC's written policy and the evidence that PNC has paid some overtime and disciplined branch managers who have prevented employees from properly recording overtime, Bell contends that the evidence in the record also demonstrates that PNC has an unofficial policy of frequently denying proper compensation to its non-exempt employees who have worked overtime. Bell argues that this evidence constitutes a sufficient basis to certify the following class definition:

> All people residing in Illinois who:
> (a)    Were employed by PNC Bank (or any of its predecessors) on a full-time basis at any point [from February 22, 2009 to the date of class certification];
> (b)    Were classified by PNC Bank as non-exempt from the overtime laws; and
> (c)    Worked in one of the 27 Certified Branches.
> Specifically excluded from this Class are employees that PNC Bank had classified as exempt and employees working as mortgage loan officers. Also excluded are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

---

[4] It is possible, if not likely, that PNC has business records to support Alvarez's statements. But even if PNC has paid the overtime Alvarez claims it has, this does not negate the evidence in the record that PNC's management has denied compensation for overtime work on a number of occasions. Additionally, the evidence shows that PNC often paid overtime only after initially failing to do so. If PNC willfully failed to pay overtime, PNC would be liable not merely for actual overtime wages (which Alvarez claims PNC has paid), but for additional damages under both Illinois law and the FLSA. *See* 820 ILCS 105/12; 29 U.S.C. §§ 216, 260.

R. 63 ¶ 3. The "Certified Branches" include the following 27 branches at which Bell

contends "there is proof of the unofficial policy or practice on overtime," R. 78 at 3 n.

7:

(1) Algonquin;

(2) Bloomington (at Market Street & JC Parkway);

(3) Bolingbrook (on Weber Road);

(4) Buffalo Grove;

(5) Carpentersville;

(6) Chicago (at 18th & Clark);

(7) Chicago (at 35th & State);

(8) Chicago (at 87th & Cottage Grove);

(9) Chicago (at Broadway & Berwyn);

(10) Chicago (at DePaul);[5]

(11) Chicago (at LaSalle & Kinzie);

(12) Chicago (at Lincoln Park, at Clark & Lincoln);

(13) Chicago (at Madison & Leavitt);

(14) Chicago (at North & Homan);

(15) Chicago (at State & Huron);

(16) Downers Grove (on 75th Street);

(17) Elgin (on Summit Street);

(18) Fox Lake;

(19) Loves Park;

(20) Naperville (on 75th Street);

(21) North Aurora;

(22) Orland Park West;

(23) Park Ridge;

(24) Rockford (on Riverside Blvd.);

(25) Schaumburg (on Roselle Road);

(26) West Aurora; and

(27) Wheaton (Danada location).

*See* R. 63 ¶ 3. Bell contends that "the class-wide proceedings would involve liability

issues, [damages to be resolved individually,] resolving at least the following

common questions":

> As a question of fact, did PNC Bank have an unofficial policy or practice that required employees class-wide to work off-the-clock overtime hours (that is, an unofficial policy or practice that prohibited employees from reporting overtime hours)?

---

[5] The DePaul "branch" consists of two separate locations: one at DePaul's Loop campus at 333 South State Street; and the other located at DePaul's Lincoln Park campus at 2600 North Halsted. *See* R. 65 at APX13 (¶ 1d).

> As a question of fact, did PNC Bank have a policy or practice that PNC Bank investigations would not fairly lead to full pay for employees for overtime work?
>
> As a mixed question of law and fact, were those policies and practices unlawful and harmful to employees in the 27 Illinois branches that are in the class?
>
> As a matter of law, is PNC Bank's written policy on overtime a defense?
>
> As a mixed question of law and fact, has the plaintiff shown that PNC Bank's conduct was willful?
>
> As a mixed question of law and fact, has PNC Bank proven that its conduct was undertaken in good faith?
>
> As a question of fact, did PNC Bank's conduct make it more difficult for class members to calculate the number of off-the-clock hours that they worked?
>
> As a mixed question of law and fact, when calculating overtime pay for class members, does the Fluctuating Workweek doctrine apply?[6]

R. 63 ¶ 5a. Under both Illinois law and the FLSA, a good faith violation does not absolve the employer of liability. *See* 820 ILCS 105/12; 29 U.S.C. §§ 216, 260. Instead, both Illinois law and the FLSA distinguish between willful violations or violations made in good faith for purposes of determining the *extent* of an employer's liability. *See* 820 ILCS 105/12; 29 U.S.C. §§ 216, 260. All of the questions Bell proposes as common to the class are relevant to whether PNC committed willful or good faith violations, if any. Thus, these questions are relevant to the extent of PNC's liability.

---

[6] The Fluctuating Workweek doctrine is "an interpretive rule promulgated by the Department of Labor," which "calculates an employee's regular rate of pay by dividing her weekly wage by the total number of hours she works in a given week rather than 40 hours per week." *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 666 (7th Cir. 2010) (citing 29 C.F.R. § 778.114(a)).

PNC primarily argues that (1) the class cannot meet the requirements of Rule 23(a), i.e., numerosity, commonality, typicality, and adequacy; (2) Bell cannot demonstrate that common questions of law or fact predominate as required by Rule 23(b)(3); (3) the class is insufficiently defined; and (4) conditional certification of a collective action under the FLSA is not warranted.

<h3 style="text-align:center">Analysis</h3>

## I.    Class Action Under Rule 23

### A.    Legal Standard

A party seeking to certify a class action must show that the putative class satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *See Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 811 (7th Cir. 2012). The action must also satisfy at least one of the three subsections of Rule 23(b). *See id.* Here, Bell seeks certification under Rule 23(b)(3), which requires a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Additionally, implicit in Rule 23's express prerequisites is the requirement that a class is "sufficiently definite that its members are ascertainable," *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012), and not so overbroad that it "include[s] a great number of members who . . . could not have been harmed by the defendant's allegedly unlawful conduct." *Messner*, 669 F.3d at 824. District courts have "broad

discretion" in determining whether a proposed class satisfies Rule 23. *See Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 528 (7th Cir. 2012); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2562 (2011) ("[M]ost issues arising under Rule 23 . . . [are] committed in the first instance to the discretion of the district court.") (citation omitted). However, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Dukes*, 131 S. Ct. at 2551-52).

"Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements." *Messner*, 669 F.3d at 811. "The Rule does not set forth a mere pleading standard," rather, the plaintiff must satisfy Rule 23 "through evidentiary proof." *Comcast*, 133 S. Ct. at 1432. "It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)). This does not mean that "the court should . . . turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811. Yet, "[i]f there are material factual disputes, the court must 'receive evidence . . . and resolve the disputes before deciding whether to certify the class.'" *Messner*, 669 F.3d at 811 (quoting *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim,'" *Comcast*, 133 S. Ct. at 1432 (quoting *Dukes*, 131 S. Ct. at 2551), but "[m]erits questions may be considered . . . only to the

extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1195 (2013).

## B.   Commonality and Predominance

PNC argues that Bell's questions are not "common to the class," as Rule 23(a)(2) requires, because "the answer to why the alleged off-the-clock violation occurred is because of a rogue manager or a supervisory-level decision," as opposed to a PNC policy with class-wide effect. R. 72 at 21. The problem with PNC's argument is that there is evidence in the record to the contrary that supports Bell's contention that PNC has "an unofficial policy or practice that required employees class-wide to work off-the-clock overtime hours." R. 63 at 3. Bell and Flores both state that Christina Romis, a PNC regional manager, told them that PNC had a policy against paying for overtime work. R. 65 at APX10 (¶ 3d), APX3 (¶ 6). Additionally, PNC's investigation reports reveal that employees from at least six other branches alleged that their managers told them that PNC had an unofficial policy against compensating overtime work. *See* R. 66 at APX364 (Buffalo Grove); R. 67 at APX599 (Elgin); R. 66 at APX475 (87th & Cottage Grove); R. 67 at APX623 (Loves Park); R. 67 at APX652-53 (North Aurora); R. 67 at APX738, 731 (Wheaton-Danada). Whether or not PNC had such a policy is relevant to whether PNC willfully denied overtime pay to its employees, or whether any such denials occurred despite a good faith attempt to comply with the statute; and these questions are in turn relevant to the extent of damages under Illinois Law and the FLSA. *See* 820

ILCS 105/12; 29 U.S.C. §§ 216, 260. These are not merely "superficial common questions." *Jamie S.*, 668 F.3d at 497. Rather, implicit in these questions is the "common contention" that "the class members have suffered the same injury," *Dukes*, 131 S. Ct. at 2551, due to PNC's unofficial policy of denying payment for overtime work. The answer to whether PNC has an unofficial policy of denying pay for overtime work will "resolve . . . in one stroke" an "issue that is central to the validity of each one of the claims." *Id.* Questions with answers that have such an effect are "capable of classwide resolution." *Id.*

Notably, in a very similar case in which the plaintiff alleged that a bank violated state and federal overtime laws, the Seventh Circuit affirmed the district court's order certifying the class because, "[u]ltimately, the glue holding together the . . . classes is based on the common question of whether an unlawful overtime policy prevented employees from collecting lawfully earned overtime compensation." *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 910 (7th Cir. 2012). PNC argues that *Ross* is inapposite because the extent of the evidence of an unofficial PNC policy is significantly less than that present in *Ross* where 89 declarants alleged that the defendant-bank had a policy against overtime. *See Ross*, 667 F.3d at 909. But the weight of the evidence is a question for the trier of fact, and it is not relevant to class certification. *See Messner*, 669 F.3d at 811. Bell's "burden at the class certification stage is not to prove the element of" PNC's willful violation of the FLSA through an unofficial policy, "but only to demonstrate that the element . . . *is capable of proof at trial* through evidence that is common to the class rather than

individual to its members." *Messner*, 669 F.3d at 818 (emphasis in original). It is this burden—to show that the elements of Bell's claim are "capable of proof at trial through evidence that is common to the class"—that Bell must meet by a preponderance of the evidence. PNC may be correct that the trier of fact will eventually find that the evidence does not show that PNC has an unofficial policy against overtime, but Bell is not required at the certification stage to prove by a preponderance of the evidence the existence of an unofficial policy. *Cf. Amgen*, 133 S. Ct. at 1196 ("[U]nder the plain language of Rule 23(b)(3), plaintiffs are not required to prove [an element of the claim] at the class certification stage. In other words, they need not, at that threshold, prove that the predominating question will be answered in their favor."). Although the evidence here is not as great as in *Ross*, the evidence of an unofficial policy that is present in the record is common to the class because an unofficial policy of would cause a common injury to the class as a whole. This common evidence of common injury justifies class treatment for Bell's claims.[7]

---

[7] On appeal, the Supreme Court granted certiorari, vacated and remanded the *Ross* decision. *See RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013) ("Judgment vacated, and case remanded to the United State Court of Appeals for the Seventh Circuit for further consideration in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)."). The case settled before the Seventh Circuit could address the Supreme Court's order. *See Tamas v. Family Video Movie Club, Inc.*, 2013 WL 4080649, at *6 (N.D. Ill. Aug. 13, 2013). The Supreme Court's order, however, does not negate the precedential authority or persuasiveness of the holding and reasoning in *Ross*. *See Tamas*, 2013 WL 4080649, at *6 (citing *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006) (grant, vacate, and remand ("GVR") orders do not "indicate, nor even suggest, that the lower court's decision was erroneous"); *Gonzalez v. Justices of the Municipal Court of Boston*, 420 F.3d 5, 7 (1st Cir. 2005) ( "[A] GVR order is neither an outright reversal nor an invitation to

PNC also cites a number of cases in which courts have denied class certification of overtime claims. *See* R. 72 at 21-22. In those cases, however, the plaintiffs either *alleged* in the first instance that the overtime denials at issue were the result of decisions made by individual managers, or the only evidence in the record showed that no unofficial company-wide policy against payment of overtime existed. *See Vang v. Kohler Co.*, 488 Fed. App'x 146, 147 (7th Cir. 2012) ("The allegation in this suit, [as distinguished from *Ross*], appears to be that particular superiors regularly departed from the policy established by [the defendant-employer's] top brass."); *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 894 (7th Cir. 2012) ("[The defendant-employer] has a central organization of permanent employees, including superintendents dispatched to manage particular projects. These superintendents have discretion over hiring and pay of the hourly workers who do most of the tasks on-site."); *Smith v. Family Video Movie Club, Inc.*, 2013

---

reverse; it is merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it . . . ."); *United States v. Norman*, 427 F.3d 537, 538 n. 1 (8th Cir. 2005) (GVRs are "not the equivalent of a reversal on the merits.")). Furthermore, in another case in which the Supreme Court remanded a Seventh Circuit decision in light of *Comcast*, the Seventh Circuit explained that *Comcast* concerned a particular threat to class certification, namely the "possibility . . . that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis." *See Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 800 (7th Cir. 2013). That is not a concern here because Bell alleges that PNC failed to pay overtime to the class because PNC has an unofficial policy against doing so, meaning that the only alleged source of damages is challenged on a class-wide basis. The Seventh Circuit also rejected broader arguments that *Comcast* altered the proper method of analysis for commonality and predominance generally. *See Butler*, 727 F.3d at 800 ("*Comcast* [does not] reject[] the notion that efficiency is a proper basis for class certification. . . ."). Thus, *Comcast* is not a basis to disregard the Seventh Circuit's holding and reasoning in *Ross*.

WL 1628176, at *6 (N.D. Ill. Apr. 15, 2013) ("Because whether a putative class member was required to make off-the-clock bank deposits varied depending upon the particular store and personnel working at the store, Plaintiffs have failed to show by a preponderance of the evidence that their claims regarding off-the-clock bank deposits are 'capable of proof at trial through evidence that is common to the class rather than individual to its members.'"); *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 444 (S.D. Ind. 2012) ("At best, that evidence shows that certain supervisors may have instructed their charges [not to record pre- and post-shift work] . . . ."); *Slayton v. Iowa Coll. Acquisition Corp.*, 2010 WL 3937455, at *3 (N.D. Ill. Oct. 5, 2010) (the evidence in the record showed that the plaintiff and other employees at her level sometimes worked off-the-clock and that managers sometimes asked them to do so; there was no evidence that the defendant-employer's upper-management required off-the-clock work). These cases are distinguishable from Bell's because Bell has proffered evidence that at least one member of PNC's upper-management (Christina Romis, a regional manager) told its branch managers not to record overtime their employees worked.

PNC also argues that Bell cannot satisfy the commonality requirement because "if this class were to be certified, this Court would then be required to engage in a highly factual, individualized analysis to determine whether Plaintiff is overtime eligible, whether she is in fact owed additional overtime, and, if so, how much, and whether such underpayment was the result of an 'improper investigation system.'" R. 72 at 23. Similarly, PNC argues that these individual questions

"overwhelm" any questions common to the class such that Bell cannot satisfy the predominance requirement of Rule 23(b)(3). R. 72 at 30. "It is well established," however, "that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815. Furthermore, common questions do not need to outnumber individual questions in order to satisfy the predominance requirement; rather, common questions predominate "[i]f resolving a common issue . . . greatly simplify[ies] the litigation to judgment or settlement of hundred[s] or thousands of claimants." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). After the common questions relevant to liability have been resolved, the Court can "devise . . . solutions to problems created by the presence . . . of individual damages issues. . . . includ[ing] . . . 'appointing a magistrate judge or special master to preside over the individual damages proceedings . . . [or] providing notice to class members concerning how they may proceed to prove damages.'" *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001)); *see also Butler*, 727 F.3d at 800 (7th Cir. 2013) ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."); *Alvarez v. City of Chicago*, 605 F.3d 445, 449 n.1 (7th Cir. 2010) ("[A]lthough the specific variables (number of hours worked, hourly wage, etc.) will vary from individual to individual. . . . the individualized facts will

likely come in the form of undisputed payroll and time records. . . . [I]f necessary Federal Rule of Civil Procedure 53(a)(1)(B)(ii) authorizes the district court to appoint a special master to 'resolve difficult computation of damages.'"). Bell alleges that PNC has an unofficial policy of not compensating its employees for time they work beyond 40 hours a week. Whether PNC has such a policy is relevant to the extent of PNC's liability, if any, under state and federal overtime laws. It is more efficient to answer this question (and the other related questions Bell has raised) in one stroke on a class-wide basis. For this reason, individualized damages questions are not an impediment to class certification here.[8]

### C.    Class Definition

PNC argues that the class is impermissibly overbroad because it "includes employees who (1) never performed off-the-clock work and suffered no injury, or (2) were injured, but have been made whole as the result of a PNC investigation." R. 72 at 10. Bell argues that "certification is permissible even if a portion of the prospective class might not have an injury or damages." R. 78 at 3.

The "critical [distinction] for class certification purposes" is "between [class] members who *were not* harmed and those who *could not* have been harmed." *Messner*, 669 F.3d at 825 (emphases in original). "[A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost

---

[8] PNC argues that class treatment is not "superior" for the same reasons PNC argues that the commonality and predominance requirements are not satisfied. *See* R. 72 at 30-31. The Court addressed these arguments in finding that common questions predominate, and for these same reasons the Court finds that class treatment is superior.

inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification . . . ." *Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). By contrast, a class is overbroad if it necessarily includes many members who cannot satisfy the elements of the legal claim. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-14 (7th Cir. 2006) (affirming denial of class certification where the claim required members of the class to have been deceived and the class definition necessarily included "millions" of individual who were not deceived).

Here, PNC is correct that if PNC is found to have an unofficial policy of failing to pay overtime for work beyond 40 hours in a week, it is likely that it will turn out that a certain number of class members were not harmed by this policy because they never worked any overtime. But this is a damages issue that does not prevent the Court from certifying the class for purposes of liability questions. *See Messner*, 669 F.3d at 815 ("It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."); *see also Parko*, 739 F.3d at 1084-85 ("To require the district judge to determine whether each of the 150 members of the class has sustained an injury—on the theory that 140 have not, and so lack standing . . . —would make the class certification process unworkable . . . ."). Furthermore, PNC's argument that the proposed class would include employees who "have been made whole as the result of a PNC investigation," ignores the fact that it is still possible that these employees

24

were injured and could collect damages beyond their actual wages. Both Illinois law and the FLSA provide that employees are entitled to damages beyond their earned wages if the employer willfully violated the law. *See* 820 ILCS 105/12; 29 U.S.C. §§ 216, 260. Thus, Bell's class is not overbroad on its face.

Nevertheless, even if a class definition is not so broad on its face as to prevent certification, discovery can reveal facts that alter this analysis. *See Messner*, 669 F.3d at 826 ("Of course, the district court is free to revisit this issue at a later time if discovery shows that the number of members who could not have been harmed by the merger was more significant than it appears at this time."); *Kohen*, 571 F.3d at 679 (noting that defendant was free to "depose a random sample of the class" to determine whether an impermissibly high portion of the class could not have been harmed by the defendant's actions and, if so, request decertification of the class). Here, PNC argues that discovery has shown that that there were no allegations of unpaid overtime at five of the 27 branches in the class definition (North & Homan, Carpentersville, 35th & State, Madison & Leavitt, and Lincoln Park). R. 72 at 3 n.3. Since the class definition is based on branches at which there were allegations of unpaid overtime,[9] evidence that certain branches did not experience such allegations would be reason to remove them from the class. However, the Court's review of the evidence in the record regarding these five branches (summarized

---

[9] *See* R. 63 ¶ 3 (class definition); *see also* R. 64 at 15 ("In forming the size and scope of the class for this Motion, Plaintiff has focused only on those branches where discovery has shown that there were overtime issues . . . and where the branch was the subject of a PNC Bank investigation."); R. 78 at 3 n.7 ("[T]he Amended Motion is limited to those 27 branches were there is proof of the unofficial policy or practice on overtime.").

above) shows that there were allegations of unpaid off-the-clock work at all five of these branches. The fact that some of the employees at these branches admitted that they worked off-the-clock of their own accord and did not seek compensation for this work does not necessarily absolve PNC of liability for this allegedly unpaid overtime under Illinois law or the FLSA. *See*, *e.g.*, 820 ILCS 105/12(a) ("Any agreement between the employee and the employer to work for less than such wage is no defense . . . ."). Thus, these five branches will remain in the class definition.

The parties also disagree as to whether the evidence shows that allegations of unpaid overtime were made at the DePaul branch. Bell cites Cobb's affidavit as evidence that there were allegations of unpaid overtime at the DePaul branch. R. 64 at 6. But Cobb, the manager of the DePaul branch, does not claim that DePaul employees were not paid overtime. Rather, he says that he "borrowed" 37 employees from other branches and those employees were not paid by the DePaul branch. R. 65 at APX14 (¶ 5). Cobb knows that one of the 37 employees—namely his spouse Ernest Ward—was not paid by his home branch (namely the Broadway & Berwyn branch), but he "do[es] not know whether those [other] employees [were] paid" by their home branches. *Id*. Alvarez states that she spoke with a member PNC's payroll department who told her that all 37 of the employees on Cobb's list were paid for the work they did at the DePaul branch. R. 73-1 ¶ 22.

The parties, however, have not raised the more fundamental issue that Cobb does not allege that any employees of the *DePaul branch* were not properly paid. Without any allegations that DePaul branch employees were improperly paid, the

DePaul branch does not satisfy the class definition. *See* R. 63 ¶ 3; R. 64 at 15; R. 78 at 3 n.7. Thus, the Court revises the class definition to exclude the DePaul branch.

Moreover, Cobb's affidavit is not evidence that the 36 employees on his list (not including Ward, who has filed a lawsuit alleging that he was not properly paid) were improperly paid. Cobb expressly states that he "do[es] not know whether those [other] employees [were] paid" by their home branches. R. 65 at APX14 (¶ 5). Cobb's admission that he is speculating about whether the 36 employees other than Ward were properly paid is an insufficient basis to include the 36 employees in the class.[10]

Lastly, the Court notes that Bell includes the Naperville branch at 75th Street in the class definition. But the evidence Bell cites to support this decision (*see* R. 64 at 7) actually references an investigation report regarding an employee at the Oak Brook branch who was found to be working from home without permission of his manager. *See* R. 67 at APX634-37; R. 65 at APX155. Thus, the Court replaces the Naperville branch at 75th Street with the Oak Brook branch in the class definition.

## D. Numerosity

PNC argues that Bell cannot show that the putative class is "so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1), because Bell's numerosity calculation is based on a class definition that is overbroad. *See* R. 72 at 13. The Court has already found that the evidence does not support PNC's

---

[10] The Court reaches this conclusion without relying on Alvarez's affidavit statement that she spoke with PNC's payroll department and confirmed that the 37 employees were properly paid. This statement, unsupported by business records, is hearsay, and cannot serve as evidence that PNC paid the 37 employees.

argument that the class is overbroad. Furthermore, PNC does not contest Bell's assertion that eleven class members worked at the Broadway & Berwyn branch, or Bell's contention that eleven can be used as an average for the number of class members at each branch included in the class definition. *See* R. 64 at 15. Thus, the record suggests that there are approximately 286 class members in the 26 branches other than DePaul. *See Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989) ("plaintiffs are not required to specify the exact number of persons in the class"); *see also Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008) (as "estimate" is sufficient to "establish[] numerosity, or at a minimum . . . [to] warrant further discovery on the issue"). A class of 286 members satisfies Rule 23(a)(1). *See Pruitt v. City of Chicago*, 472 F.3d 925, 926-27 (7th Cir. 2006) ("Sometimes 'even' 40 plaintiffs would be unmanageable . . . ."); *Shields v. Local 705, Int'l Bhd. of Teamsters Pension Plan*, 188 F.3d 895, 897 (7th Cir. 1999) (noting that class consisted of the class representative "and 35 other[s]"); *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n. 9 (7th Cir. 1969) ("Even if the class were limited to 40 . . . that is a sufficiently large group to satisfy Rule 23(a)."); *Costello v. BeavEx Inc.*, 2014 WL 1289612, at *8 (N.D. Ill. Mar. 31, 2014) ("A class consisting of more than 40 members generally satisfies the numerosity requirement of certifying a class action.").

## E.    Typicality and Adequacy

PNC argues that Bell's "claims are atypical," and cannot satisfy Rule 23(a)(3), "because the answers to the individualized questions necessary to prove her claim

would have no bearing on the claim of any other putative class member." R. 72 at 27-28. By "individualized questions," PNC means the issue of variable damages among the class members. *See* R. 72 at 27 (citing R. 72 §§ III(A), III(B)(2)(a), III(B)(3)). The Court has already addressed this issue in the context of analyzing the class definition, numerosity, commonality, and predominance, and held that these differences among the class members do not predominate or make the class definition unmanageable. Bell's claim is typical of the class because both Bell and the class claim that they were injured by PNC's alleged unofficial policy to deny proper compensation for overtime work. *See Arreola*, 546 F.3d at 798 ("'A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [the] claims are based on the same legal theory.'" (quoting *Oshana*, 472 F.3d at 514)). Since Bell's claim and the class's claim are "based on the same legal theory," *Arreola*, 546 F.3d at 798, there is "enough congruence between [Bell's] claim and that of the unnamed members of the class to justify allowing [Bell] to litigate on behalf of the group." *See Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). That Bell's damages are also dependent on the number of hours she worked off-the-clock for which she was not compensated does not make her atypical of the class as a whole. *See Ross v. RBS Citizens, N.A.*, 2010 WL 3980113, at *3 (N.D. Ill. Oct. 8, 2010) ("Typical does not mean identical, and the typicality requirement is liberally construed."). Rather, issues of variable damages are present for the class as a whole, and as the Court discussed with respect to the commonality and predominance requirements, these

individualized damages issues can be addressed after the common questions Bell identified regarding liability are addressed on a class-wide basis.

PNC also argues that Bell is atypical and an inadequate class representative because her "de facto managerial position will require this Court to devote significant time to the issue of whether [Bell] was in fact exempt from overtime compensation under one or more exemptions under the Fair Labor Standards Act." R. 72 at 17. PNC contends that Bell is exempt and not entitled to overtime because she "routinely performed managerial job duties." R. 72 at 16. Contrary to PNC's argument, however, documentary evidence shows that PNC classified Bell as nonexempt, R. 65 at APX176; PNC's representative testified that Bell was classified as nonexempt, *id.* at APX66-67 (16:10–18:11); and PNC states in its brief that "Plaintiff was . . . overtime eligible." R. 72 at 16 n.21. Based on this testimonial and documentary evidence, it is not clear how PNC can challenge Bell's inclusion in the class which is defined as employees who "[w]ere classified by PNC Bank as non-exempt from the overtime laws." R. 63 ¶ 3. In any event, even if PNC has a legitimate defense to Bell's claim based on the type of work she performed, this defense (and any others like it) can be addressed along with other individualized questions relevant to damages after addressing the common questions relevant to liability Bell has identified. *See CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 725 (7th Cir. 2011) ("[T]ypicality under Rule 23(a)(3) should be determined with reference to the [defendant's] actions, not with respect to

particularized defenses it might have against certain class members." (citing *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996))).

Furthermore, PNC's argument that Bell was a de facto exempt employee does not mean Bell is an inadequate class representative under Rule 23(a)(4). Bell has presented evidence showing that she "possess[es] the same interest and suffer[ed] the same injury as the class members" who were also subject to PNC's alleged unofficial policy to deny proper compensation for overtime work. *See Amchem Prods., Inc. v. Windsor, Inc.*, 521 U.S. 591, 625 (1997). Since Bell has presented such evidence, her claims and the claims of the class with respect to PNC's alleged unofficial policy are not "antagonistic or conflicting." *See Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993). PNC's argument that Bell is an inadequate employee fails because Bell retains the same interest as the class as a whole in pursuing a common answer to the questions of liability Bell has raised.

Regardless of whether she was a de facto exempt employee, PNC also contends that Bell is "an inadequate representative because her testimony contradicts her allegations." R. 72 at 18. Specifically, PNC argues that Bell's testimony that Regional Manager Romis told her that "I understand that you are going to have overtime, you may submit your overtime," R. 65 at APX58 (166:9-167:4), contradicts Bell's affidavit statement that "Romis herself told me that PNC Bank would not permit overtime to be reported by employees." R. 65 at APX3 (¶ 6). The context of the deposition questioning, however, shows that Bell's testimony is ambiguous as to the timing of the statements she attributes to Romis such that it is

possible that Bell meant to testify that there was a period of time when Romis maintained that PNC "would not permit overtime to be reported by employees," and a later period of time when Romis permitted Bell to "submit [her] overtime." The fact that Bell also testified at her deposition that "Christina [Romis] would also say [overtime] wasn't permissible," R. 65 at APX58 (166:13-15)—which conforms to her affidavit statement—indicates that Bell's testimony is not necessarily inconsistent with her affidavit statement.

In any event, although there might be some ambiguity or inconsistency in Bell's statements that could affect their evidentiary weight, there is no indication that Bell had intent to conceal the truth or mislead the Court. The cases PNC cites to support its argument that a named plaintiff whose credibility is at issue is an inadequate class representative all involved evidence that the named plaintiff had "deliberate[ly] attempt[ed] to conceal information." *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990); *see also Howard v. Ray's LLC*, 2011 WL 4625735, at *5 (S.D. Ind. Sept. 30, 2011) (the plaintiff testified that he always worked through lunch, but five fellow employees said they took lunch breaks with him); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) ("The fact that Savino offered differing accounts about the letters that form the very basis for his lawsuit surely would create serious concerns as to his credibility at any trial."); *Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir. 1981) ("Plaintiff's lack of credibility is abundantly clear in the record. She gave no less than four versions of her conversation with her

broker."). Bell's various statements do not create an analogous concern about her credibility here, and the Court finds that she is an adequate class representative.[11]

The Court finds that Bell has met the requirements of Federal Rule of Civil Procedure 23. Accordingly, the Court certifies the class as defined in Bell's motion, and revised by this order, to address the questions relevant to liability identified in Bell's motion.

## II. Collective Action Under § 216(b) of the FLSA

In addition to her claims under Illinois law, Bell brings claims under the FLSA. Rule 23 is applicable to Bell's state law claims, but the FLSA provides for "collective actions" independently of Rule 23. The Court has granted Bell's motion to certify a class in her claims under Illinois law. Bell also argues that certification of a collective action under the FLSA is appropriate for much the same reasons.

### A. Certification

The FLSA "gives employees the right to bring their FLSA claims through a 'collective action' on behalf of themselves and other 'similarly situated' employees." *Alvarez*, 605 F.3d at 448 (citing 29 U.S.C. § 216(b)). A collective action under the FLSA is distinguished from a Rule 23 class action in that "in a collective action unnamed plaintiffs need to opt in to be bound, rather than, as in a class action, opt out not to be bound." *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 877 (7th Cir. 2012).

---

[11] The adequacy inquiry also involves determining whether the proposed class counsel is adequate. *See Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). PNC does not challenge Bell's counsel's adequacy so the Court will not address it.

"The Seventh Circuit has not yet established criteria for determining whether employees are 'similarly situated' for purposes of the FLSA, but the majority of courts . . . have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action." *Gallardo v. Scott Byron & Co.*, 2014 WL 126085, at *17 (N.D. Ill. Jan. 14, 2014) (citing cases). "The first step focuses on 'determin[ing] whether 'similarly situated' plaintiffs do in fact exist,'" such that a notice can be sent to them. *Id.* (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010), and citing *Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 536 n.4 (3d Cir. 2012)); *see also Brown v. Club Assist Road Serv. U.S., Inc.*, 2013 WL 5304100, at *12 (The first step requires "the court [to] make[] an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." (citing *Myers*, 624 F.3d at 555)). The named plaintiffs "can show that the potential claimants are similarly situated by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Strait v. Belcan Engineering Group, Inc.*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012) (citations omitted). Other courts in this District have described this "modest factual showing" as a "low standard of proof," *Bergman v. Kindred Healthcare, Inc.*, 2013 WL 2632596, at *3 (N.D. Ill. June 11, 2013), and requiring only a "minimal showing." *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008).

After notice has been sent and additional plaintiffs have opted in to the lawsuit, "the second step focuses on 'whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs.'" *Gallardo*, 2014 WL 126085, at *17 (quoting *Myers*, 624 F.3d at 555, and citing *Zavala*, 691 F.3d at 536 n.4). In order to make this determination, courts consider "'(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns.'" *Gallardo*, 2014 WL 126085, at *17 (quoting *Strait*, 911 F. Supp. 2d at 718). "'This stage is where the certification becomes more akin to the familiar Rule 23 class certification standard . . . .'" *Gallardo*, 2014 WL 126085, at *17 (quoting Brown, 2013 WL 5304100, at *12).

PNC argues that the Court should apply an "intermediate level of scrutiny" because "the parties have conducted significant discovery." R. 72 at 31 (citing *Strait*, 911 F. Supp. 2d at 718, 728-29; *Boelk v. AT&T Teleholdings, Inc.*, 2013 WL 261265, at *14 (W.D. Wisc. Jan. 10, 2013)). Regardless of whether this is the appropriate level of scrutiny at this point in the litigation, the Court has already applied what amounts to an intermediate level of scrutiny in certifying the class pursuant to Rule 23. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("[T]here isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards . . . ."). The Court finds that the proposed class members are similarly situated to Bell

such that it is appropriate to conditionally certify the collective action and to send notice to the members.

### B. Equitable Tolling

Bell asks the Court to toll the statute of limitations from the date the complaint was filed for any opt-in plaintiffs. R. 64 at 20-21. Bell argues that such tolling is appropriate because PNC's "long-running denial that it requires off-the-clock overtime," and "its insistence that only Ms. Bell suffered from its violation of the overtime laws," constitutes an "extraordinary circumstance" that calls for tolling R. 64 at 21. PNC does not directly respond to this argument. Additionally, although the FLSA does not categorically bar tolling of the statute of limitations, it is not clear that the Court has jurisdiction to toll the statute of limitations for plaintiffs who have yet to opt in. *See Sylvester v. Wintrust Fin. Corp.*, 2013 WL 5433593, at *9-10 (N.D. Ill. Sept. 30, 2013); *Sylvester v. Wintrust Fin. Corp.*, 12 C 1899 (N.D. Ill. Oct. 22, 2013), R. 89. Neither party has addressed the jurisdictional issue. The decision to toll the statute of limitations will have a great impact on the size of the collective action. For this reason, the Court orders the parties to file briefs more fully addressing this issue by August 18, 2014.

### Conclusion

For the foregoing reasons, Bell's motion to certify a class pursuant to Rule 23 and a collective action pursuant to the FLSA, R. 63, is granted. The class definition is revised in accordance with this order. The parties shall each file a brief of no more

than ten pages by August 18, 2014 addressing the issue of tolling the statute of limitations for plaintiffs who opt in under the FLSA.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: July 24, 2014